UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                               Case No. 24-CR-236 (WED)

ARLETTA ALLEN,

        Defendant.

## UNITED STATES' CONSOLIDATED RESPONSE BRIEF TO DEFENDANT'S PRETRIAL MOTIONS

The United States of America, by and through its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Kelly B. Watzka and Porchia S. Lewand, Assistant United States Attorneys, hereby responds to the defendant's motions to suppress and request for a *Franks* hearing. Because the defendant's motions fail to make a *prima facie* showing to meet the standard for a *Franks* hearing, the affidavits are otherwise lawful, and Allen was not in custody during her interview, the government respectfully requests that the defendant's motions and her request for a *Franks* hearing be denied.

### I.    PROCEDURAL HISTORY

On December 17, 2024, a grand jury in this district returned a four-count Indictment, charging the defendant, Arletta Allen, with (1) arson, in violation of Title 18, United States Code, Section 844(i); (2) wire fraud, in violation of Title 18, United States Code Sections 1343 and 1349; (3) arson in connection with a federal felony, in violation of Title 18, United States Code, Section 844(h); and (4) false statements, in violation of Title 18, United States Code Section 1001. Dkt. No. 1.

Allen made her initial appearance before Magistrate Judge Stephen C. Dries on January 13, 2025, and entered pleas of not guilty. Dkt. No. 4. On May 27, 2025, Allen filed a motion to suppress all evidence from her residence, vehicle, and restaurant (Dkt. No. 23); a motion to suppress her Facebook records (Dkt. No. 24); and a motion to suppress her statements (Dkt. No. 25). Further, Allen requested an evidentiary hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978).

For the reasons set forth herein, Allen's motions and request for a *Franks* hearing should be denied.

## II.     STATEMENT OF RELEVANT FACTS[1]

At approximately 8:59 p.m. on October 10, 2021, emergency services/911 in Fond du Lac, Wisconsin, received a report of a burning smell and the sight of smoke in the 400 block of S. Main Street.  SW Aff ¶ 7.[2]  Firefighters responding to the area determined that the smoke was emanating from the roof of "A Family Affair Soul Food Kitchen" (hereinafter "the restaurant") at 417 S. Main Street. *Id.* All of the doors and windows of the restaurant were closed and locked.  *Id*.  After forcing entry, firefighters observed heavy smoke inside, which completely obscured their vision.  *Id*.  A thermal imaging camera led the firefighters towards the ceiling area of the kitchen. *Id.* Once in that area, they saw flames near the floor of the adjacent landing for the stairs that lead to the basement. *Id*.  Firefighters extinguished the fire by spraying their hoses in those areas. *Id*.

At the time of the fire, the building was owned by R.F. and leased by Allen, who owned and operated the restaurant on the premises. SW Aff ¶ 9.

---

[1] The Government is mindful of the Seventh Circuit's position on introducing new evidence to rebut a request for a *Franks* hearing and is so limiting its analysis to the materials submitted and referenced by the defendant and the statements within the four corners of the affidavit. *See, United States v. McMurtrey*, 704 F.3d. 502 (7th Cir. 2013)

[2] In this consolidated response, the affidavit supporting the search warrants for Allen's home, business, and vehicle will be referenced as "SW Aff;" the affidavit supporting the search warrant for Allen's FB will be referenced as "FB SW Aff."

Federal law enforcement agents from the Wisconsin Department of Justice, Division of Criminal Investigations (DCI) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) became involved in the investigation. *Id.* at ¶ 8.

ATF Special Agent Rick Hankins (hereinafter SA Hankins) conducted fire scene examinations on both October 12, 2021, and October 14, 2021. *Id.* at ¶ 10. After examining the fire scene and conducting various investigative measures, SA Hankins applied for several search warrants pertaining to the investigation of the restaurant fire. The search warrants were authorized by Magistrate Judge Stephen C. Dries and subsequently executed. Agents interviewed Allen in a vehicle outside her home during the search. (*See* audio recording at Dkt. No. 31)

Allen's motions challenge the veracity of the search warrant affidavit alleging that SA Hankins made material misstatements and omissions thereby demanding a *Franks* hearing. *See* Dkt. No. 23. She further moves to suppress the warrant to search her Facebook account, alleging that the warrant lacked probable cause and was overbroad. *See* Dkt. No. 24. Finally, she moves to suppress her statements, alleging that agents violated her *Miranda* rights. *See* Dkt. No. 25.

The government hereby relies on the facts contained within the four corners of SA Hankins' affidavits, as well as the parties' stipulated facts and attachments filed at Dkt. No. 30, including the audio-recorded interview at Dkt. No. 31—all of which are discussed in greater detail herein.

## III.    LEGAL ANALYSIS AND ARGUMENT

### Table of Contents

                                                                                    **Page**

A. *Franks v. Delaware* analysis………………………………………………………………..4

B. Motion to Suppress Evidence from Residence, Vehicle, Business…………………….....…10

3

C. Motion to Suppress Facebook Records……………………………………………………16

D. Motion to Suppress Statements……………………………………………………………27

## A. *FRANKS V. DELAWARE* ANALYSIS

Allen alleges that SA Hankins made intentional or reckless misstatements and omissions in the affidavit supporting the search warrants in this case in violation of *Franks v. Delaware,* 438 U.S. 154 (1978), and demands a hearing. Because Allen fails to make the requisite preliminary showing, her request should be denied.

Search warrant affidavits are presumed valid. *Id.* at 171. Statements in a sworn affidavit must be "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165. A defendant making a *Franks* allegation bears the burden by a preponderance of the evidence. *Id.* at 156. Conclusory attacks are insufficient; allegations must be supported by "more than a mere desire to cross-examine." *Id.* at 172. Thus, a defendant is not entitled to a *Franks* hearing unless he makes a threshold showing.

The Seventh Circuit has held that "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing." *United States v. Swanson,* 210 F.3d 788, 790 (7th Cir. 2000). To obtain a hearing, the defendant is required to make a "substantial preliminary showing" that: "(1) the affidavit contained a false material statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement is necessary to support the finding of probable cause." *Id.* at 789-90. The *Swanson* court further held that "these elements are hard to prove, and thus *Franks* hearings are rarely held." *Id.* at 790.

*Franks* violations based on omissions require "a showing that the material information was omitted deliberately or recklessly to *mislead* the issuing magistrate." *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013). This requires "'direct evidence of the affiant's state of mind'

4

or else 'circumstantial evidence' of 'a subjective intent to deceive.'" *United States v. Daniels*, 906 F.3d 673, 677 (7th Cir. 2018) (per curiam) (quoting *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014)). This necessitates a showing that the officer perjured himself or acted recklessly because he had serious doubt as to the truth of the allegations. *See United States v. Johnson*, 580 F.3d 666 (7th Cir. 2009).

In the rare case that a defendant meets his burden of making a substantial preliminary showing, it becomes the duty of the reviewing court to "remove any overt falsehood from the affidavit—or else incorporate any omitted material facts that undermine probable cause, if an omission is what rendered the affidavit misleading—and see if probable cause remains." *United States v. Daniels,* 906 F.3d 673, 676 (7th Cir. 2018).

Importantly, good faith mistakes or misstatements resulting from mere negligence will not invalidate an affidavit which on its face establishes probable cause. *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). In fact, even "deliberately inaccurate representations do not invalidate a warrant if the truthful statements establish probable cause." *United States v. Ferra,* 948 F.2d 352, 353 (7th Cir. 1991).

Because they are presumptively valid, affidavits are generally upheld and reversal becomes a remedy "only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. Spry,* 190 F. 3d 829, 835 (7th Cir. 1999). Even in questionable cases, the Seventh Circuit instructs that, "doubtful cases should be resolved in favor of upholding the warrant." *United States v. Quintanilla*, 218 F.3d 647, 677 (7th Cir. 2000).

> **i.** **Special Agent Hankins' affidavit does not contain any material misstatements or omissions.**

Allen alleges that SA Hankins' affidavit was defective because it contained intentionally or recklessly omitted material facts. *See* Dkt. No. 23. Yet, Allen's allegations do not meet the threshold of materiality because they do not affect the determination of whether the affidavit established probable cause. The immaterial assertions made by Allen are expressly rejected by *Franks*.

Specifically, Allen argues that SA Hankins failed to disclose that there was no evidence of an accelerant used in the fire, and therefore it was likely not incendiary. *Id.* at 10. As further discussed below in response to Allen's motion to suppress evidence, the presence or absence of an accelerant had no bearing on probable cause in this case because the affidavit articulates that the fire was believed to be "consistent with intentional open flame ignition of combustible material." SW Aff ¶ 43. Thus, the presence or absence of any accelerant was immaterial. Allen's only support for this conclusory accusation is the article she references, which as discussed below, is inadequate to meet her burden under *Franks.*

Next, Allen accuses SA Hankins of intentionally or recklessly omitting facts regarding the probability that lithium-ion batteries were recovered at the scene or could have contributed to the fire. Dkt. No. 23 at 14. That accusation also fails under *Franks* because at the time that the affidavit was prepared, there was no indication that the batteries were in fact lithium-ion batteries. The batteries recovered and documented by SA Hankins were only identified as remnants of four batteries. *Id.* An electrical engineer's examination of the batteries months after the affidavit was sworn revealed that they were lithium-ion batteries. *Id.* Yet, even that finding did not indicate that the batteries were a cause of the fire because the engineer was unable to draw that conclusion.

These omissions are immaterial because had either been included in the affidavit, neither would have defeated probable cause. The lack of an accelerant did not alter the probability that an

6

open flame was introduced to combustible material at the location where fire was observed by first responders, especially given SA Hankins' statement about the timing of the fire in relation to the suspicious person departing the vicinity of the restaurant, and the presence of multiple lighters at the suspected origin point. *Id.* at ¶ 13. Similarly, the fact that 'miscellaneous batteries' were recovered, which is all that SA Hankins knew about the batteries at the time he swore to the affidavit, would also not have defeated probable cause, given the totality of the circumstances as otherwise articulated in the affidavit regarding the suspicious nature of the fire, particularly given the movements of a person that was captured on surveillance footage leaving the immediate vicinity of the closed the restaurant minutes before the fire was reported.

### ii. Allen fails to articulate how SA Hankins' alleged omissions showed intentional or reckless disregard for the truth.

Allen fails to meet her burden of establishing that the statements or omissions were made intentionally or with reckless disregard for the truth. The Seventh Circuit requires direct evidence of SA Hankins' state of mind, or circumstantial evidence of SA Hankins subjective intent to deceive in order to establish Allen is entitled to a *Franks* hearing. *Daniels*, at 677. Rather than provide the court with any evidence of SA Hankins' *subjective* intent to provide false statements or omissions in this case specifically, Allen relies on the NFPA 921 guidelines regarding fire investigation, which is not the standard by which the second prong of *Franks* addresses. The sort of objective professional standards outlined in the NFPA 921 are insufficient to meet any subjective challenge to SA Hankins' alleged misrepresentations or omissions in the affidavits.[3]

---

[3] The NFPA 921 is not a mandate, but rather suggested guidelines for fire/explosive investigations. While it is widely accepted, the NFPA 921 itself cautions "anyone using this document should rely on his or her own judgement…in determining the exercise of reasonable care in any given circumstance. The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of NFPA standards." NFPA 921, 2021 edition, inside over disclosure "Important Notices and Disclaimers Concerning NFPA Standards."

7

While the government rejects any allegation that SA Hankins improperly followed the guidelines, that argument is best suited for a jury's credibility determination of SA Hankins' expert testimony. It has no bearing on the facts alleged (or omitted) in the affidavit. To the extent that the NFPA 921 guidelines have any bearing on the court's assessment, it would be minimal in a probable cause assessment, because SA Hankins was very clear to inform Magistrate Judge Dries that a final origin and cause had yet to be determined. He never averred that the investigation was complete or that his findings were made with 100% certainty. Armed with those qualifications of his findings, Magistrate Judge Dries nonetheless found probable cause.

Without offering any subjective evidence of SA Hankins intent to perjure himself, Allen asserts that SA Hankins omissions are akin to "failing to alert the warrant-issuing judge about serious credibility concerns with an informant." *Id.* at 13-14. There is nothing in the record to support any inference that he had reason to doubt the truthfulness of the statements that he averred in the affidavit and Allen provides no evidence that SA Hankins had any subjective intent or motive to deceive the reviewing court. To compare him to an informant with no credibility is unacceptable.

Because Allen failed to assert subjective evidence of deceit, she accuses SA Hankins of improperly using negative corpus during the investigation. Dkt. No. 23 at 10. As noted above, that argument has no place in a subjective *Franks* analysis and is a point of defense at trial; yet, the argument nonetheless fails because SA Hankins' affidavit in fact points to *affirmative* data consistent with the arson investigation. Specifically, the affidavit articulates affirmative evidence of a person, consistent with Allen's shape and size, wearing clothing and shoes consistent with that previously worn by Allen and a vehicle, consistent with Allen's vehicle, approaching and departing the area of the *closed* business, in the dark, within minutes of the fire. *See SW Aff.* at 10-17. Additionally, the vehicle, rather than park directly at the business, instead parks on an entirely

different street. Further the person, with a hoodie drawn and in dark clothing, approaches the immediate vicinity of the restaurant, close enough to trigger it's motion light. *Id.* Given the similarities in appearance to Allen and her vehicle, Magistrate Judge Dries in so reviewing could reasonably infer that Allen had lied to agents about being home at the time of fire. That affirmative data defeats a claim of negative corpus. SA Hankins' affidavit was thorough and provided the reviewing court with information sufficient to support probable cause and Allen provides this court with no evidence to refute SA Hankins' findings.

In fact, SA Hankins' subjective intent to be transparent with the court regarding the state of the investigation is evident throughout the affidavit. SA Hankins' affidavit did not avoid certain portions of the investigation that could potentially negate evidence of a crime, such as the findings by the electrical engineer or the pending evidence at the lab. He instead provided Magistrate Judge Dries with that information so that he could decide whether probable cause nonetheless existed. SA Hankins further informed Magistrate Judge Dries of Allen's own assertions about "seeing sparks," again giving Magistrate Judge Dries potential alternate theories to consider that were asserted by Allen herself. SW Aff ¶ 17. SA Hankins' inclusion of these considerations is clear evidence of his subjective intent to provide Magistrate Judge Dries with enough information to independently ascertain whether probable cause existed and is wholly inconsistent with any intent to deceive.

Finally, regarding the lithium batteries, as noted above, at the time the affidavit was prepared, the batteries weren't identified as lithium batteries so SA Hankins' failure to inform the court about a fact not yet in existence cannot meet the *Franks* standard for intentionally or recklessly misleading. Allen's own motion concedes that SA Hankins had only identified them as "remnants of four batteries" and she further concedes that it wasn't until four months later that the

9

laboratory determined that the batteries were lithium batteries. Dkt. No. 23 at 14. It would be a stretch to describe omission of a fact yet unknown to SA Hankins as negligence, but even if it were, it is well established that negligent conduct does not meet the standards set forth for a *Franks* challenge. *See Williams*, 718 F.3d at 650. The sworn statements put forth in the affidavit by SA Hankins were believed to be true when he submitted them and Allen's motion fails to point to any subjective intent by SA to otherwise deceive the court.

Allen's motion fails to overcome the affidavit's presumption of validity. Because she fails to satisfy her burden under *Franks* by a preponderance of the evidence, her motion for a hearing must be denied.

## B. MOTION TO SUPPRESS EVIDENCE FROM RESIDENCE, VEHICLE, AND BUSINESS

Encompassed within her *Franks* challenges, Allen also moved to suppress evidence obtained from her residence, vehicle, and business, alleging that the affidavit supporting the warrant lacked probable cause that the fire was intentionally set, and that the affidavit failed to connect her to the fire. *See* Dkt. No. 23.

A reviewing court should "uphold a finding of probable cause so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010). The requisite "showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search." *Michigan v. Tyler,* 436 U.S. 499, 506 (1978).

 "A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it 'sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *United States v. Mykytiuk,* 402 F.3d 773, 776 (7th Cir. 2005).

Probable cause is not an exact science, in fact, "probable cause is a low bar that can be cleared without a *prima facie* showing of criminal activity." *United States v. Rees,* 957 F.3d 761, 769 (7th Cir. 2020). Further, "a probable cause inquiry does not take each fact in isolation, it depends on the totality of the circumstances." *Rainsberger v. Benner,* 913 F.3d 640, 648 (7th Cir. 2019). A reviewing court's decision on whether probable cause is established is afforded great deference. *See United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009).

### i.      The affidavit provided sufficient information to support the probability that the fire was arson.

Allen alleges that the affidavit failed to establish that the fire was arson. *See* Dkt. No. 23. Allen's argument fails because SA Hankins' affidavit contains sufficient facts and reasonable inferences regarding the suspicious nature of the fire at Allen's restaurant and goes far beyond simply informing the court that a fire occurred.

Allen's argument mostly focuses on the fact that the affidavit failed to inform Magistrate Judge Dries that there was no evidence use of an accelerant (*Id.* at 10, 17); however, SA Hankins averred that in this case, the fire was most consistent with an "open flame" fire. SW Aff. ¶ 42. Thus, failure to discuss a lack of accelerant was entirely irrelevant to the probable cause analysis and as discussed above, fails under *Franks* on the materiality prong.

Allen makes other immaterial assertions that have no bearing on the probable cause determination. Specifically, she makes a conclusory, unsupported, allegation that SA Hankins' determination of where the fire originated is somehow inaccurate because he didn't inform the court of the detailed methods he used to make his determinations. Dkt. No. 23 at 23. Yet, SA Hankins did inform the court that he had personally, along with other investigators, conducted a fire scene examination on both October 12, 2021, and October 14, 2021, and that the fire had originated on a shelf where there were remnants of charred towels, cardboard napkins, electrical

11

circuit, and appliances were recovered. SW Aff. ¶ 11. This was also the location where first responders observed flames and where lighters were recovered. *Id.* at ¶¶ 7, 13.

Rather than provide legal precedent to support her argument, Allen relies solely on an article in which the author claimed that most arsons involve the use of an accelerant. Her reliance on the article is misplaced, as it makes the conclusory statement without citing any data, much less reliable data, to support that claim and this has no persuasive authority. Further, neither the article upon which Allen relies, nor the NFPA 921, state that the absence of an ignitable liquid at a fire scene is, by itself, an indicator of an accidental fire.

SA Hankins averred that he had conducted more than 285 fire scene examinations and completed nearly 1,500 hours of classroom training. *Id.* at ¶3. Using that training and experience, he opined that the fire originated at the top of the stairs, which was consistent with where fire was observed by first responders. *Id.* at 7. Even further, he informed Magistrate Judge Dries that the investigation was ongoing and that while a formal origin and cause had not yet been determined, he believed the fire to have been intentionally set based on the totality of the investigation as articulated in the affidavit. *Id.* at ¶ 42.

Allen also argues that the affidavit lacked probable cause because "the affidavit didn't indicate that the engineer had conclusively excluded an electrical failure as the fire cause." Dkt. No. 23 at 3. Much like Allen's lithium battery argument, that argument is a non-starter. A final determination as to the origin and cause of the fire was not made until months later. While SA Hankins could not entirely rule out electrical failure as a cause of the fire in his affidavit, he informed Magistrate Judge Dries that the engineer's determinations at that point in the investigation made electrical failure a less likely cause. SW Aff ¶ 11.

Probable cause does not require that SA Hankins be certain of every fact; it requires that there is a probability that facts, and reasonable inferences drawn therefrom, are true. Exercising due diligence, SA Hankins, informed Magistrate Judge Dries that the possibility of an electrical fire had been considered, and while not eliminated, it was inconsistent with the investigation. *Id.* at ¶ 11, 43. This sort of thorough and candid disclosure is exactly the type that makes an affidavit stronger, not weaker. The reviewing court was advised of the status of the electrical investigation so that it could consider that fact, alongside all the other facts contained in the affidavit, to ultimately determine that probable cause existed. Deference to Magistrate Judge Dries finding of probable cause should be upheld.

Allen further challenges that "[t]he affidavit did not address other potential accidental causes for the fire," calling into question whether the fire was incendiary. Dkt. No. 23 at 3. Allen's motion provides no legal authority requiring affiants to speculate on infinite potential alternate theories to establish probable cause for purposes of a search warrant. While that line of inquiry may become relevant at trial, it had no applicability at the probable cause stage. SA Hankins informed the reviewing court that the "affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter." SW Aff ¶ 5. Allen provides this Court with nothing to support her conclusory attack that SA Hankins' determination of the origin was incorrect other than to discuss that there was also fire in the kitchen. She invites the Court to speculate, arguing that "[i]f the fire started somewhere else in the restaurant, then there were potential accidental and electrical ignition sources that investigators never investigated or ruled out." Dkt. No. 23 at 9. That sort of speculation is insufficient to defeat Magistrate Judge Dries' finding of probable cause in this case. That is especially true because SA Hankins informed the court of the preliminary findings by the electrical

engineer, included Allen's own speculations about seeing sparks, detailed the investigation into the state of the electrical appliances and electrical activity where the fire was observed, and informed the court that items had been submitted to the lab.

Next, Allen alleges that the warrant somehow lacked probable cause because SA Hankins did not wait for the results of the artifacts that were sent to the lab before opining about the probable origin and cause of the fire. Dkt. No. 23 at 6. This attack also fails because Magistrate Judge Dries was made aware that some materials were at the lab, and nevertheless found that the affidavit still established probable cause. SW Aff ¶¶ 13, 42.

> ii.  **The affidavit contained sufficient information to support probable cause that Allen started the fire.**

Allen next alleges that the affidavit lacked probable cause that *she* was responsible for the fire. Dkt. No. 23 at 11. She relies on *United States v. Waide,* 60 F. 4th 327 (2023), in support of her argument attacking probable cause (Dkt. No. 23 at 8). However, the circumstances in *Waide*, are easily distinguished from this case. In *Waide*, law enforcement officers sought a warrant for Waide's camera system after a fire occurred on a property next to Waide's. *Waide,* at 331. The fire was *not* on Waide's property and Waide was never a suspect in the fire. *Id.* Further the *Waide* affidavit was barely four paragraphs long and based on mere hearsay and conclusory allegations that the fire was had been determined to be incendiary. *Id.* at 336. The court on appeal in that case found the search unreasonable and the affidavit too attenuated to invade Waide's privacy interest because the uncorroborated information was insufficient to support probable cause. *Id.* at 336.

Those facts stand in stark contrast to Allen. In this case, it was Allen's business that was set on fire and based on the investigation to date, Allen was a suspect in the fire at the time that the affidavit was sworn. Further, SA Hankins' affidavit was substantially longer and more comprehensive than the affidavit in *Waide*, in that it included 17 pages detailing the status of the

investigation, as well as photographs from which Magistrate Judge Dries could draw its his inferences and conclusions.

Again, probable cause does not require certainty. Yet, the type of certainty Allen seems to demand here is more akin to proof beyond a reasonable doubt, and that is certainly not the standard required for a search warrant. Nonetheless, SA Hankins' affidavit provided a sufficient nexus as to whether there was probable cause that evidence would be recovered in the places identified in the warrant.

SA Hankins' affidavit informed the reviewing court that the doors to the restaurant were closed and locked at the time the fire department responded to Allen's business and that firefighters had to force entry. SW Aff. ¶ 7. SA Hankins averred that "the limited access to the door code lends to the probability that the person suspected of entering the rear door was likely Arletta Allen." *Id.* at ¶ 42.

Allen challenges that the affidavit failed to assert any motive or that the business was in financial trouble. Dkt. No. 23 at 11. Yet, that argument also fails because SA Hankins averred that Allen had invested her "life savings" into the business, thereby comingling her personal financial interest in with her business. SW Aff. ¶ 18. SA Hankins also averred that "fires are sometimes intentionally started by business owners in order to alleviate financial stress." *Id.* at ¶ 4. SA Hankins further averred that a cook at the restaurant had given Allen notice, and that the day of the fire was his last day, and he was unaware of a replacement cook. *Id.* at ¶ 20. He also noted that a trash pull revealed that one of Allen's credit card payments had been rejected by her bank and that she had paperwork in her trash applying for economic hardship related to her student loans. *Id.* at ¶ 40. Thus, it was probable that Allen's personal financial stability was intertwined with that of her business.

15

Finally and perhaps most significantly, SA Hankins' affidavit thoroughly discussed the surveillance portion of the investigation in the *minutes* before the fire which depicted a person appearing to enter and exit the immediate vicinity of the closed restaurant. SW Aff. at 10-17. The affidavit includes photos of the person, with their hood drawn tightly. *Id.* It further informs the court that Allen was pictured in clothing similar to that person and that she appeared to match the same body type. *Id.* It also included images depicting the motion sensor light at the rear of the restaurant activating shortly after that person towards the restaurant. *Id.*

SA Hankins included the photos so that Magistrate Judge Dries could make his own determinations about whether there was probable cause to believe that Allen was at the restaurant approximately 20 minutes before the fire was reported and was likely involved in the fire. *Id*. SA Hankins further averred that the suspect vehicle that was observed on surveillance footage was consistent with the type of vehicle owned by Allen. *Id.* That conclusion was not only supported by investigators' observations of her vehicle in photos that she posted on Facebook, but it was also further supported by independent surveillance of Allen. *Id.*

Based on the totality of the circumstances as articulated in the affidavit, SA Hankins provided the reviewing court with a substantial basis to conclude that there was probable cause that the fire was intentionally set and further provided the court with sufficient information that Allen was probably involved.

As the Seventh Circuit articulated in *Rees*, probable cause is a low bar, and SA Hankins' affidavit certainly surpassed that bar in this case. Thus, the reviewing court's decision that the affidavit was supported by probable cause should stand on the great deference that it is afforded.

## C.     MOTION TO SUPPRESS FACEBOOK RECORDS

Allen has moved to suppress evidence obtained pursuant to a search warrant for her Facebook account, alleging the warrant lacked probable cause and was impermissibly broad in violation of the Fourth Amendment's particularity requirement. *See* Dkt. No. 24. For the same reasons she challenged the warrants for her home and business, Allen also claims the warrant lacked probable cause and raises a *Franks* issue, claiming that the warrant omitted material facts. *Id.* To the extent that her arguments for suppression of her Facebook records overlap with those already addressed above on the basis of *Franks* or a lack of probable cause, the government hereby incorporates by reference the responses above.

For the reasons set forth above and below, the Court should deny Allen's motion to suppress information obtained pursuant to the Facebook warrant.

### i. Applicable law

Whether or not an affidavit establishes probable cause is a practical, non-technical, inquiry. *Illinois v. Gates*, 462 U.S. 213, 230-231 (1983). "[A] magistrate judge's decision to issue a warrant "is to be given considerable weight" and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, fails to allege specific facts and circumstances to allow the judge to reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. Koerth*, 312 F.3d 862, 866–67 (7th Cir. 2002) (internal citation omitted). Establishing probable cause for a search warrant "does not require direct evidence linking a crime to a particular place." *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006). A judge is entitled to draw reasonable inferences based on the totality of the circumstances in determining whether probable cause exists. *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) (finding that issuing judge "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit").

Search warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This "requirement 'ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable cause.'" *United States v. Vizcarra-Millan*, 15 F.4th 473, 502 (7th Cir. 2021) (quoting *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998)). A warrant meets the particularity requirement when it provides a description from which reasonable officers can ascertain and identify the place to be searched. *United States v. Nafzger*, 965 F.2d 213, 215 (7th Cir. 1992), *citing Steele v. United States*, 267 U.S. 498, 503 (1925). The warrant must be specific enough that officers involved in its execution may be able to identify the things to be seized with reasonable certainty. *United States v. Spears*, 965 F.2d 262, 277 (7th Cir. 1992). The requirement of reasonable specificity does not mean that the description must be "elaborately detailed," *United States v. Somers,* 950 F.2d 1279, 1285 (7th Cir. 1991), or that it "minutely identify" every item. *United States v. Prewitt*, 553 F.2d 1082, 1086 (7th Cir. 1977). It must be as specific as the circumstances and the nature of the activity under investigation permit. *United States v. Shoffner*, 826 F.2d 619, 630 (7th Cir. 1987). "Courts do not ask whether a warrant could have been *more* precise; rather, [courts ask] whether a warrant was sufficiently precise to satisfy constitutional requirements." *United States v. Wenzel*, 854 F.3d 957, 961 (7th Cir. 2017). (emphasis in original).

>    ii.    **Magistrate Judge Dries appropriately concluded that the warrant established probable cause to believe Allen's Facebook account would contain information relevant to the arson investigation.**

For the reasons set forth above, SA Hankins' affidavit in support of the Facebook warrant established probable cause to believe that the fire was intentionally set and Allen was involved in starting the fire. Additionally, SA Hankins' affidavit provided ample information from which

18

Magistrate Judge Dries could reasonably infer that her Facebook records would contain information relevant to the arson investigation.

First, SA Hankins' affidavit explained that the investigation had revealed that Allen was a prolific user of Facebook, in the habit of posting multiple times per day. FB SW Aff ¶ 36. In fact, Allen told investigators that she first learned of the fire from a woman who sent her a picture of the fire department at her restaurant and Allen called the woman back via Facebook to learn more. FB SW Aff ¶ 17. Allen's knowledge of the fire is certainly material to the arson investigation and these facts established why records of Facebook messages and phone calls could shed light on that issue.

Allen's whereabouts on the day of the fire are also highly relevant to the arson investigation, especially given that firefighters found the restaurant to be locked and with no signs of forced entry and Allen was one of only three individuals with access to the lockbox containing the key. FB SW Aff ¶16. Allen told investigators that she had closed her restaurant mid-afternoon that day, returned home, and remained at home until she learned of the fire from her friend that evening. FB SW Aff ¶ 17. But, as the affidavit explained, other information obtained during the investigation suggested Allen was near the restaurant shortly before the fire. FB SW Aff 22-38. SA Hankins explained that Facebook retains Internet Profile ("IP") logs that retain IP address information, including historical location information, for a device, such as a cell phone or a laptop, using a Facebook account. FB SW Aff ¶ 57. Additionally, Facebook builds geo-location into some of its services which allows, for example, users to "tag" their location in posts. FB SW Aff ¶ 60. It was, therefore, reasonable for Magistrate Judge Dries to infer that Facebook records would include information that could help determine Allen's actual location leading up to the fire. Given Allen's active use of Facebook, location information could also paint a picture of Allen's typical

comings and goings from the restaurant, including whether it would be unusual for her to be at the restaurant after hours at night – which is why the warrant authorized law enforcement to seize information demonstrating the patterns of travel of the user of the account. FB SW ATT B ¶ f. It could also determine whether Allen had been dishonest with investigators – which is why the warrant authorized seizure of information indicating whether any person had attempted to obstruct or impede the investigation. FB SW ATT B ¶ k.

Information either corroborating or refuting that Allen was the person depicted on the surveillance stills is also material to the arson investigation. That would include whether Allen's physical appearance, clothing, shoes, vehicle, and accessories were consistent with that individual. The affidavit included publicly available photographs obtained from Allen's Facebook wall that had been posted on June 10, 2019. FB SW Aff ¶ 37. The photographs depicted Allen wearing leggings and distinctively marked shoes, as well as her overall body shape and size, that were consistent with the person depicted in surveillance stills captured on the night of the fire. *Id*. Allen's Facebook wall also included publicly posted photographs of a dark colored Dodge Durango with chrome wheels, consistent with the vehicle captured in surveillance stills near the restaurant on the night of the fire. FB SW Aff ¶38. It was reasonable for Magistrate Judge Dries to infer that Allen's prolific postings on Facebook might also depict a glossy or reflective backpack like the one worn by the person in the surveillance stills – or could include additional images depicting Allen's attire, vehicle, and physical features relevant to the arson investigation.

SA Hankins also explained that Facebook activity may provide relevant insight into the account owner's state of mind as it relates to the arson, including whether the individual had motive or intent to commit arson. FB SW Aff ¶ 60. In SA Hankins' experience, commercial arsonists can be motivated by financial reasons. FB SW Aff ¶ 5 ("fires are sometimes intentionally started

by business owners in order to alleviate financial stress."). The affidavit included information suggesting that Allen was experiencing financial difficulties at the time of the fire. FB SW Aff ¶ 41 (trash pull revealed Allen's credit card payments had been rejected by her bank and paperwork relating to an application for economic hardship deferment of student loan payments). It also included information that Allen's fry cook had given his two-week notice, had not been replaced, and his last day of work was the day of the fire. FB SW Aff ¶ 21. Based on those circumstances, and Allen's prolific use of Facebook, it was reasonable for Magistrate Judge Dries to infer that Facebook records would probably include information regarding the financial performance of Allen's restaurant (including whether or not it was busy and the extent to which Allen solicited business), whether Allen was personally experiencing financial difficulties, whether Allen had made attempts to replace her departing fry cook by advertising on Facebook marketplace or on her wall, and whether Allen was happy or unhappy operating the restaurant.

For all these reasons, the affidavit established probable cause to believe that Allen's Facebook records would contain information relevant to the arson investigation.

### iii. The warrant was sufficiently particular and not overly broad

The Facebook warrant identified the specific offense, 18 U.S.C. § 844(i), for which the affidavit established probable cause. It also described the place to be searched—the particular Facebook account, identified by ID number and username. Allen correctly notes that the information identified in Attachment A to be disclosed by Facebook was very broad – but the items identified in Attachment B to be seized by the government was much narrower and tailored to the arson investigation. Specifically, the warrant authorized seizure of information that constituted fruits, evidence, and instrumentalities of violations of arson of commercial property, in violation

of Title 18, United States Code, Section 844(i). FB SW Att. B.  The warrant further limited the range of information to be seized to items pertaining to:

> a) evidence of the crimes described above; b) preparatory steps taken in furtherance of these crimes; c) evidence of the existence, scope, or overt acts in furtherance of a conspiracy; d) evidence of motive, intent, or knowledge of the crimes described above; e) evidence about the relationships between the users of these accounts; f) evidence of the location, whereabouts, and patterns of travel of the user of the account; appearance, g) clothing, and identity of the user of the account; h) evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner; i) evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; j) the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and k) evidence indicating that any person attempting to obstruct or impede investigations related to arson.  *Id.*

The fact that the Facebook account contained a wide range of potentially relevant information does not mean that the warrant violated the particularity requirement, given the limitations set forth in Attachment B.  *See United States v. Anderson,* 2024 WL 4198673, at *10 (N.D. Ind, September 6, 2024) (finding that warrant that contained express limitation of agents' authority to retrieve evidence from a cell phone avoided wide-ranging exploratory search the Framers intended to prohibit); *United States v. Robinson*, 2024 WL 2862111, at *5 (E.D. Wis. June 6, 2024) (holding that a warrant is not overly broad "if the warrant cabins the things being looked for by stating what crime is under investigation.").

Allen's overbreadth argument seems to suggest that the warrant should have been limited to the events leading up to a "single, discreet date – October 10, 2021," the day of the fire. Dkt. No. 24 at 6.  In doing so, she ignores the fact that many commercial arsons stem from the business owner's financial distress, as explained in the affidavit. Because agents had obtained information suggesting Allen was experiencing financial difficulties and a staff shortage (FB SW Aff ¶¶ 21, 41), the arson investigation necessarily involved obtaining a broader understanding of the financial

22

health of the restaurant and Allen to determine if she had a motive to set the fire. That kind of motivation is not something that occurs overnight - it builds over time. It was reasonable for the agents to seek records relating to a period of time just before she operated the restaurant, the time during which she was investing in the restaurant, and the time in which the restaurant was operating. Additionally, it was reasonable to seek a longer period of location information through Allen's Facebook records to understand when she would routinely be at the restaurant and whether it was unusual for her to be there after hours in the dark. In light of these factors, and because the affidavit also included photos posted by Allen on Facebook dating back to June 2019 that tied her to the person and vehicle depicted in surveillance stills, the time period set forth in the warrant was not unreasonably broad.

### iv.   The agents relied in good faith on a facially valid warrant

Even when the defendant has established a Fourth Amendment violation, suppression of the resulting evidence "is not an automatic consequence." *Herring v. United States*, 555 U.S. 135, 137 (2009). In fact, exclusion of evidence is a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), which "presents a high obstacle for those urging [its] application," *Herring* at 141. Consequently, the exclusionary rule is only appropriate when a law enforcement agent's conduct is "deliberate, reckless, or grossly negligent," or when it will deter "recurring or systemic negligence." *Id.* at 144. Isolated negligent acts typically do not warrant application of the exclusionary rule. *Id.*

The exclusionary rule does not apply if a law enforcement agent reasonably and in good faith believed the search was lawful. *United States v. Tomkins*, 782 F.3d 338, 349 (7th Cir. 2015) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). An officer's decision to obtain a warrant is *prima facie* evidence that he was acting in good faith, as SA Hankins did here. *Id.* Allen can

only rebut that presumption by demonstrating that Magistrate Judge Dries failed to perform his neutral and detached function by serving as a rubber stamp for the police, the officer was dishonest or reckless in preparing the affidavit, or that the affidavit was so lacking in probable cause that no officer could have reasonably relied on it. *United States v. Bell,* 585 F.3d 1045, 1052 (7th Cir. 2009); *see also United States v. Harju,* 466 F.3d 602, 607 (7th Cir. 2006).

Allen cannot overcome the presumption here. The first two issues are readily resolved. First, Allen does not allege that Magistrate Judge Dries failed to perform his neutral detached role and nothing in the record would support such a conclusion. Second, any suggestion that SA Hankins was dishonest or reckless in preparing the affidavit should be rejected for the reasons set forth above in response to Allen's *Franks* motion.

With respect to the third issue, to determine if an officer exhibited good-faith reliance, the court asks whether "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Dickerson*, 975 F.2d 1245, 1249 (7th Cir. 1992), *quoting Leon*, 468 U.S. at 922. "[P]olice officers are charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles." *United States v. Bell*, 585 F.3d 1045, 1052 (7th Cir. 2009). To be well-established, case law from the Seventh Circuit must give an officer in this jurisdiction reasonable notice of a warrant's deficiency. *See Koerth* at 869 (finding the good faith-exception applied because "[w]e have not 'clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand' "); *United States v. Rainone*, 816 F.3d 490, 496 (7th Cir. 2016) ("[T]he federal good-faith exception and Seventh Circuit precedent govern whether the exclusionary rule applies.").

Whether a search warrant for an entire social media account satisfies the particularity requirement of the Fourth Amendment is an unsettled area of the law. *See United States v. Burkhow*, 2020 WL 589536, at *9 (N.D. Iowa Feb. 6, 2020) (discussing the wide variety of holdings in cases that consider the effect of limiting a Facebook search warrant to the relevant time range or offense being investigated). Allen has not pointed to any binding Supreme Court or Seventh Circuit case that has definitively resolved the issue in her favor, such that SA Hankins could be expected to know that the warrant at issue here was overly broad. Instead, Allen relies upon two non-precedential cases, neither of which decided the particularity issue, contrary to Allen's representation. Dkt. No. 24 at 6.

In *United States v. Shipp*, 392 F. Supp. 3d 300, 311-312 (E.D.N.Y. 2019), the district court for the E.D. of New York expressed concerns about the breadth of a Facebook warrant but ultimately decided to forego reaching the merits of that issue and upheld the warrant on the basis of the good faith doctrine. Similarly, in *United States v. Blake*, 868 F.3d 960, 966-967 (11th Cir. 2017), agents obtained search warrants for a suspect's Facebook account that required Facebook to disclose virtually every type of data associated with the accounts and included no temporal limits. *Id*. The warrant then authorized the agents to seize information that constituted fruits, evidence, and instrumentalities of a specified crime from that data. *Id*. Although the Eleventh Circuit *in dicta* expressed concern that this two-stage procedure violated the particularity clause and essentially amounted to "the internet-era version of a 'general warrant,'" the court declined to determine whether the warrant violated the Fourth Amendment *Id*. at 974-975. After noting that the particularity issue was "not an open and shut matter," the court found that the warrants were not so facially deficient that the agents could not reasonably rely upon their validity. *Id.*

As another district court in the Seventh Circuit has noted, the *Blake* decision is insufficient to put law enforcement officers in the Seventh Circuit on notice that social media warrants like the one in this case are overbroad . . . "particularly when Defendant has pointed to no caselaw in this Circuit finding similar warrants with similar facts deficient." *United States v. Roberts*, 2023 WL 5509261, at *4 (S.D. Ind. Aug. 25, 2023).

For all of these reasons, this Court should find that the good faith exception applies, in the event it determines that Allen has established a Fourth Amendment violation.

     **v.**    **Allen lacks standing to assert a Fourth Amendment violation related to the vast majority of her Facebook records.**

A defendant seeking to suppress evidence obtained from an allegedly unconstitutional search bears the burden of establishing that the search violated her Fourth Amendment rights. *United States v. Carlisle*, 614 F.3d 750, 758 (7th Cir. 2010). A defendant has standing to challenge a search only if she has a "legitimate expectation of privacy" in the searched area. *Id.* "A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). A person's "expectation of privacy does not extend to '[w]hat a person knowingly exposes to the public, even in his own home or office.'" *United States v. House*, 120 F.4th 1313, 1317 (7th Cir. 2024) (quoting *United States v. Thompson*, 811 F.3d 944, 949 (7th Cir. 2016). Some courts have recognized that there is no expectation of privacy in publicly accessible Facebook postings, pages, and photographs. *See United States v. Khan,* 2017 WL 2362572, at *8 (N.D. Ill. May 31, 2017) (collecting district court cases); *see also United States v. Adkinson*, 2017 WL 1318420, at *5 (S.D. Ind. Apr. 7, 2017), <u>aff'd,</u> 916 F.3d 605 (7th Cir. 2019) (noting that whether the Fourth Amendment applies to Facebook depends on a user's privacy

settings and finding defendant had no expectation of privacy in his profile picture or posts he shared on other's Facebook pages).

As explained in SA Hankins' affidavit, Facebook users can select different levels of privacy for the communications and information associated with their account (Facebook SW AFF ¶ 47). By selecting particular settings, a Facebook user can make information available to only herself (i.e. the "only me" setting), to particular Facebook users, or to anyone with access to the internet, including people who are not Facebook users (i.e. the "public" setting). *Id.* Allen selected the "public" setting for 46 categories of information associated with her account.[4] For example, her wall postings setting was "public," meaning anything she posted on her Facebook wall could be viewed by any person with internet access. Indeed, that is how agents located the Facebook images of Allen and her vehicle that are included in the affidavit.

To the extent that any of the data obtained via the search warrant was delineated by Allen as being accessible to the "public" or "friends," she has no reasonable expectation of privacy in that data and no standing to seek its suppression.

**D.     MOTION TO SUPPRESS STATEMENTS**

Finally, Allen moved to suppress statements that she made during the investigation of the arson of her business. Specifically, Allen claims that on the morning of November 2, 2021, she was subject to custodial interrogation without having first been advised of her *Miranda* rights. Dkt. No. 25 at 1. Allen also claims, without identifying any particular statement or relevant case law, that statements made to law enforcement after her interview on November 2, 2021, should be

---

[4] Of the 84 categories of information, Allen utilized the "only me" privacy setting for only 10 categories. Less the 46 "public" categories, for the remaining 28 categories, Allen indicated the information could be accessed by any of the hundreds of people with whom she was friends on Facebook.

suppressed as fruits of that unlawfully obtained statement. *Id.*[5] Neither position has any merit and her motion should be denied.

### i. Applicable law

*Miranda* warnings "are not required in every instance of questioning by law enforcement." *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016). Rather, *Miranda* is only implicated if a suspect is in custody and subjected to interrogation. *Id.* "Custody" requires "a restraint [of] movement of the degree associated with a formal arrest," *Id.* at 455, and involves "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-509 (2012). "Because custody is determined by an objective standard, the subjective beliefs of the suspect and police officers are irrelevant." *Stechauner v. Smith*, 852 F.3d 708, 715 (7th Cir. 2017). For this reason, the Supreme Court has made clear that the custody inquiry "involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." *J.D.B v. North Carolina.*, 564 U.S. 261, 271 (2011) (internal citations omitted).

In determining whether a person is in custody, the initial step is to assess whether, in light of the objective circumstances of the interrogation, a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes* at 509 (internal citations omitted). Factors relevant to the totality of the circumstances analysis include: the location of the interrogation; its duration; statements made during the interrogation; the presence or absence of physical restraints during the questioning; and whether the suspect was released at the end of the interrogation. *Id*. The Seventh Circuit has identified a non-exhaustive list of additional relevant

---

[5] While Allen has not cited any authority to support her argument that the fruit of the poisonous tree doctrine applies to *Miranda* violations, the Supreme Court has suggested that it does not. See *United States v. Patane,* 542 U.S. 630, 637, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality) (in which five Justices found that *Miranda* does not require the suppression of the fruits of an un-*Mirandized* statement made during custodial questioning). Nevertheless, in the event Allen makes a more developed argument on this issue and the Court does not deem it waived, the United States requests an opportunity to respond.

factors, including "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Patterson*, at 455.

Because "not all restraints on freedom of movement amount to custody for purposes of *Miranda*," *Howes* at 509, the second step in the process is to ascertain "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*.

### ii. Allen was not in custody

In support of her motion, Allen cites *United States v. Slaight,* 620 F.3d 816, 820 (7th Cir.2010) (in which the defendant was interviewed in a "Lilliputian" sized windowless room at the police station after "nine officers drove up to the house, broke in with a battering arm, strode in with pistols and assault rifles at the ready, and when they found [the defendant] naked in his bed ordered him, in an 'authoritative tone' and guns pointed at him, to put his hands up."); *United States v. De La Vega,* 2018WL8545871 at *1 (E.D. Wis. Oct. 18, 2018) (in which the defendant was awoken by twelve agents executing a search warrant who yelled at him to "open the fucking door," entered the home with weapons drawn, pointed a rifle at him, told him to put his hands up, handcuffed him, began to execute the search, and refused to answer questions about what was going on before later attempting to interview him in a nearby law enforcement vehicle); *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012) (in which fourteen agents executed a search warrant, the defendant was handcuffed as he was getting out of bed, his activities and a phone call to his brother were monitored by the police, he was told that the questioning was a "non-custodial

interview," and was never told that he could terminate the interview and leave); and *United States v. Colona*, 511 F.3d 431 (4th Cir. 2007) (in which twenty-five agents executed a warrant by waking the defendant up at gunpoint, searched the home while guarding the defendant, and never told him he was free to leave before seeking to interview him in an FBI vehicle and telling him he was not under arrest). None of these cases are remotely analogous to the circumstances of Allen's interview with DCI agents on November 2, 2021.

First, DCI Special Agents Kevin Heimerl and Matthew Anderson, with whom Allen was already quite familiar, called her in advance and requested an opportunity to meet so they could show her some things related to the fire investigation, to which she agreed. Tr. 00:11-00:44, Stip ¶ 38. Shortly thereafter, they arrived at her house in plain clothes and never displayed their weapons to her.[6] They asked to speak with her outside in their truck and she agreed. Tr. 5:51-5:55. That Allen consented at every stage in the process weighs against a finding of custody.

The agents asked Allen, who was dressed in leggings and a shirt, if she wanted to grab a coat before they went out to the truck. Tr. 5:55-5:59 and Stip ¶ 10. When Allen started to head upstairs with a cell phone in her hand, SA Heimerl asked, "Hang on a second – what are you going up for?" Tr. 6:16-6:23. He then asked to hold onto Allen's phone and took it out of her hands. *Id*. and Stip ¶ 18. SA Heimerl told Allen that other investigators would be arriving to execute a search warrant. Tr. 6:25. The search warrant authorized the agents to search her home (including the upstairs bedrooms) and to seize cell phones. SW Attachments A and B, ¶ 2. The search team had not yet entered the home to conduct a security sweep and SA Heimerl told Allen that he was following her for safety reasons. Tr. 6:39. SA Heimerl stood just inside Allen's bedroom and SA

---

[6] Although Allen subsequently witnessed the search team approach her home with weapons drawn while she was in the truck, no law enforcement officer ever pointed a weapon directly at her.

Anderson stood in the hallway near the entrance to her bedroom while Allen retrieved socks. Stip ¶¶ 20-21. Allen was never patted down or placed in handcuffs. Stip ¶ 25. SA Anderson, followed by Allen and then SA Heimerl, walked downstairs, out the door leading to Allen's garage and to the agents' truck, which was parked nearby on her driveway. *Id*. and Exhibits A, B, C, and D. While Allen's movements prior to the interview were somewhat restricted for safety and preservation of evidence purposes, she was not in custody for *Miranda* purposes. *See United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ("Most detentions that occur during the execution of a search warrant . . . are comparatively nonthreatening. They are often short in duration. Moreover, such detentions are surely less intrusive than the search itself . . . Therefore, we conclude that, in the usual case, a person detained during the execution of a search warrant is not "in custody" for purposes of *Miranda*.").

The interview took place inside the agents' unmarked truck parked on her driveway which was adjacent to a public street (Dkt. No. 30, Exhibits A, B, C, D) and in view of her neighbor. Tr. 1:13:41. The fact that the encounter took place within public view weighs against a finding of custody. *United States v. Ruiz*, 785 F.3d 1134, 1145 (7th Cir. 2015). Additionally, no one ever raised their voice or yelled directives at Allen.[7] At all times, the agents' tone was conversational, polite, and professional. These facts also weigh against a finding of custody. *See Patterson* at 458. ("low key" interaction in which agents did not yell or use profanity to compel compliance did not support finding of custody). When Allen expressed concern or fear, the agents were empathetic and took steps to explain what was happening and why it was happening.[8] Throughout their

---

[77] The search team yelled to announce their presence when the arrived at the front entrance of the house, which was around the corner from where Allen was seated inside the truck on the driveway. No agent ever yelled at Allen.

[8] For example, when Allen fearfully reacted to the sight of arrest team members carrying guns as they approached her house, SA Heimerl explained that they always executed warrants in that fashion as a matter

encounter, the agents consistently expressed concern for Allen's wellbeing by, for example, asking her if she wanted to grab a coat (Tr. 5:55); offering her water (Tr. 8:09); asking if she was too cold or hot (Tr. 11:28-11:36, 57:54); explaining that she could adjust her seat (Tr. 1:35:25); and allowing her to use the restroom unescorted less than four minutes after she advised them that she needed to urinate (Tr. 2:03:47). Although it was cold outside and Allen was only wearing leggings, a top, socks, and house slippers, she spent less than 30 seconds outdoors while walking through her garage to the agent's truck, which was parked nearby on the driveway and had heat. The agents' conduct reflected an overall concern with comfort, not coercion.

Among the most important considerations in the *Miranda* custody analysis is whether the agents informed the suspect that she was free to leave and to refuse to answer questions. *Howes*, 565 U.S. at 515 ("Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave . . . whenever he wanted."). In this case, both before and after they entered the agents' truck, Allen was told multiple times that at the conclusion of their encounter that day, the agents would leave, and she would go back inside her home. Tr. 7:02, 9:11, 12:20. She was also told that she wasn't going anywhere (Tr. 7:21), that she could get out of the truck at any time (Tr. 11:44), and that she didn't have to talk to the agents. Tr. 11:44. The agents also explicitly told her multiple times that she was not under arrest and that she would not be arrested that day. Tr. 9:28, 9:32, 11:44. Finally, once the search team completed its search of Allen's vehicle, the agents twice told her she could leave in her vehicle, which Allen declined to do. Tr. 1:03:48, 1:32:42. These facts strongly weigh against a finding of custody.

---

of policy and for safety purposes (Tr. 9:41-9:59). After the house was safely cleared, SA Heimerl pointed out that the search team had put away their tactical gear and guns to make the situation more "low key" (Tr. 36:42-37:12).

The duration of Allen's interview was relatively short. She was questioned for less than 50 minutes.[9] Courts have routinely found much lengthier interviews noncustodial. *See Beckwith v. United States,* 425 U.S. 341, 347-48 (1976) (three hours); *United States v. Valley,* 755 F.3d 581, 583 (7th Cir. 2014) (five-and-a-half hours); *United States v. Chavez-Pina*, 2017WL11606859 (E.D. Wis. July 21, 207), report and recommendation adopted, 2017WL11606860 (E.D Wis. September 1, 2017) (three hours).

While the issue for the court's determination is what a reasonable person would have understood during questioning, it is significant that Ms. Allen's words and conduct demonstrated that she plainly understood the voluntary nature of the interview. That is, Ms. Allen knew she didn't have to speak with the agents and could terminate the interview at any time. Throughout the interview, Allen demonstrated independent thinking and was not timid about exercising her rights. For example, she elected not to provide an explanation for why her car might have been seen near the restaurant before the fire by saying she didn't want to "incriminate herself." Tr. 36:13. She corrected SA Heimerl's characterization of the shoes worn by the individual in the surveillance photo, and also owned by Allen, as "very unique," noting that they are very popular, and a lot of people wear them. Tr. 33:44-34:11. She declined to agree that the information the agents had shown her was compelling, (Tr. 36:27), indicating that before she agreed to anything she was "gonna need counsel," to which SA Heimerl responded, "that's your choice, absolutely." Tr. 36:32.[10] She expressed an interest in talking privately to her pastor (Tr. 46:48-48:30, 50:25)

---

[9] Allen falsely states that she "was interrogated for approximately two hours in close quarters . . ." (Dkt. No. 25 at 4). In fact, the questioning lasted approximately 47 minutes, after which Allen elected to remain in the truck despite being afforded the opportunity to go inside her home, where she would be accompanied by an agent until the search concluded, or to leave the premises by herself in her vehicle.

[10] Allen's anticipatory and isolated statement cannot reasonably be construed as a clear and unambiguous present desire to consult with counsel. *See Davis v. United States,* 512 U.S. 452, 452 (1994) (finding if reasonable officer would have understood only that the suspect *might* be invoking the right to counsel,

and the agents offered twice to accommodate that request. Tr. 50:32, 51:18. Finally, when she stated that she didn't think it was in her best interest to talk further, SA Heimerl immediately stated, "Okay that's fine. I understand. You have rights and we're going to respect that. We're not going to ask any more questions." Tr. 54:47.

That is exactly what happened - after approximately 47 minutes of questioning inside the agents' truck, there was no further discussion of her potential involvement in the fire.  All subsequent communications with Allen amounted to small talk, while they waited for the search to conclude, or involved providing information to Allen about the status of the search and what to expect following the search.  That Allen controlled the scope and duration of the interview by exercising her rights in this manner certainly lends support to the conclusion that a reasonable person in Allen's shoes would have understood that she was not in custody.  After terminating the interview, Allen was comfortable enough to engage in small talk, discussing, among other things, one of her son's school habits, how to update the registration of her license plate, the weather, and the rabbits and mice in her yard. Her demeanor further undercuts any suggestion that a reasonable person in these circumstances would have felt like she was in custody. *See United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (defendant's talkative discussions of his birthday plans and job application process suggested a reasonable person would not have thought himself in custody).

Finally, the encounter ended on good terms, with the agents explaining next steps, answering Allen's questions, and seeking her input on the logistics of returning property to her. Allen thanked the agents multiple times. Tr. 2:07:42, 2:14:57, 2:16:08. The agents also thanked

---

questioning need not stop); *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) (explaining that "potential desire to consult with legal counsel" is not invocation of right to counsel).

Allen for her cooperation. Tr. 2:16:10. And, true to their word, the agents left, and Ms. Allen was not arrested. These final factors clearly weigh against a finding of custody.

All of the above-referenced facts are consistent with an environment in which a reasonable person would have felt free to terminate the interview and leave. And even though Allen's movements were minimally restricted *prior* to the interview to ensure safety and to preserve evidence, an interview 1) conducted with Allen's consent, 2) by two agents in plainclothes and whose tone and demeanor was calm, empathetic, and professional, 3) in an unmarked truck, 4) occurring on familiar turf – that is, the driveway of Allen's home, 5) within view of the public, 6) of relatively short duration, 7) when Allen had neither been patted down nor handcuffed, and 8) had been told she was free to leave the truck at any time, did not have to answer questions, and was not under arrest, does not come close to approximating the "inherently coercive" environment of a "station house." *Howes* at 509.

Nevertheless, Allen suggests that "the agents' machinations that day appear to reflect an intentional effort to circumvent the protections of *Miranda.*" Dkt. No. 25 at 5-6. She argues that a reasonable person would not believe the agents' repeated assurances that she would not be arrested that day because the agents had already "misled" her about their reason for coming to her home. Dkt. No. 25 at 3-4. She further asserts that she was not actually free to leave because the agents confronted her "with accusations and evidence . . . of her purported commission of a serious crime." Dkt. No. 25 at 4. Not so.

First, this was not a *Miranda*-avoidance scheme like *Slaight,* in which police obtained a warrant to seize and search a computer for child pornography and "could easily have obtained an arrest warrant as well." *Slaight*, at 817. In that case, the officers testified at the suppression hearing that they intended to interview the defendant at his home but the evidence demonstrated that they

35

had already reserved a room at the police station to interview him. *Id.* at 818. During the interview, the officers told the defendant he was free to leave but denied his request for a smoke break and locked him in a tiny interrogation room alone for 40 minutes. *Id.* at 819. The court found that the officers "made ingenious, pertinacious, but ultimately (as it seems to us) transparent efforts to disguise a custodial interrogation as noncustodial." *Id.* at 817. Here, the agents were not in a position to arrest Allen. Her November 2, 2021, interview took place approximately three weeks after the fire while the investigation was still in its early stages and no final determination had been made regarding the origin and cause of the fire. Additionally, unlike in *Slaight*, the agents' actions were entirely consistent with their words. During the interview, Allen was not restrained in any way and was told she could get out of the truck at any time. She was told she didn't have to answer questions and questioning stopped as soon as Allen stated she didn't want to say anything further. She was offered the opportunity to privately call her paster, to go inside her home with an escort while the search was in process, and to leave the premises on her own in her vehicle – but she declined each of those opportunities. And, Allen was not arrested and returned to her home just as the agents promised. Nothing in the record supports Allen's claim that the agents intended to disguise a custodial interrogation as noncustodial.

Second, Allen's suggestion that the agents lied to her is not accurate. In support of her argument, Allen relies on ATF Special Agent Rick Hankins' use of the word "ruse" to describe his understanding of the DCI agents' initial contact with Allen in his report regarding the execution of the search warrant.[11] Regardless of SA Hankins' characterization, the DCI agents told Allen the truth – that they would like to meet with her, share information, and show her some things. Tr. 00:11. That is, in fact, what happened. For safety and preservation of evidence reasons, they, of

---

[11] SA Hankins participated in the execution of the search warrant but had no contact with Allen until after her interview in the truck (Tr. 2:04:32).

course, did not give her advance notice of the fact that they would also be executing a search warrant. Because they already had the warrant in hand, they did not need to employ a ruse to get Allen's permission to come to her home. In the context of the whole record, it's apparent that the agents were merely taking steps to ensure that Allen was not inside the home during the initial, tactical sweep by the search team – which would have been far more stressful for her. That is consistent with SA Heimerl's intent to execute the warrant in as "low key" (Tr. 36:42-37:12) manner as possible by, for example, waiting until they believed Ms. Allen's teenage son had left for school (Tr. 10:58-11:00),[12] and having the search team put away their tactical gear and weapons after the initial sweep. Tr. 36:42-37:12. It is also consistent with circuit law. *See Patterson* at 456 (finding no ruse where agents truthfully told defendant that they wanted to discuss their investigation with him at the FBI office and encouraged him to come with them so that he could "clear his name.").

Third, while it was undoubtedly uncomfortable for Allen to be confronted with evidence that suggested her involvement in the fire, the fact that the agents showed her evidence hoping to obtain an admission of guilt did not transform the encounter into a custodial interrogation. As the Supreme Court has explained:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply . . . because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

---

[12] As it turns out, both the agents and Allen were regrettably mistaken about that fact. Her son, who was in the habit of skipping school, was in the basement of the home when the search team entered (Tr. 29:57-30:58).

Here, the agents, while maintaining a respectful and calm demeanor, certainly made clear that they believed Allen was the person depicted near her restaurant shortly before the fire. But that is not dispositive of the issue. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). The agents' tone during the interview, which was neither hostile nor threatening, cannot reasonably be characterized as "coercive." Even taking into account that Allen may have felt upset or intimidated in light of the agents' comments and questions, that says nothing about whether a reasonable person would conclude that she was in custody. *See United States v. Snodgrass*, 635 F.3d 324, 328 (7th Cir. 2011) ("At no time did the inspectors raise their voices, encourage Snodgrass to speak, coerce Snodgrass into speaking, restrain Snodgrass, threaten Snodgrass, verbally or physically abuse Snodgrass, or otherwise give Snodgrass a reason to feel intimidated. Thus, although the defendant subjectively felt intimidated, we find that a reasonable person in Snodgrass' position would have felt free to leave."). While Allen was upset at times during the interview, her demeanor was perfectly calm and decisive when she told the agents, "I don't think it's in my best interest to say anything else" (Tr. 54:40) and questioning ceased. The totality of the circumstances surrounding Allen's interview, coupled with her choice to terminate the agents' questioning, belies her claim that she was not actually free to leave.

Simply put, the undisputed evidence demonstrates that Allen was not "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *United States v. Lennick,* 917 F.2d 974, 977 (7th Cir 1990) (citing *Mathiason* at 495). Additionally, the circumstances of Allen's interview did not present "a serious danger of

coercion." *Howes* at 508-509. For these reasons, no *Miranda* warnings were required and Allen's motion to suppress her statements should be denied.

## IV. CONCLUSION

SA Hankins' affidavits provided Magistrate Judge Dries with sufficient information regarding the investigation and its status, photos, and reasonable inferences for him to independently find that there was probable cause for each of the issued search warrants. When the supporting affidavits are each read as a whole in a realistic and common-sense manner, there is probable cause to believe that the fire was intentionally set by Allen, and that her Facebook records, her home, her vehicle, and her business, would contain information relevant to the arson investigation. Thus, Allen's motions to suppress the evidence from her home, vehicle, business, and Facebook should be denied.

Further, Allen's request for a *Franks* hearing should also be denied because she fails to make the requisite "substantial preliminary showing" that the affidavits intentionally or recklessly contained any *material* omissions necessary to the probable cause determination.

Finally, Allen was not in custody within the meaning of *Miranda,* necessitating the denial of her motion to suppress her statements to law enforcement on November 2, 2021.

Dated at Milwaukee, Wisconsin, this 25th day of June 2025.

Respectfully Submitted,

RICHARD G. FROHLING
Acting United States Attorney

By: /s/ *Kelly B. Watzka &*
*Porchia S. Lewand*
Assistant United States Attorneys
Watzka Bar No. 1023186
Lewand Bar No. 1099830

39

Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin, 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-mail: Kelly.watzka@usdoj.gov
E-mail: porchia.lewand@usdoj.gov