# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.          **Case No. 24-CR-236**

ARLETTA ALLEN,

    Defendant.

# RECOMMENDATION AND ORDER

## 1. Procedural History

On December 17, 2024, a grand jury in this district returned a four-count indictment charging Arletta Allen with arson, wire fraud, using arson to commit a federal felony (wire fraud), and making a false statement to law enforcement. (ECF No. 1.) On May 27, 2025, Allen filed three motions: (1) to suppress the fruits of search warrants executed on her home, vehicle, and business (ECF No. 23); (2) to suppress evidence obtained from a search warrant executed on Allen's Facebook account (ECF No. 24); and (3) to suppress statements Allen made to law enforcement on November 2, 2021 (ECF No. 25). Allen requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the warrants for her home, vehicle, and business. (ECF No. 23.)

**2. Facts**

On October 10, 2021, firefighters responded to a fire at the restaurant owned by Allen, A Family Affair Soulfood Kitchen in Fond du Lac. (ECF No. 23-4, ¶ 7.) Upon their arrival, firefighters found all the doors of the restaurant were closed and locked. (*Id.*) After entering the kitchen, firefighters used a thermal imaging camera and observed heat at the ceiling level of the kitchen. (*Id.*) The firefighters turned to their right and observed a small fire approximately one foot high at the floor level at the top landing of the basement staircase. (*Id.*) Firefighters sprayed water near the heat at ceiling level in the kitchen, as well as the open flame they observed at floor level in the top landing of the basement staircase, and the fire quickly extinguished. (*Id.*)

Investigators recovered surveillance video from two businesses near Allen's restaurant. (ECF No. 23-4, ¶ 21.) The footage revealed that a dark SUV with chrome wheels drove by at 8:33:03 P.M. on the night of the fire and slowed down as it left the camera's view. (*Id.*, ¶ 26.) At approximately, 8:34:27 P.M., a person wearing a dark hoodie and carrying a backpack walked past the same location. (*Id.*) Further imaging revealed that the person wore dark pants, dark shoes with a distinct white design on the sides, and a backpack that was glossy/reflective. (*Id.*, ¶ 28.) At 8:37:54 P.M., the person turned toward the restaurant and out of view of the camera. (*Id.*, ¶ 29.) A few seconds later, the camera captured illumination from the motion light mounted near the rear door of Allen's restaurant. (*Id.*, ¶ 30.) At approximately 8:41:43 P.M., the footage revealed the

same person emerge from the area of the restaurant and walk back across a parking lot the person had previously crossed. (*Id.*, ¶ 31.) Less than a minute later, reflections of lights pulsed twice, similar to a vehicle being unlocked, near where the dark SUV had slowed down before going out of view. (*Id.*, ¶ 33.) Emergency dispatch received a 911 call regarding smoke at 8:59 P.M. (*Id.*, ¶ 7.) Firefighters arrived on scene at approximately 9:03:57 P.M. (*Id.*, ¶ 34.)

Special Agent Rick Hankins, of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), conducted a fire scene investigation together with other investigators. (ECF No. 23-4, ¶¶ 1, 10.) During the fire scene examination, investigators determined the fire originated on a shelf located on the north wall of the top landing of the basement staircase. (*Id.*, ¶ 11.) Investigators found remnants of charred towels, cardboard, napkins, and electrical circuits and appliances in the area. (*Id.*) An ATF electrical engineer examined the electrical components around the fire origin and did not locate evidence of electrical arcing that could be indicative of fire causation. (*Id.*) Investigators also located two handheld lighters in a wall-mounted basket just outside the entry into the top of the basement staircase. (*Id.*, ¶ 13.)

Through interviews with Allen investigators learned that three people had access to the restaurant's door code: Allen, her barbecue/smoker employee, and a delivery person. (ECF No. 23-4, ¶ 15.) Allen's fry cook had given his two-week's notice, and his last day of work at the restaurant was the day of the fire. (*Id.*, ¶ 20.) Allen stated that she

had closed and departed the restaurant with her fry cook employee between 2:45–3:00 P.M. on the day of the fire. (*Id.*, ¶ 16.) She said she went straight home and did not leave again until she received word of the fire by a woman who lived behind the restaurant. (*Id.*) Allen further said she had experienced arcs and sparks emitting from near the ceiling-mounted receptacle located in the top landing of the basement staircase during the morning hours of October 10, 2021—the day of the fire. (*Id.*, ¶ 17.)

On November 1, 2021, search warrants were issued for Allen's home, vehicle, and business, as well as her Facebook account records, based on affidavits from Hankins. (ECF Nos. 23-1–23-4, 24-1.) At that time, the investigation into the cause and origin was still ongoing, as several electrical artifacts still needed to be examined, but law enforcement believed that the fire was likely the result of an incendiary, intentional act. (ECF No. 23-4, ¶ 42.)

**3.      Standard**

"The Fourth Amendment requires that, absent certain exceptions not applicable here, police must obtain a warrant from a neutral and disinterested magistrate before commencing a search." *United States v. Mullins*, 803 F.3d 858, 861 (7th Cir. 2015) (quoting *United States v. Robinson*, 546 F.3d 884, 887 (7th Cir. 2008)). Any such search warrant must be supported by probable cause and must "particularly describe[] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

4

In determining whether to suppress evidence obtained from an allegedly defective search warrant, a reviewing court employs a two-step process. *See United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002); *see also United States v. Toniolo*, No. 12-cr-204, 2013 WL 494161, at *5, 2013 U.S. Dist. LEXIS 17307, at *15 (E.D. Wis. Jan. 14, 2013). First, the court reviews the probable cause determination, which "is given great deference on review, and the Fourth Amendment requires no more than a substantial basis for concluding that a search would uncover evidence of a crime." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). If the court concludes that no substantial basis existed for probable cause, it must ask—at step two—whether the warrant can be saved by the good faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 920–24 (1984).

### 4.    Analysis

#### 4.1(a). Residence, Vehicle, and Business

Allen argues that the affidavit[1] supporting the search warrant applications for her residence, vehicle, and business was facially deficient. (ECF No. 23 at 1.) She contends the affidavit did not supply probable cause that someone started the fire intentionally or, even if it did, that Allen herself started the fire. (*Id*.) The government maintains that the affidavit contained sufficient facts and reasonable inferences to satisfy this low bar. (*See* ECF No. 32 at 11 (citing *United States v. Rees*, 957 F.3d 761, 769 (7th Cir. 2020) (observing

---

[1] The affiant submitted the same affidavit in support of all three search warrants. (*See* ECF No. 23-4.)

that "probable cause is a low bar that can be cleared without a *prima facie* showing of criminal activity."))

"Determinations of probable cause are naturally based on probabilities, and a finding of probable cause 'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (quoting *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001)). A reviewing court "affords 'great deference to the decision of the judge issuing the warrant'" and should "uphold a finding of probable cause so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing." *United States v. Wenzel*, 854 F.3d 957, 960 (7th Cir. 2017) (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)).

### i.    Origin of the Fire

Allen asserts the affidavit failed to supply probable cause that the fire was intentionally started (i.e., incendiary) because the investigation had not ruled out accidental causes. (ECF No. 23 at 8.) The government responds that the affiant did not need to rule out all speculative causes of the fire to establish probable cause. (ECF No. 32 at 13.)

Allen reasons that the intentional/accidental determination depends on an accurate understanding of the fire's origin. (ECF No. 23 at 8.) She claims the affidavit

offered insufficient facts from which the magistrate judge could independently conclude that the fire originated at the shelf at the top of the stairwell. (*Id.* (citing *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be the mere ratification of the bare conclusion of others")).)

The government responds that the affidavit explained that the affiant participated in the fire scene examination, which determined that the fire originated on a shelf where they recovered remnants of flammable materials. (ECF No. 32 at 11–12 (citing ECF No. 23-4, ¶ 11)). The affidavit also noted that this location was where first responders observed flames and where investigators recovered lighters. (ECF No. 23-4, ¶¶ 7, 13.)

Allen suggests that the kitchen was also on fire when firefighters arrived. (ECF No. 23 at 9.) However, the affidavit distinguished between the "heat" firefighters detected along the kitchen ceiling and the "small fire" and "flames" they observed in the top landing of the basement staircase. (ECF No. 23-4, ¶ 7.) Allen presents no evidence to suggest the firefighters missed a potential location of origin elsewhere in the building. She argues that flames, the presence of a lighter, and the presence of charred material cannot establish an origin point. (ECF No. 37 at 7.) Although the affidavit's explanation is insufficient to train the issuing magistrate judge as a fire scene investigator, it is adequately detailed to substantiate the investigators' conclusion about the likely location of the fire's origin for probable cause purposes.

Allen also contends that the affidavit lacked explanation as to what potential ignition sources the investigators considered and why they ruled them out. (ECF No. 23 at 9.) She claims the investigators improperly relied on the *inability* to affirmatively determine an ignition source or to know what the person who walked by shortly before the fire was doing in the area. (*Id.* at 10.) She criticizes the affidavit as too conclusory and highlights that the investigators still needed to test electrical artifacts collected from the scene. (*Id.* at 9.)

The affidavit reflects that "there were no other potential accidental heat sources in that area other than electrical heat sources." (ECF No. 23-4, ¶ 42.) Rather than conclusory, a logical reading of this statement suggests that investigators simply did not identify other potential ignition sources. A probable cause determination does not require an affiant to exhaust the realm of possible sources when the scene in question did not reveal such connections. Moreover, the affidavit revealed to the issuing judge that the affiant's team[2] was still investigating the potential of an electrical cause. (*See id.*) Despite the ongoing nature of the investigation, the issuing magistrate judge had a substantial basis to find probable cause that someone started the fire intentionally.

---

[2] Allen argues in her reply brief that the affidavit fails to specify whether it was the opinion of the affiant or other unnamed investigators with unknown qualifications. (ECF No. 37 at 4.). Arguments raised for the first time in a reply brief are waived. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Passing that issue, the affidavit specified that the affiant personally conducted the fire scene examination along with other investigators. (ECF No. 23-4, ¶ 10.)

### ii.    Identification

Allen argues that, even if the fire was an arson, the affidavit lacked probable cause that she set the fire. (ECF No. 23 at 8.) Based upon publicly available Facebook photos, the affiant believed that the person in the surveillance footage was of similar "size and shape" to Allen. (ECF No. 23-4, ¶ 16.) Allen acknowledges that the surveillance video revealed a person wearing shoes and driving a vehicle consistent with those she owned but points out that Vans sneakers and dark-colored SUVs are ubiquitous across Wisconsin. (ECF No. 23 at 11.) Allen's point about popularity is well-taken, but the investigation did not need to directly tie Allen to the scene. *See United States v. Sewell*, 780 F.3d 839, 846 (7th Cir. 2015) ("Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site.") (quoting *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009)).

Moreover, the affidavit did not rely solely on Allen's physical appearance and belongings. Allen claims the affidavit failed to establish any motive specific to her. (ECF No. 23 at 11.) But the affidavit stated that investigators conducted a trash pull four days after the fire, which revealed that a utility payment had been rejected by Allen's bank and that Allen had filed an application to postpone student loan payments based on economic hardship. (ECF No. 23-4, ¶ 40.) The affidavit also referenced an interview in which Allen told investigators that she invested approximately $100,000 in improvements to the restaurant building—with $25,000 pulled from her life savings and $75,000 through

loans. (*Id.*, ¶ 18.) This financial investment and personal economic hardship support the inference that Allen was financially motivated to start the fire.

The affidavit also expounded upon the timing of the person passing by in the surveillance footage, the fact that the person appeared to trigger the restaurant's security light, and that Allen was one of three individuals with access to the door code to the restaurant. (ECF No. 23-4, ¶¶ 15, 21–34.) Allen contends that the person in the video did not necessarily enter the restaurant, let alone set the fire, and that the investigation only revealed what time the fire was reported, not when it might have started. (ECF No. 37 at 10.) The affidavit did not need to establish beyond a reasonable doubt that Allen started the fire. *See United States v. Schenck*, 3 F.4th 943, 948 (7th Cir. 2021) (observing that an "affidavit need not prove the truth of its every assertion"). The totality of the circumstances supports a probable cause determination linking Allen to the suspected arson.

### 4.1(b). Request for *Franks* Hearing

Allen argues that, even if the affidavit was facially sufficient, material omissions prevented an accurate analysis of probable cause and, therefore, she is entitled to a *Franks* hearing. (ECF No. 23 at 12.) Under *Franks*, suppression of evidence is appropriate when (1) there is an omission or misrepresentation with respect to a search warrant affidavit; (2) the omission or misrepresentation was made intentionally or with reckless disregard

for the truth; and (3) the omission or misrepresentation was material to the finding of probable cause. *Mullins*, 803 F.3d at 861–62.

"To secure a *Franks* hearing, a defendant must put forth 'an offer of proof' that is 'more than conclusory' and gestures toward more than negligent mistakes." *United States v. Daniels*, 906 F.3d 673, 677 (7th Cir. 2018) (quoting *Franks*, 438 U.S. at 171). "What is needed is 'direct evidence of the affiant's state of mind' or else 'circumstantial evidence' of 'a subjective intent to deceive.'" *Id.* (quoting *Glover*, 755 F.3d at 820). This is a "relatively difficult" standard for a defendant to meet. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). "The role of a judge considering a defendant's motion for a *Franks* hearing is to remove any overt falsehood from the affidavit—or else incorporate any omitted material facts that undermine probable cause, if an omission is what rendered the affidavit misleading—and see if probable cause remains." *Daniels*, 906 F.3d at 676.

Allen alleges that the affiant omitted the following details from his affidavit: (1) that investigators detected no ignitable liquids in the debris collected from the shelf where they suspected the fire had started; (2) that investigators recovered four lithium batteries (three of which were damaged); and (3) that the affiant relied on a methodology (known as negative corpus) that is considered inconsistent with the scientific method. (ECF No. 23 at 13–14.) The government concedes that the affidavit omitted these details but maintains they were not material to the probable cause analysis. (ECF No. 32 at 6.)

### i.    Ignitable Liquids

Allen emphasizes that the absence of ignitable liquids—as well as other evidence one might expect to find if someone set the fire intentionally, such as multiple fires, trailers, unusual fuel load, or removal of personal contents before the fire—suggested this incident was not an arson. (ECF No. 23 at 15–16.) Therefore, Allen contends, the affidavit should have included the Wisconsin State Crime Laboratory's test results regarding the absence of ignitable liquids. (*Id.*) The government responds that the presence or absence of an accelerant had no bearing on probable cause because the affidavit articulated that the fire was believed to be "consistent with intentional open flame ignition of combustible material." (ECF No. 32 at 6 (quoting ECF No. 23-4, ¶ 42).)

Allen cites an academic article regarding chemical analysis of fire debris (ECF No. 23 at 6), but it merely opines that accelerants often suggest arson and "typically" are not present in accidental fires. *See* YuanTing Low, Eadaoin Tyrrell, Eoin Gillespie, Cormac Quigley, *Review: Recent advancements and moving trends in chemical analysis of fire debris*, Forensic Science International 345 (April 2023), available at: https://www.sciencedirect.com/science/article/pii/S0379073823000737#bib13.    Although the absence of an accelerant would potentially put this fire outside the norm for arsons, distance from the norm is not dispositive to the probable cause determination. *See United States v. Thompson*, 801 F.3d 845, 847 (7th Cir. 2015) (per curiam) ("Probable cause exists when, based on the totality of the circumstances, there is a fair probability that a search

will uncover contraband or evidence of a crime."). Therefore, even if the absence of an accelerant suggests that a fire is an accident, awareness of that fact would not have removed the basis for probable cause in this instance.

### ii.     Lithium Batteries

Allen contends that the affiant must have known lithium batteries like the ones recovered from the restaurant are a potential fire source but failed to mention them in the affidavit. (ECF No. 23 at 6.)

The government responds that the investigation simply recovered "remnants of four batteries" from the fire's suspected origin, and investigators submitted them for additional laboratory examination—along with other "potentially relevant electrical artifacts." (ECF No. 32 at 6; *see also* Ex. I, ECF No. 23-9 at 2–3.) The affidavit acknowledged that investigators collected "several electrical artifacts from the fire scene for further forensic examination at the ATF Fire Research Laboratory," but it did not specifically reference batteries. (ECF No. 23-4, ¶ 13.) Months after the affidavit was submitted, an electrical engineer determined that the four "miscellaneous" batteries were lithium-ion cells—three of which had ruptured and ejected their contents. (Ex. J, ECF No. 23-10 at 2, 4.) The engineer could not affirmatively determine whether damage to the batteries occurred before or after the fire started. (*Id.* at 7.)

Allen criticizes the affiant's conclusion that "there were no other potential accidental heat sources in that area other than electrical heat sources." (ECF No. 23 at 15

(citing ECF No. 23-4, ¶ 42).) While Allen claims the affidavit should have named the batteries specifically, batteries certainly store and release electrical energy. *See* "How Lithium-ion Batteries Work," U.S. Dep't of Energy, available at https://www.energy.gov/science/doe-explainsbatteries. Considering the other suspicious circumstances addressed in the affidavit, specific mention of the batteries and their potential contribution to the fire would not have tipped the scales against probable cause.

### iii. Negative Corpus

Allen asserts that the affidavit failed to acknowledge that the affiant relied on an inappropriate methodology known as negative corpus. (ECF No. 23 at 13.) Allen claims that the affiant's origin and cause report[3] stated that he "utilized the Scientific Method during the course of this fire investigation, as recommended by the 2021 edition of the NFPA 921 Guide for Fire & Explosion Investigations." (*Id.* at 7 n.6.) The National Fire Protection Association's "NFPA 921" is "the industry guide for fire inspections." *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, No. 03-C-1249, 2005 WL 6746594, at *2, 2005 U.S. Dist. LEXIS 47897, at *5 (E.D. Wis. Oct. 31, 2005).

According to NFPA 921, "negative corpus" is an inappropriate use of the process of elimination, whereby an investigator determines a fire's ignition source "by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists." NFPA 921, *Guide for*

---

[3] The record does not include a copy of this report.

*Fire and Explosion Investigations* (2021), § 19.6.5 (hereinafter NFPA 921). Furthermore, NFPA 921 advises that the "negative corpus process is not consistent with the scientific method, inappropriate, and should not be used because it generates untestable hypotheses…." *Id.*

Allen reasons that the affiant relied on the negative corpus process because he drew conclusions about how the fire started by ruling out other potential sources rather than relying on affirmative evidence. (ECF No. 23 at 13–14.) The government responds that the affidavit pointed to affirmative evidence of an incendiary, intentional start to the fire—namely, the suspicious person who approached the closed and locked building about twenty minutes before the fire was reported. (ECF No. 32 at 8–9; *see also* ECF No. 23-4 , ¶¶ 7, 29–31.) Allen contends that investigators must determine whether a fire was an arson before looking for someone who may have started the fire because a fire itself is not evidence of a crime. (ECF No. 37 at 17.)

Because the affidavit revealed to the issuing judge what evidence supported the arson theory and that another potential cause was still being investigated, there was no material omission regarding the affiant's reasoning. Allen's argument about the weight that should be assigned to the investigatory analysis may be a useful trial strategy, but it does not defeat the probable cause to search Allen's home, vehicle, and business. *See United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995) (observing that "probable cause

requires only a probability or substantial chance of criminal activity, not an actual showing of such activity") (quoting *Gates*, 462 U.S. at 243 n.13).

Therefore, the affidavit did not contain any material misrepresentation or omission and Allen is not entitled to a *Franks* hearing.

## 4.2 Facebook Records

Allen's second pretrial motion seeks to suppress all evidence[4] obtained from execution of the search warrant for her Facebook account. (ECF No. 24.) Allen argues that the search warrant violated the Fourth Amendment because it was overbroad both in time and subject matter. (*Id.* at 1.) The government contends that the affidavit adequately connected the scope of information to be seized with the crime alleged and, even if it did not, the good faith exception to the exclusionary rule should bar suppression. (ECF No. 32 at 21–26.)

### i.    Background

The affidavit underlying the Facebook warrant contained five paragraphs connecting Allen's use of Facebook to the investigation. First, the affidavit recounted that Allen said she used Facebook to call the woman who lived behind the restaurant, who had reached out to let Allen know of the fire. (ECF No. 24-1, ¶ 17.) Second, the affidavit

---

[4] The government challenges Allen's standing to suppress publicly available Facebook data. (ECF No. 32 at 26–27.) Allen clarifies that she seeks suppression of the private data supplied by Facebook in response to the warrant, if the government indeed obtained the publicly available data independent from execution of the warrant. (ECF No. 39 at 11.)

revealed that investigators found a "publicly viewable Facebook profile depicting the likeness of Arletta Allen" and observed that "Allen often posts multiple times daily to her Facebook account." (*Id.*, ¶ 36.) Third, the affidavit noted that two publicly viewable photos from Allen's Facebook account (posted more than two years prior to the fire) showed her "wearing black shoes with distinct white designs on the sides that are consistent with the shoes worn by the unknown person" observed on the surveillance video. (*Id.*, ¶ 37.) Fourth, the affidavit observed that Allen had posted photos of a vehicle consistent with the one depicted on the surveillance video. (*Id.*, ¶ 38.) Finally, the affidavit claimed that a Facebook user's data could reveal details relevant to the crime under investigation, such as who used or controlled the Facebook account, the chronological and geographical context of the account access, and insight into the account owner's state of mind, which may indicate motive and intent to commit a crime or consciousness of guilt. (*Id.*, ¶ 60.)

The warrant required Facebook to disclose nineteen separate categories of information from Allen's Facebook account, including: all stories posted since June 1, 2019; all photos and videos since June 1, 2019; all records of the account's usage of the "like" feature; all information about Facebook pages the account is a "fan" of; all past and present lists of friends; and all Facebook searches since June 1, 2019. (ECF No. 24-1 at 4–7.) From the broad swath of information to be disclosed, the warrant narrowed the scope of information to be "seized" by the government to eleven categories, including: evidence

of the crimes described; preparatory steps taken in furtherance of the crimes; evidence of motive, intent, or knowledge of the crimes; and evidence of the location, whereabouts, and patterns of travel of the account user. (*Id.* at 42–43.)

### ii. General Warrant

Allen argues that the Facebook warrant constitutes the type of "general warrant" that the Fourth Amendment seeks to prevent. (ECF No. 24 at 4; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (observing that the colonists meant to address the "specific evil" that is the "general warrant" and that "the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings") (citations omitted).) Allen points out that Facebook data offers vast insight into an individual's life, including personal, familial, social, professional, and financial activity. (ECF No. 24 at 4–5.) She argues that the affidavit made no attempt to connect the alleged offense with the particular details available from Facebook. (*Id.* at 6–7.) Nor, Allen argues, did the affidavit explain its request to forge so deeply into her past. (*Id.* at 6.) The alleged arson occurred on October 10, 2021 (ECF No. 24-1, ¶ 8), while the warrant application sought information dating back to June 1, 2019, in some categories and all history in other categories (*Id.* at 4–7). Allen had not opened her restaurant until February 2021. (ECF No. 24 at 6.)

The government acknowledges that the scope of information to be "disclosed" by Facebook was "very broad" but contends that the information to be "seized" by the government was tailored to the arson investigation under Attachment B to the warrant.

(ECF No. 32 at 21–22; *see also* ECF No. 24-1 at 8–9.) The government draws a comparison to warrants that have permitted agents to search every file on a cell phone, with the caveat that the things being looked for are cabined to the crime under investigation. (ECF No. 32 at 22 (citing *United States v. Robinson*, 2024 WL 2862111, at *5, 2024 U.S. Dist. LEXIS 100647, at *14 (E.D. Wis. June 6, 2024)).)

Allen insists there is no meaningful difference between the information to be "searched" and "seized" when it comes to electronic data like Facebook records. (ECF No. 39 at 6–7.) Allen also points out that the government seized the entirety of the disclosed information because it produced over 87,000 pages of Facebook records in discovery, with no indication it had been pared down to documents relevant to the investigation. (*Id.*)

In any event, the distinction between "disclosure" and "seizure" "is not dispositive because the government would have seen both disclosed and seized information." *United States v. Chambers*, No. 16-CR-13, 2016 WL 11448314, at *5, 2016 U.S. Dist. LEXIS 149047, at *17 (E.D. Wis. Sept. 14, 2016) (observing that "the government's receipt and review of one's private papers implicates privacy whether or not the government retains those papers"), report and recommendation adopted, 2016 WL 6304709, 2016 U.S. Dist. LEXIS 149050 (E.D. Wis. Oct. 26, 2016).

Allen also argues the government failed to justify the breadth of its search as a practical necessity. (ECF No. 39 at 7.) After all, "[a] warrant may be thought 'too general'

only if some more-specific alternative would have done better at protecting privacy while still permitting legitimate investigation." *United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018) (citations omitted). "But a warrant need not be more specific than knowledge allows." *Id.* at 338.

The government contends that reasonable inferences from the affidavit established probable cause to believe that Allen's Facebook records would contain information relevant to the criminal investigation. (ECF No. 32 at 19–23.) For example, the government maintains that Allen's Facebook messages and calls were necessary to investigate Allen's knowledge of the fire, given that she claimed to have learned of the fire from a neighbor via Facebook. (*Id.* at 19.) The government also points out that Facebook's geo-location data could help investigators verify whether Allen indeed stayed home or was near the restaurant prior to the fire starting. (*Id.* at 19.) The historical depth of location information could further allow law enforcement to understand Allen's travel patterns and ascertain whether it would have been unusual for her to be at the restaurant in the evening. (*Id.* at 19–20.)

The government asserts that Facebook posts could provide additional images consistent with the glossy or reflective backpack worn by the person in the surveillance footage. (ECF No. 32 at 20.) The government contextualizes its request for data dating back to June 1, 2019, by the fact that the publicly available Facebook photographs contained in the affidavit dated back to June 2019. (*Id.* at 23.)

Finally, the government claims that "Facebook activity" could provide insight into Allen's state of mind and whether financial hardship may have motivated her to commit arson. (ECF No. 32 at 20–21.) The government submits that such motivation would have been built up over time (*Id.* at 23) and that

> Facebook records would probably include information regarding the financial performance of Allen's restaurant (including whether or not it was busy and the extent to which Allen solicited business), whether Allen was personally experiencing financial difficulties, whether Allen had made attempts to replace her departing fry cook by advertising on Facebook marketplace or on her wall, and whether Allen was happy or unhappy operating the restaurant.

(*Id.* at 21.)

"While the Seventh Circuit and Supreme Court have not yet provided specific guidance on search warrants similar to the Facebook Warrant, at least one circuit has found such 'social media warrants' to be overbroad and invalid." *United States v. Roberts*, No. 122CR00136JRSTAB, 2023 WL 5509261, at *2, 2023 U.S. Dist. LEXIS 149875, at *6–7 (S.D. Ind. Aug. 25, 2023) (citing *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (finding warrants seeking search of "virtually every type of data that could be located in a Facebook account" to be overbroad, but nonetheless admitting the evidence under the good faith-exception)).) District courts across the country have diverged on the question of overbreadth in social media warrants. *See United States v. Burkhow*, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *9, 2020 U.S. Dist. LEXIS 20319, at *23–25 (N.D. Iowa Feb. 6, 2020) (listing cases). "Some courts have held that a warrant to search a defendant's social

media account is not overbroad if it particularly describes the information to be disclosed and the offense being investigated," while others have held that "[i]t is not enough that the warrant makes reference to a particular offense; the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Id.*

In this instance, the warrant's scope is overbroad in both time and content. Facebook warrants permit specificity because of the many categories of information that may be requested. (*See* ECF No. 24-1 at 4–7 (requesting nineteen categories of Facebook account data).) Yet this affidavit did not explain why probable cause supported most of the requested categories. (*See id.* at 11–36.) Instead, the affidavit hypothesized that general "Facebook account activity" could reveal evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. (*Id.*, ¶ 60.)

Moreover, the affidavit did not adequately contextualize the need for historical data. (*See generally* ECF No. 24-1.) Like the Eleventh Circuit suggested in *United States v. Blake*, law enforcement could have requested more limited data because "[d]isclosures consistent with those limitations might then have provided probable cause for a broader, although still targeted, search of [the defendant's] Facebook account." *Blake*, 868 F.3d at 974. Given the opportunity for a "more-specific alternative," the Facebook warrant was overbroad. *See Bishop*, 910 F.3d at 337. The court need not determine whether to pare

down the particular categories of information that were overbroad because the good-faith exception to the exclusionary rule, discussed below, precludes suppression.

### iii. Good Faith Exception to the Exclusionary Rule

The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011). Exclusion is appropriate only where there is "[r]eal deterrent value," and where "the deterrence benefits of suppression…outweigh its heavy costs." *Id.* at 236–37 ("Exclusion exacts a heavy toll on both the judicial system and society at large…[because] [i]ts bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'") (citations omitted).

The Supreme Court established the "good-faith exception" to the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984). Essentially, the rule counsels that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Davis*, 564 U.S. at 238 (internal citations omitted).

In Allen's case, the government argues that law enforcement acted in good faith because the constitutionality of social media warrants is an unsettled area of the law. (ECF

No. 32 at 23–36.) Where the law is unsettled, the police conduct generally must be "'deliberate, reckless, or grossly negligent' [in order] to warrant application of the exclusionary rule." *United States v. Martin*, 807 F.3d 842, 847 (7th Cir. 2015) (quoting *Davis*, 564 U.S. at 238).

Allen argues that the good-faith exception cannot apply because a reasonable officer should have known the Facebook warrant was simply too broad to pass constitutional muster. (ECF No. 39 at 8–11.) She asserts that the warrant constituted the type of generalized rummaging that the Fourth Amendment prohibits. (*Id.* at 10.)

However, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. The Eleventh Circuit's decision in *Blake* does not put officers in the Seventh Circuit on notice of the potential for unconstitutional overbreadth in social media warrants. Because Allen has not pointed to any aggravating circumstances, she has not established that law enforcement officials acted deliberately, recklessly, or with gross negligence. (*See* ECF No. 39 at 8–11.)

Because law enforcement officials applied for and executed the Facebook warrant in good faith, suppression is not warranted.

### 4.3. Statements

Allen's third pretrial motion seeks to suppress all statements she made to law enforcement on November 2, 2021, on the grounds that she was subjected to custodial

interrogation but not advised of her *Miranda* rights before questioning. (ECF No. 25 at 1.) Allen also moves to suppress unidentified statements she made after the November 2 interrogation because she claims they were fruits of the unlawfully obtained statements. (*Id.*)

The parties agree that portions of Special Agent Heimerl's questioning of Allen on November 2, 2021, constituted an interrogation. (ECF No. 30, ¶ 42.) The parties dispute, however, whether that interrogation was conducted in a custodial setting. (*Id.*)

### i.    Relevant Facts

The following factual summary is taken in combination from the parties' stipulated facts (ECF No. 30) and from the transcript of the agent's audio recording of the November 2 interrogation (ECF No. 30-5), as cited respectively.

On November 2, 2021, Heimerl called Allen to ask if he and his partner (Anderson) could meet with her and "share a little bit of information." (ECF No. 30, ¶ 1.) Heimerl audio recorded a portion of his phone call with Allen, and he continued that audio recording throughout their in-person interaction and interview that morning. (*Id.*, ¶ 5.)

Allen opened the front door for the agents when they arrived at her home two minutes later. (ECF No. 30, ¶¶ 6, 8–9.) The agents were dressed in plainclothes and armed but they did not display their weapons to Allen. (*Id.*, ¶ 40.) They stated they were "hoping to talk in the truck" they had parked on Allen's driveway. (*Id.*, ¶ 11.) Allen was wearing

the clothes she had slept in (leggings and a t-shirt), and the temperature was in the low thirties, so they asked her whether she would like to grab a coat first. (*Id.*, ¶¶ 10–12.)

When Allen started walking upstairs Heimerl asked what she was going upstairs for (ECF No. 30, ¶ 16) and Allen responded for socks. (ECF No. 30-5 at 6:22). Heimerl asked whether he could hold onto her phone. (ECF No. 30, ¶ 17.) Without waiting for an answer, Heimerl took Allen's phone from her hand. (*Id.*, ¶ 18.) Heimerl told her that they had a search warrant for her home and other investigators were coming to search. (ECF No. 30-5 at 06:25.) He said he would explain in a second, asked if she was just grabbing a coat, and stated he was following her up for safety purposes. (*Id.* at 6:39.) Allen responded with confusion ("I don't know what's going on.") and fear ("This is scary."). (*Id.* at 6:53, 7:00.) Heimerl stood inside Allen's bedroom while she retrieved socks, and Anderson stood near the doorway of the bedroom. (ECF No. 30, ¶ 21.)

Heimerl and Anderson then escorted Allen back downstairs, through the residence, into the garage, through the yard, and toward the agents' vehicle. (ECF No. 30, ¶ 25.) Allen was not patted down nor placed in handcuffs. (*Id.*) According to Allen's recollection, Heimerl placed his hand on her arm from behind and physically guided her out the door of her home while escorting her to his vehicle. (*Id.*, ¶ 26.) Heimerl, on the other hand, recalls that, aside from the physical contact he had with Allen when retrieving her phone, he did not have any further physical contact with her. (*Id.*, ¶ 26.)

Once in the truck Heimerl sat in the driver's seat, Allen in the passenger seat, and Anderson in the rear passenger seat behind Allen. (ECF No. 30, ¶ 28.) Heimerl turned the vehicle and its heat system on. (*Id.*, ¶ 29.) Allen watched from the truck window as approximately ten officers dressed in black tactical gear approached her home with large assault rifles drawn and pointed at the house. (*Id.*, ¶ 30.) She asked why they had guns. (ECF No. 30-5 at 9:41.) Heimerl explained multiple times that the officers were following policy and always entered in a tactical fashion for safety. (*Id.* at 9:49, 9:59, 10:33.) The officers yelled loudly as they entered the home. (ECF No. 30, ¶ 32.)

Heimerl asked Allen if she was warm enough and told her to let him know if she got warm or cold. (ECF No. 30-5 at 11:28.) Heimerl then told Allen,

> When we're done talking…actually, you don't have to talk with us. Okay? But I'm hoping that we can take this opportunity to talk some more. Okay? You can get out of the truck and leave anytime you want. You understand that? I told you, and I'm just gonna repeat it. You're not under arrest, we have no intention of arresting you today.

(*Id.* at 11:44.)

Heimerl proceeded to question Allen about the fire and showed her pictures from surveillance footage depicting the person and vehicle nearby the restaurant shortly before the fire. (ECF No. 30, ¶ 33–34.) About half an hour into the conversation, Allen made a reference to counsel:

> HEIMERL: You have, you have very difficult decisions to make now. You've already agreed that this is very compelling information that I've shown you, right?

ALLEN: Well, I don't, I don't think that I should be, like, agreeing to anything because I'm gonna need counsel, obviously.

HEIMERL: That's your choice. Absolutely. Absolutely.

(ECF No. 30-5 at 36:18–36:32.)

Heimerl and Allen continued talking, as Heimerl explained that he wanted to share this information so that Allen understood why they were at her house that day. (ECF No. 30-5 at 36:37.) He also answered Allen's questions about getting her phone back. (*Id.* at 37:33–38:08.) Then the conversation turned accusatory again, as Heimerl suggested, "There's a very strong likelihood that there is data in your phone that would probably demonstrate where that phone went on the night of the fire." (*Id.* at 38:08.) After some back and forth conversation, Allen stated that she wanted to make a phone call to her pastor. (*Id.* at 46:48–48:30.) Heimerl explained that Allen could not use her phone while it was in their custody. (*Id.* at 47:04.) Heimerl advised that Allen could go in her house, but the agents would have to stay with her and that there were women there to accompany her if she needed to use the restroom. (*Id.* at 49:40.) Heimerl offered to let Allen use one of the agents' phones to make a private call, but she did not take him up on the offer. (*Id.* at 50:32.)

Eventually Allen said, "I don't think that it's…I don't think it's in my best interest to say anything else." (ECF No. 30-5 at 54:40.) Allen also said she did not want to sit in the agents' truck. (*Id.* at 56:05.) Heimerl responded,

Then we can go in the house, but you need--I want you to understand that…right now the number one priority in your house is that search for evidence that is occurring. And we need to control where you can go, and where you don't go. Okay? And that's for the safety of everybody. Okay? So, um, you are not…as I told you, we're--you're not detained, but we need to make sure that the search can get done as expeditiously as possible.

(*Id.* at 56:06.)

Then Allen stated that she wanted to wait to go in her house until the officers exited. (ECF No. 30-5 at 56:45.) Anderson updated them that the officers could not give a concrete timeline but would need more time. (*Id.* at 58:55.) Heimerl said, "So, you don't have to stay here I uh just want you to understand…" before getting cut off in conversation and transitioning topics. (*Id.* at 59:49.)

The subsequent conversation turned to personal topics and did not touch on the investigation until Heimerl observed that the officers had completed the search. (ECF No. 30-5 at 1:59:49.) At that point, Heimerl and Allen discussed procedural matters, such as returning her phone, providing a copy of the warrant, and the publicity of the investigation. (*Id.* at 1:59:49–2:16:45.) In sum, Allen remained in the agents' truck for the duration of the search of her home—approximately two hours. (ECF No. 30, ¶¶ 35–36.) The agents did not inform Allen of her *Miranda* rights at any time during their interaction. (*Id.*, ¶ 37.)

### ii.    Legal Standard

"Any police interview of an individual suspected of a crime has 'coercive aspects to it.'" *J. D. B. v. North Carolina*, 564 U.S. 261, 268 (2011) (quoting *Oregon v. Mathiason*, 429

U.S. 492, 495 (1977) (per curiam)). But the prophylactic warnings created by the Supreme Court in *Miranda* "are not required merely because the person being questioned is a suspect or the focus of a criminal investigation." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). "The privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation. Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.*

"'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). For example, a person may be detained during a *Terry* stop, and thus not free to leave, but yet not be in "custody" for purposes of *Miranda*. *United States v. Patterson*, 826 F.3d 450, 455–57 (7th Cir. 2016). Similarly, "[a] person detained during the execution of a search warrant is normally not in custody for *Miranda* purposes." *United States v. Saadeh*, 61 F.3d 510, 520 (7th Cir. 1995). A person is only "in custody" for *Miranda* purposes "if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Patterson*, 826 F.3d at 457. "[D]etentions pursuant to the execution of a search warrant are 'substantially less intrusive than an arrest….'" *Saadeh*, 61 F.3d at 519–20 (quoting *Michigan v. Summers*, 452 U.S. 692, 702 (1981)).

Whether a person is in custody is assessed from the perspective of a reasonable person in the defendant's position. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).

"Relevant factors include the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *United States v. Borostowski*, 775 F.3d 851, 859-60 (7th Cir. 2014). Additional factors identified by the Seventh Circuit include:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*Patterson*, 826 F.3d at 455. However, "there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (describing how the use of handcuffs, placing suspects in police cars, and drawing weapons does not necessarily render an investigatory detention an arrest).

### iii.    Analysis

Allen argues that the agents' interrogation was custodial because a reasonable person in her shoes would not have believed she was free to leave under the totality of the circumstances. (ECF No. 25.) Allen contends that the agents controlled her movements—beginning when they followed her to her bedroom for socks—and that they indicated that her ability to return to her home after the search was contingent on talking

with them. (ECF No. 38 at 14.) Allen points to her fear and confusion about the events unfolding, including the officers dressed like a SWAT team storming her home with weapons drawn. (*Id.*) She also maintains that Heimerl spoke in a forceful tone that demanded compliance when he told her they would be going to talk in his truck. (*Id.* at 17.)

Allen also asserts that her statements about needing a lawyer and incriminating herself are indicative of the fact that she did not feel free to leave in the face of aggressive questioning. (ECF No. 25, ¶ 6; ECF No. 38 at 14–15, 21–23.) Allen does not suggest that her statements should have prompted the agents to end their questioning. (*See* ECF No. 25; *see also United States v. Hampton*, 885 F.3d 1016, 1019 (7th Cir. 2018) (observing that invocation of the right to counsel must be unequivocal).)

Allen further contends she did not have any reasonable options for leaving because it was cold outside, she was not dressed appropriately for the weather, and she did not have access to her phone, purse, or vehicle. (ECF No. 38 at 19.) She claims that the exchange occurred in a police-dominated environment due to the officers searching her home and her being surrounded by agents inside their vehicle. (*Id.* at 20, 23–25.) She argues that, even if some of the agents' statements and actions were motivated by safety or politeness, the dispositive question lies with her reasonable belief that she was not free to leave. (*Id.* at 25–27.)

The government maintains that no *Miranda* warning was required because Allen was not in custody. (ECF No. 32 at 27–39.) The government argues that Allen consented to speaking with the agents at every stage of the interaction and that their conversation did not occur in a police-dominated environment because they sat in the agents' unmarked truck on Allen's driveway, adjacent to the public street and in view of her neighbor. (*Id.* at 30–31.) The government maintains that Allen's movement was limited prior to the interview only for safety and the preservation of evidence. (*Id.* at 31.) The government highlights that Heimerl told Allen she was free to leave, did not have to answer questions, and that she would be allowed to go back inside her home after they were done talking and the search was complete. (*Id.* at 32.)

The government also points out that the investigative portion of the conversation lasted less than fifty minutes, with the conversation changing topics for the latter portion when Allen opted to remain in the vehicle while officers completed their search. (ECF No. 32 at 33.) The government claims that Allen understood the voluntary nature of the interview, as demonstrated by her careful, clarifying responses and occasional disagreements with Heimerl's evidentiary characterizations. (*Id.* at 33.)

All facts considered, Allen fails to establish that there was a restraint on her freedom of movement to the degree associated with an arrest. In fact, Heimerl specifically told Allen that she was *not* under arrest. The significant police presence and display of weapons was undoubtedly disturbing, but it was not such a police-dominated

environment that custody resulted. Heimerl explained that the search team was following protocol. (ECF No. 30-5 at 9:49, 9:59, 10:33.) Like the Supreme Court reasoned in *Michigan v. Summers*, 452 U.S. 692 (1981), detention at the owner's residence "could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.'" *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994).

Similarly, the courts have consistently held that a warrant founded on probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Burns*, 37 F.3d at 279 (quoting *Summers*, 452 U.S. at 705). Here the agents told Allen that she did not have to remain on the premises or speak with them. (ECF No. 30-5 at 11:44.) Her movement was surely limited by the weather conditions and lack of access to her belongings, but Heimerl explained that law enforcement had to monitor her movement around the house if she chose to enter while they were conducting the search. (*Id.* at 56:06.) Heimerl also offered to let Allen use one of the agents' phones for a private call when she asked. (*Id.* at 50:32.)

Allen disagrees with the characterization of her participation as consent. (ECF No. 38 at 18–19.). But she willingly answered the agent's questions after she was told that she did not have to. The agent's statement that she could go back inside her home after they finished talking was not a threat so much as an explanation and attempt at reassurance.

Additional factors that weigh against a custodial finding include the facts that the agents did not move Allen away from the premises, did not employ physical restraints, told her she was free to leave, and actually released her at the end of their conversation. *See Borostowski*, 775 F.3d at 859-60. The totality of the circumstances does not rise to the degree of restraint associated with an arrest. Therefore, Allen's interrogation was not custodial and did not require a *Miranda* warning.

**5. Conclusion**

**IT IS THEREFORE RECOMMENDED** that Allen's Motion to Suppress related to the warrants for her home, vehicle, and business (ECF No. 23) be **denied**.

**IT IS THEREFORE RECOMMENDED** that Allen's Motion to Suppress related to her Facebook records (ECF No. 24) be **denied**.

**IT IS THEREFORE RECOMMENDED** that Allen's Motion to Suppress related to her statements made on November 2, 2021 (ECF No. 25) be **denied**.

**IT IS ALSO ORDERED** that Allen's request for a *Franks* hearing is **denied**.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

[signature page follows]

Dated at Milwaukee, Wisconsin this 4th day of August, 2025.

WILLIAM E. DUFFIN
U.S. Magistrate Judge