UNITED STATES OF AMERICA,

        *Plaintiff,*

        *vs.*                            Case No. 24-CR-236

ARLETTA ALLEN,

## OBJECTIONS TO MAGISTRATE JUDGE'S RECOMMENDATION

On May 27, 2025, Allen filed three motions: (1) to suppress the fruits of search warrants for her home, vehicle, and restaurant; (2) to suppress evidence obtained from the execution of a search warrant on her Facebook account; and (3) to suppress statements she made to law enforcement that were not preceded by *Miranda* warnings.[1] On August 4, 2025, Magistrate Judge Duffin issued a Recommendation to deny all three motions.[2] Allen objects to the Recommendation as to all three motions. In support of these Objections, Allen incorporates the arguments made in her earlier pleadings in support of these motions[3] and adds the following to address the Recommendation.

---

[1] Dkt. Nos. 23, 24, 25.
[2] Dkt. No. 41.
[3] (Dkt. Nos. 23, 24, 25, 37, 38, 39)

*Federal Defender Services*
*of Wisconsin, Inc.*

## I. The affidavit in support of the warrants to search Allen's home, vehicle, and restaurant failed to supply probable cause that the fire was intentionally set and that Allen was responsible.

Law enforcement officers sought a warrant to search Allen's home, vehicle, and restaurant for evidence that the fire at the restaurant was an arson. To establish probable cause for those searches, investigators had to establish probable cause as to two things: first, that the fire was intentionally set; and second, that Allen was the perpetrator. The affidavit failed on both counts.

### A. The affidavit didn't supply sufficient facts to allow the warrant-issuing judge to find that the fire originated on the shelf at the top of the basement stairwell.

As highlighted in Allen's past briefing, determining whether a fire was intentionally set relies on accurately identifying the point of origin of the fire.[4] Without an accurate determination of the origin, it's unlikely that the cause of a fire can be established.[5] Here, although the affidavit for the warrants to search Allen's home, vehicle, and restaurant stated that investigators "determined the fire originated on a shelf located on the north wall of the top landing of the basement staircase,"[6] it did not provide sufficient facts for the warrant-issuing judge to conclude that investigators had accurately determined the fire's origin. The affidavit merely summarized observations the firefighters made at the

---

[4] Dkt. No. 23 at 9, n. 7.
[5] NFPA 921 at § 18.1; Dkt. No. 23, Ex. G (NFPA 921, ch. 18). *See also* § 19.1, Dkt. No. 23, Ex. H (NFPA 921, ch. 19) ("Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined").
[6] Dkt. No. 23-4 at 6.

*Federal Defender Services
of Wisconsin, Inc.*

fire scene and included the investigators' opinion as to where the fire originated, but it did not explain why those observations led the investigators to reach their conclusion.

That was problematic. The affidavit provided no foundation for the warrant-issuing judge to make an informed determination that the investigators had done their job correctly. There was no way to determine if scientific principles supported the investigators' conclusion, or if the investigators accurately applied those scientific principles. A warrant affidavit must include more than the investigator's *ipse dixit* — something beyond "because I said so." As the Court emphasized in *Illinois v. Gates*, 462 U.S. 213, 239, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be the mere ratification of the bare conclusion of others." *See also United States v. Waide*, 60 F. 4th 327, 337 (6th Cir. 2023) (an affidavit's assertion that a fire was "incendiary" or an "arson" without factual support is conclusory and doesn't establish probable cause).

The Magistrate Judge's Recommendation fails to hold the government to the principle set forth in *Gates*. The Recommendation notes the observations that the fire investigators made at the scene—the charred items on the shelf, the small one-foot-high fire at the top of the stairwell when firefighters entered, and the lighters in a basket near the shelf—and concludes that they alone were enough for the warrant-issuing judge to find that the investigators reached the correct conclusion about the fire's origin. In doing so, the Recommendation seems to find that the fire couldn't have started in the kitchen ceiling, where firefighters observed significant enough heat to warrant spraying it down,

3

*Federal Defender Services
of Wisconsin, Inc.*

with little reasoning or explanation. The Recommendation also faults Allen for failing to present evidence to suggest that investigators missed a potential origin point, overlooking the requirement that probable cause is the government's burden and must be established within the affidavit's four corners. Finally, the Recommendation quips that while the affidavit might not be enough to train the issuing magistrate judge as a fire scene investigator, it was good enough for probable cause purposes.[7] But while the issuing magistrate may not need a full dissertation on the field of fire investigation, there must be enough information to evaluate the accuracy and reliability of the investigator's conclusion.

Fire investigation is a "complex endeavor involving skill, technology, knowledge, and science," and is based on the scientific method.[8] Things are not always what they seem. For many years, the fire investigation field was plagued by reliance upon myths and inaccurate assumptions about fires, leading to dozens of wrongful convictions and even a wrongful execution.[9] That history underscores why courts cannot simply blindly defer to investigator opinions or adopt conclusions about the cause and origin of fires that are not sufficiently supported or explained.

---

[7] Dkt. No. 41 at 7.

[8] NFPA 921 at §§ 4.1, 4.2.

[9] *See* Valena Elizabeth Beety & Jennifer D. Oliva, *Evidence on Fire*, 97 N.C. L. Rev. 483 (2019) ("[F]ire science, a field developed by 'arson' investigators – that is, police officers or similar first responders untrained in chemistry and physics – which has been historically dominated by the application of unreliable methods and, therefore, the generation of faulty conclusions."); *see also* Equal Justice Initiative, *Report Documents the Execution of an Innocent Man in Texas* (2009) (detailing the case of Cameron Willingham, a man later determined to be innocent who was executed in 2004 for a purported arson after investigators "relied on discredited folklore[] and failed to eliminate potential accidental or alternative causes of the fire").

4

*Federal Defender Services*
*of Wisconsin, Inc.*

Here, the Recommendation assumes that the small fire on the stairwell landing (not on the shelf) means that the shelf is the likely origin point.[10] But the affidavit doesn't actually say that the investigators relied on that observation to make the origin determination or explain *why* that observation would support that assumption. The affidavit does not explain, for example, how or whether a one-foot-tall fire on the floor of the basement landing could cause the significant heat in the kitchen's ceiling that firefighters observed through thermal imaging when they first entered the restaurant. Nor does the affidavit explain how or whether the one-foot-tall fire in the basement landing could have caused, or was consistent with, the damage found in the restaurant beyond just the basement stairwell. Nor does the affidavit explain what other points of origin were considered and rejected and why – did investigators consider whether the fire could have started in the ceiling and fallen through to the ground by the stairwell? Why would that point of origin be any less likely or probable than the shelf? The affidavit does not say, instead requiring the reviewing judge to simply adopt the determination by investigators with little explanation or justification. That is contrary to the independent review demanded by the Fourth Amendment's warrant requirement.

The Recommendation also cited the presence of lighters in the landing area but, again, the affidavit doesn't say that investigators relied on that fact in determining origin. Further, given the ubiquity of lighters (particularly in a setting like a restaurant) and their

_____

[10] Dkt. No. 41 at 7.

*Federal Defender Services*
*of Wisconsin, Inc.*

transportability, there's no reason to believe that that observation supports an expert opinion that the fire started on the shelf. Similarly, the charred remains on the shelf merely reveals that the fire spread to the shelf, but it isn't a fact establishing its origin there, and the affidavit doesn't say it was relied upon by investigators.

Finally, the Recommendation makes assumptions about there being a distinction between heat in the ceiling and fire on the floor, but the affidavit doesn't indicate that the investigators found this distinction meaningful, or explain how, if at all, it contributed to its conclusion regarding the fire's origin.[11] As just two examples, the presence of a fire in a particular area could be the result of the fire spreading by "drop down," or conduction, rather than an indication that the fire originated in that location.

In short, it is not enough for the affiant to simply give their "expert" opinion without explaining how the opinion was reached. Without such an explanation, the warrant-issuing judge is merely ratifying the bare conclusions of others, contrary to the teachings of *Gates*.

**B. The affidavit also failed to supply probable cause that the fire was intentionally set.**

To obtain a warrant to search a location for evidence of arson, the government must show more than the fact that a fire occurred; it must show a crime occurred, which requires probable cause that the fire was intentionally set. *See Michigan v. Tyler,* 436 U.S. 499, 507 (1978). The affidavit suggests that the fire was intentionally set because the

---

[11] Dkt. No. 41 at 7.

*Federal Defender Services*
*of Wisconsin, Inc.*

investigators couldn't identify an electrical source and couldn't identify any other potential ignition source at the point of origin. Thus, the government's hypothesis is that the absence of any other ignition source must mean that the fire was intentional.

The first problem with this hypothesis is that the affidavit didn't actually rule out other ignition sources. The affidavit acknowledges that this couldn't be done at least until the investigators completed additional testing of items collected at the scene. Since the government's theory depended on ruling out other ignition sources, and they hadn't been ruled out, the affidavit was deficient. Notably, the affidavit provides no explanation as to the importance of further testing and the likelihood that further testing would reveal an electrical source for the fire. Without knowing that information, it's impossible to assess the likelihood that the fire was intentionally set.

The Recommendation rejects this argument, saying it was enough that the affidavit made the issuing magistrate judge aware that the investigators needed to do more testing.[12] But notifying the warrant-issuing judge of the deficiency doesn't cure the deficiency, particularly when the warrant-issuing judge wasn't given any information to assess how important additional testing would be. Thus, the Court should reject the recommendation's acceptance of a theory relying on information that the affidavit acknowledges is incomplete.[13]

---

[12] Dkt. No. 41 at 8.
[13] *See* NFPA 921 § 4.3.5 ("The scientific method requires that all data collected be analyzed. This is an essential step that must take place before the formation of the final hypothesis.").

*Federal Defender Services*
*of Wisconsin, Inc.*

The second problem with the affiant's theory that the fire must have been intentionally set because the investigators uncovered no other ignition source is that this methodology—known as negative corpus—has been rejected as inconsistent with the scientific method, as explained more fully in Allen's prior briefing.

**C.    The affidavit failed to show that Allen set the fire.**

Even if the affidavit provided probable cause that the fire was incendiary, it still failed to supply probable cause to search Allen's home, vehicle, and restaurant because it didn't show she was the perpetrator. The affidavit relied on two claims in pointing the finger at Allen. First, that she resembled the person who was seen in the vicinity of the restaurant not long before the fire and, second, that she was financially motivated to commit the fire.

With respect to appearance, the grainy surveillance stills included in the affidavit aren't clear enough to identify the person as Allen. Instead, the affidavit relies on the fact that the person is wearing popular Vans shoes, also drives a dark SUV, and is of a similar build to Allen. The Recommendation seems to accept Allen's point that Vans sneakers and dark SUV's are very common and don't do much to support a conclusion that the person in the video is Allen. Instead, the Recommendation says that the investigation "did not need to directly tie Allen to the scene, citing to the fact that "[w]arrants may be issued even in the absence of direct evidence linking criminal objects to a particular

*Federal Defender Services*
*of Wisconsin, Inc.*

site."[14] The case the Recommendation cites for that proposition, however, is about how, under certain circumstances, the home of a suspect can be searched even without direct evidence tying their criminal activity to that home if there is probable cause that the criminal activity occurred, that the defendant was involved, and reason to believe that individuals engaged in that activity typically keep evidence of it in their homes. *See United States v. Sewell*, 780 F.3d 839 (7th Cir. 2015). The problem here is altogether different. Allen is not challenging the nexus between the purported offense and her home. Instead, her argument is that officers did not have enough evidence tying her to the crime at all. The surveillance images were too grainy to make a positive identification, and the other purported identifiers included in the warrant affidavit– the SUV and the Vans shoes – were too unexceptional and nondescript to establish probable cause that Allen the person on the footage. Without placing Allen at the scene, there would be very little left to establish any cause to believe she was involved in the fire at all, defeating any probable cause to search her property.

The Magistrate Judge also suggests that the inability to affirmatively identify Allen as the person walking near the restaurant or to show that person entered the restaurant is made up for by the evidence of motive, but the affidavit does not support that conclusion. The affidavit alleged that as part of a trash pull at Allen's home four days after the fire, investigators discovered bank correspondence indicating that a $200 utility

---

[14] Dkt. No. 41 at 9.

*Federal Defender Services
of Wisconsin, Inc.*

payment for Allen's home had been rejected by the bank and that she had filed an application to postpone student loan payments based on economic hardship. But an isolated bounced payment, which could be the result of oversight, miscalculation, or a delayed deposit not clearing in time, doesn't support an inference that she was suffering financial hardship, let alone the degree of financial hardship needed to motivate someone to commit arson. And deferring student loans not only is common practice (according one article, 3.1 million borrowers)[15] given the amount of student debt many people incur, it says nothing about the financial state of her restaurant. Nor, for that matter, does it indicate that she was suffering from personal economic hardship.

The affidavit also summarized statements Allen made to investigators regarding the money she invested in her restaurant. But there's no evidence that that money was at substantial risk. There is no information, for example, indicating that the restaurant was failing.

Importantly, the affidavit also does not establish why, even if Allen *was* dealing with either personal or business-related economic struggles, that would create motive for her to commit an arson on the building. As the affidavit notes, Allen was not the owner of the property, she was a lessee.[16] While the affidavit notes the *property* was insured, it provides no basis to believe Allen would be the beneficiary of an insurance payout for a

---

[15] *See* Jennifer Calonia, *What is Student Loan Deferment*, Wall Street J. (Oct. 16, 2024) (indicating that 3.1 million borrowers had federal student loans in deferment and that deferment can offer "eligible borrowers a temporary break from budget crushing student loan payments"), available at https://www.wsj.com/buyside/personal-finance/student-loans/student-loan-deferment.
[16] Dkt. No. 23-4 at 4.

*Federal Defender Services
of Wisconsin, Inc.*

building she did not own. Nor does the affidavit provide any other financial benefit Allen would receive as a result of the purported arson. Without that, the affidavit fails to establish any motive, let alone a motive significant enough to overcome the affidavit's inability to affirmatively identify Allen as the person in the surveillance footage.

## II. Allen is entitled to a *Franks* hearing based on the affidavit's material omissions.

Even if the Court were to find the warrant affidavits were facially sufficient, the Court should grant Allen's request for a *Franks* hearing. Three important facts were knowingly left out of the affidavit that would have extinguished any probable cause showing: (1) damaged lithium batteries, a well-known potential source of ignition, were found on the shelf, providing a wholly accidental and innocent potential cause of the fire; (2) the crime lab tested debris from the shelf and uncovered no traces of any ignitable liquids, undermining a claim the fire was intentionally set; and (3) the methodology used to provide the opinion that the fire was incendiary – negative corpus – is inconsistent with the scientific method and deemed inappropriate by the NFPA 921—the "industry guide for fire inspections."

### A. Lithium batteries, a potential fire source, were found at the scene.

According to a report authored by SA Hankins dated October 22, 2021, on October 14, 2021, investigators collected numerous "potentially relevant electrical artifacts in the top landing of the basement staircase," and identified 17 items to be submitted for

11

*Federal Defender Services*
*of Wisconsin, Inc.*

additional laboratory examination, including remnants of four batteries.[17] These batteries were lithium batteries, a potential fire source so notorious that they're given their own specific sub-section in the NFPA 921.[18] However, Hankins did not reveal in his affidavit that lithium batteries were found on the shelf. Nor did he reveal that the batteries were not just present at the potential origin site of the fire but had also ruptured and ejected their contents – a fact that should have been evident to an experienced fire investigator and that was indicative that the batteries had failed and combusted.[19] Since the government's theory depended on the exclusion of other ignition sources, the presence of the lithium batteries significantly undermined its hypothesis that the fire must have been started by applying open flame to combustible materials. The omission of any facts relating to the batteries, therefore, misled the warrant-issuing judge.

The Recommendation waves off Allen's argument with little discussion. First, the Recommendation implies that the affidavit was not misleading because while it did not mention the batteries specifically, it stated "there were no other potential heat sources [on the shelf] other than electrical heat sources."[20] Lithium batteries "store and release electrical energy," which the Recommendation takes to mean the batteries were included in the affidavit's vague reference to "electrical heat sources."[21] But that reading ignores the full context of the sentence and the warrant affidavit more broadly. The full sentence

---

[17] *See* Dkt. No. 23-9.
[18] *See* NFPA 921 at 9.13.
[19] *See* Dkt. No. 23-10 at 7.
[20] Dkt. No. 41 at 13-14.
[21] *Id.* at 14.

*Federal Defender Services
of Wisconsin, Inc.*

the Recommendation references is: "Specifically, investigators did not observe evidence of an electrical failure in the area of the fire origin, and there were no other potential accidental heat sources in that area other than electrical heat sources."[22] That sentence sought to establish two things: (1) that the only potential "*accidental*" heat sources at the purported site of the fire's origin were electrical sources, and (2) that investigator's preliminary review did not suggest electrical failure as the cause of the fire, suggesting the fire was not "accidental." Far from informing the issuing judge that other electrical sources, including the lithium batteries, could have been the source of the fire, the affidavit suggested just the opposite – that in their preliminary review, investigators had not observed evidence suggesting an electrical source for the fire. If lithium batteries are included under the blanket of "electrical sources," as the Recommendation suggests, that makes the affidavit *more* misleading, not less. In that case, the affidavit was not just misleading by omission in failing to specifically mention the batteries, but also by affirmative misrepresentation because the claim that "investigators did not observe evidence of electrical failure" and that there were no other heat sources found at the fire's purported origin site would have been directly contrary to the recovery of damaged lithium batteries on the wire shelf showing signs of combustion. On their very face, those batteries were a potential ignition source, and the affidavit's claim that investigators did

---

[22] Dkt. No. 23-4 at ¶ 42.

*Federal Defender Services*
*of Wisconsin, Inc.*

not observe evidence of an accidental electrical origin for the fire was inconsistent with the evidence Hankins recovered at the scene.

There's also no question that Hankins would have known the importance of the lithium batteries from his prior case experience and training. The NFPA 921, § 9.13, for example, advises that investigators should be aware that all "lithium ion batteries can overheat and ignite if overcharged, undercharged, exposed to excessive heat or cold, flooded, short circuited, or physically damaged." That's why we're asked before we board a plane whether our luggage contains any lithium batteries.

The Recommendation notes that the government argued that at the time of the affidavit, Hankins only knew that these were batteries, not lithium-ion batteries, so he wouldn't have realized their significance.[23] The Recommendation does not rely on this claim in reaching its decision, which makes good sense because the government's position defies belief. The lithium-ion batteries recovered from the shelf were 18650 lithium-ion batteries.[24] Their name derives from one of their most distinctive characteristics, their size: 18650 batteries measure 18mm in diameter and 65 mm in

---

[23] *See* Dkt. No. 32 at 6, 9-10.
[24] *See* Dkt. No. 23-10 at 4 ("LIMS Exhibit #9 consisted of four fire-damaged 18650 lithium-ion cells.").

*Federal Defender Services*
*of Wisconsin, Inc.*

length.[25] That makes them perceptibly larger than their common comparator, regular household AA batteries, which measure 50mm in length and 14 mm in diameter.[26]



*18650 Battery Vs AA Battery*

*Source:* https://www.ecolithiumbattery.com/18650-battery-vs-aa-battery/#elementor-toc__heading-anchor-2.

These types of batteries are "one of the most common lithium-ion batteries in the world, found in everything from laptops to tools and toys."[27] They are also a well-known fire hazard, particularly when loose, as these were here.[28] In short: any fire investigator worth their weight would have been able to identify the batteries that were recovered as lithium-ion batteries.

---

[25] Vicky Nguyen, *Experts warn against buying loose lithium ion batteries that cause fire hazard*, Today (Feb. 15, 2021), available at https://www.today.com/news/loose-lithium-ion-batteries-cause-fire-hazard-being-sold-major-t208884

[26] *See* KH Battery, *How to differentiate between an 18650 VS AA battery?* (Feb. 26, 2024), available at https://www.lithiumbatterytech.com/how-to-differentiate-between-18650-vs-aa-battery/

[27] Nguyen, *supra* n.7.

[28] *Id.*; *see also* United States Consumer Product Safety Commission, *CPSC Issues Consumer Safety Warning: Serious Injury or Death Can Occur if Lithium-Ion Battery Cells Are Separated from Battery Packs and Used to Power Devices* (Jan. 08, 2021), available at: https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Issues-Consumer-Safety-Warning-Serious-Injury-or-Death-Can-Occur-if-Lithium-Ion-Battery-Cells-Are-Separated-from-Battery-Packs-and-Used-to-Power-Devices.

*Federal Defender Services*
*of Wisconsin, Inc.*

Crucially, Hankins himself submitted the collected artifacts, including the batteries, to the ATF Research Laboratory, and it appears he inventoried them and perhaps personally collected and photographed them as well.[29] That would indicate he saw the batteries and knew they came from the shelf or the landing below. It's beyond belief that an experienced fire investigator with as much training as Hankins had, would not have identified these batteries as lithium-ion batteries given the frequency with which these batteries cause fires or are suspected of doing so. Even if he somehow wasn't sure if they were lithium-ion batteries, which again would be shocking, he would have known that they might be lithium-ion batteries and a possible source of the fire. Yet he told the magistrate judge no other heat sources were present. That was a misrepresentation and a material one.

The Recommendation also dismisses Allen's argument stating that, "[c]onsidering the other suspicious circumstances addressed in the affidavit, specific mention of the batteries and their potential contribution to the fire would not have tipped the scales against probable cause."[30] This determination ignores that fire investigations are a scientific endeavor that must be conducted through application of the scientific method. As emphasized in the NFPA 921, the "investigator is strongly cautioned against using subjective opinions to support an incendiary cause determination in the absence of physical evidence."[31] The NFPA 921 also notes that outside factors like "the identification

---

[29] *See* Dkt. No. 23-9 at ¶¶ 9, 10; Dkt. No. 23-10 at 1.
[30] Dkt. No. 41 at 14.
[31] NFPA 921 at 23.2.7.3.

*Federal Defender Services of Wisconsin, Inc.*

of a suspected firesetter, or the 'motive' or opportunity for the fire, cannot be substituted for a properly conducted investigation and determination of the fire's origin and cause," and cautions investigators "against using the discovery or presence of these indicators in forming opinions or drawing conclusions concerning the cause of the fire in the absence of other evidence."[32] The affidavit explained that the investigators determined that the fire was not accidental because there were no potential heat sources where the fire originated. But that was not true, as the lithium batteries could have started the fire. That a person was observed walking near the restaurant, which was surrounded by other businesses and homes, at about 8:30 p.m. does not create probable cause that the fire was intentionally set rather than the result of the damaged lithium batteries combusting, let alone that the person on the video is the one who set the fire, especially since there was no showing that the person actually entered the restaurant. By omitting any mention of a very real potential accidental ignition source, investigators misleadingly gave more weight to their preliminary conclusion that the fire was intentionally set rather than accidental than was warranted. That conclusion was contrary to the standards set out in the NFPA 921 and presented the issuing judge an incomplete and skewed picture of the available evidence. In short, by omitting the batteries as a potential ignition source, the affidavit elevated suspicion over science and invited the reviewing judge to ratify guesswork masked as objective investigation. That omission and misleading claim that

---

[32] NFPA 921 at 23.4.1 – 23.4.1.2.

*Federal Defender Services*
*of Wisconsin, Inc.*

investigators did not observe evidence of other potential accidental sources for the fire warrant a hearing under *Franks*.

### B. Absence of ignitable liquids

For the reasons in Section I, any probable cause showing that the fire was intentionally set was weak at best. That minimal showing would have been extinguished if Hankins had included the fact that the investigators sent debris from the shelf to the crime laboratory for testing and that the lab found no traces of any ignitable liquids. This was of obvious importance given that fire investigators are trained to identify the presence of ignitable liquids at a fire scene as their presence or absence are important considerations in determining if a fire is incendiary and determining a fire's origin. The fact that the debris tested negative, along with the absence of other observations an investigator might expect to find at an arson scene—multiple fires, trailers, unexpected fuel load, or removal of personal or valuable contents before the fire—sharply undermined the government's theory that the fire was intentionally set. The absence of any affirmative evidence establishing that this was arson, in combination with the investigators' inappropriate reliance on negative corpus, meant that the affidavit failed to establish probable cause that a crime had been committed.

The Recommendation doesn't take particular issue with Allen's reasoning but concludes that "even if the absence of an accelerant suggests that a fire is an accident,

18

*Federal Defender Services*
*of Wisconsin, Inc.*

awareness of that fact would not have removed the basis for probable cause in this instance."[33] The Magistrate Judge simply demands too little from the government.

### C. Hankins failed to disclose that the NFPA 921 has deemed the negative corpus methodology he relied on "inappropriate."

As an experienced fire investigator, SA Hankins relies on the scientific method and specifically the NFPA 921: Guide for Fire and Explosion Investigations (2021). As Hankins was aware, a fire's cause should not be deemed incendiary just because other hypotheses have been eliminated, but that's precisely what he did here. As he explained his reasoning in the affidavit, "investigators did not observe evidence of an electrical failure in the area of fire origin, and there were no other potential accidental heat sources in that area other than electrical heat sources."[34] The NFPA 921 cautions against the inappropriate use of the process of elimination and states that "[i]dentifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as *negative corpus*."[35] It then states that: "The negative corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses and may result in incorrect determinations of the ignition source and first fuel ignited."[36] Put another way, it's not an expert opinion and given that, a judge should not rely on it.

---

[33] Dkt. No. 41 at 13.
[34] Dkt. No. 23-4 at 19.
[35] Dkt. No. 23, Ex. H, NFPA 921 at § 19.6.5.
[36] *Id.*

*Federal Defender Services of Wisconsin, Inc.*

Given that the affidavit touted Hankins's vast training and experience, it also should have included his awareness that the methodology he used here has not only been deemed inappropriate, but investigators are told it should not be used at all. Not presenting this information regarding known shortcomings about the process he used is akin to failing to alert the warrant-issuing judge about serious credibility concerns with an informant. *See, e.g.*, *United States v. Clark*, 935 F.3d 558, 566 (7th Cir. 2019).

The Recommendation doesn't deny that the NFPA 921 rejects negative corpus or that Hankins used it. Instead, it rejects Allen's argument by once again noting that probable cause is not a high bar.[37] But it is a bar, and if Hankins had disclosed what he knew—that the negative corpus methodology is inappropriate—any probable cause showing based on that methodology would have been extinguished.

### D. The Recommendation fails to consider the cumulative effect of the above omissions and misrepresentation.

Although any one of the omissions and misrepresentations identified above were, on their own, enough to negate a finding of probable cause, their cumulative impact is even more pronounced. The Recommendation went piece by piece, addressing each misrepresentation Allen raised individually, but that's not the proper standard. Instead, when determining whether the omissions and misrepresentations were material and would have affected any showing of probable cause, the court must "excis[e] the false statements and review the omitted information" all together to determine whether the

---

[37] Dkt. No. 41 at 15-16.

*Federal Defender Services*
*of Wisconsin, Inc.*

warrant affidavit still establishes probable cause. *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006). The Recommendation failed to do so here. Considering all the misleading omissions and misrepresentations at once would remove any doubt that the warrant affidavit failed to establish probable cause that the fire was not only intentionally set but intentionally set by Allen.

### III. The Magistrate Judge correctly concluded that the warrant for Allen's Facebook Records was overbroad, but incorrectly concluded the good-faith exception should apply.

Allen also sought to suppress all evidence obtained from execution of the search warrant for her Facebook account. As Allen argued in her motion, law enforcement officers sought an astonishing amount of deeply personal data from her Facebook account, spanning years, without ever explaining how that information was connected to the alleged arson under investigation. The Magistrate Judge agreed, noting that the warrant "required Facebook to disclose nineteen separate categories of information from Allen's Facebook account, including: all stories posted since June 1, 2019; all photos and videos since June 1, 2019; all records of the accounts usage of the 'like' feature; all information about Facebook pages the account is a 'fan' of; all past and present lists of friends; and all Facebook searches since June 1, 2019."[38] The Magistrate Judge correctly determined that "the warrant's scope is overbroad in both time and content," noting that the warrant affidavit "did not explain why probable cause supported most of the

---

[38] Dkt. No. 41 at 21.

*Federal Defender Services*
*of Wisconsin, Inc.*

requested categories" and "did not adequately contextualize the need for historical data."[39]

Despite those significant shortcomings, the Magistrate Judge recommended denying Allen's motion to suppress the Facebook evidence because of the good-faith exception to the exclusionary rule. Specifically, the Magistrate Judge found that out-of-circuit decisions about the constitutionality of broad social media warrants "does not put officers in the Seventh Circuit on notice of the potential for unconstitutional overbreadth" in such warrants.[40] But the Magistrate Judge takes too sweeping a view of the good-faith exception.

It is true that a police officer's decision to obtain a warrant is treated as prima facie evidence that the officer was acting in good faith. However, in the quintessential case regarding the good-faith exception, *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court "declined to go so far as to hold that exclusion is always inappropriate where an officer has obtained a warrant and abided by its terms." *United States v. Lewis*, 81 F.4th 640, 647 (6th Cir. 2023). Instead, the Court found that suppression would remain appropriate where law enforcement officers lacked "reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. Law enforcement officers lack such reasonable grounds in at least four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for

---

[39] Dkt. No. 41 at 22.
[40] Dkt. No. 41 at 24.

*Federal Defender Services*
*of Wisconsin, Inc.*

his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*Lewis*, 81 F.4th at 647 (internal quotation marks omitted).

Here, the good-faith exception cannot apply for two reasons: first, the affidavit incorporated the same misleading omissions and misrepresentations discussed above in Ms. Allen's *Franks* challenge. *See Leon*, 468 U.S. at 923 ("[S]uppression . . . remains appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth." (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

Second, the good-faith exception cannot apply because law enforcement officers' reliance on the warrant was not objectively reasonable. The Recommendation dismisses Allen's argument and appears to adopt the government's position that in order to show the good-faith exception does not apply, Allen must show the warrant was contrary to binding precedent that is directly and virtually indistinguishably on all fours with the facts of this case. But that's not the standard. [41]

---

[41] Dkt. No. 41 at 24.

*Federal Defender Services*
*of Wisconsin, Inc.*

Importantly, the cases the government and Recommendation cite that reference "binding precedent"– *United States v. Martin*, 807 F.3d 842 (7th Cir. 2015) and *Davis v. United States*, 564 U.S. 229 (2011) – are not about warrants at all. Rather, those cases deal with situations where officers conducted a search that under then-existing precedent was thought to be legal, but is later deemed unconstitutional. *See Martin*, 807 F.3d at 846 ("Neither party disputes, nor could they, that at the time officers attached the GPS and tracked Martin's Lincoln, their actions were not considered a 'search' within the Fourth Amendment and that after *Jones*, they were."); *see also Davis*, 564 U.S. at 239 ("The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent."). In such cases, the police can avoid the exclusionary rule by showing "binding appellate precedent specifically authorize[d] a particular police practice." *Davis*, 564 U.S. at 241. The government, of course, has made no showing that binding appellate precedent specifically authorized overbroad social media warrants like the one at issue here. Importantly, those cases do not hold that a defendant must cite directly binding, factually indistinguishable, appellate precedent to show an officer's reliance on a warrant was not objectively reasonable.

Instead, courts have found that the good-faith exception will not apply if *either* (1) "courts have held that a materially similar" – not identical – "affidavit failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand;" *or* (2) "the affidavit is so plainly deficient that any reasonably well-trained

24

*Federal Defender Services of Wisconsin, Inc.*

officer "would have known that his affidavit failed to establish probable cause." *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002).

A reasonably well-trained officer should have known the Facebook warrant here simply did not pass muster. For decades, it has been the law that "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). Courts across the nation have said time and again that a warrant must be as "specific [as the officers'] knowledge allows" under the circumstances, *Bishop*, 910 F.3d at 338, and not "allow officers to search for items that are unlikely to yield evidence of the crime," *United States v. Vizcarra-Millan*, 15 F.4th 473, 502 (7th Cir. 2021); *see also United States v. Jones,* 54 F.3d 1285, 1289-90 (7th Cir. 1995). These aren't new requirements, they are core principles of the Fourth Amendment.

Indeed, as far back as 15 years ago, the Seventh Circuit had clearly applied the particularity requirements of the Fourth Amendment to digital information and even directly "counsel[ed] officers and others involved in searches of digital media to exercise caution to ensure that warrant describe with particularity the things to be seized and that the searches are narrowly tailored to uncover only those things described." *United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010).

The officers here did not follow that admonition. Instead, the warrant sought broad categories of information, which the affidavit made no attempt to connect to the suspected offense at all. A reasonably well-trained officer should have known that what

*Federal Defender Services
of Wisconsin, Inc.*

this warrant authorized was nothing more than a broad exploratory search of Ms. Allen's private Facebook materials in the hopes of uncovering evidence that officers hope existed, but had no particularized probable cause to believe they would find. Again, such generalized rummaging is precisely what the Fourth Amendment prohibits, as an objectively reasonable officer should have known. *See United States v. Winn*, 79 F. Supp. 3d 904, 923-24 (S.D. Ill. 2015) (finding an objectively reasonable officer could not have relied on a warrant that broadly authorized the seizure of defendants' cellphone data, like call logs and text messages, that were unrelated to the crime under investigation); *see also Burns v. United States*, 235 A.3d 758 (D.C. 2020) (finding good-faith exception did not apply to "bare bones" and overbroad warrant that "authorized a search of everything on [defendant's] phones and listed internet browsing histories, web search terms, and photographs among the categories of items to be seized" even though the affidavit only made proper factual showing for three narrow categories of data); *United States v. Irving*, 347 F. Supp. 3d 615, 624-26 (D. Kan. 2018) (finding the good-faith exception did not apply where affiant sought broad Facebook disclosure to "identify investigative leads and corroborate other information obtained during the investigation.").[42]

---

[42] In *Irving*, the court was especially troubled by language incorporated by the affiant that showed the broad view he was taking of the warrant and Facebook search, including his statement that Facebook records had the "potential to provide identifying information for the account's user, *identify investigative leads, and corroborate other information obtained during the investigation.*" (emphasis in original). The affidavit here included similar language. For example, SA Hankins averred that "information stored in connection with a Facebook account may provide crucial evidence of the 'who, what, why, when, where, and how' of the criminal conduct under investigation." Def. Ex. K at ¶ 60. That language, like in *Irving*, revealed the same intent for an impermissibly broad exploratory search.

*Federal Defender Services of Wisconsin, Inc.*

Beyond the sheer overbreadth of the warrant, however, there are additional facts here that should preclude the application of the good-faith exception. Namely, the warrant affidavit purported to make a distinction between what data could be "searched" versus "seized" – a fact the government tried to rely on in response to Allen's motion to suppress. *See* Dkt. No. 32 at 21-22 ("Allen correctly notes that the information identified in Attachment A to be disclosed by Facebook was very broad – but the items identified in Attachment B to be seized by the government was much narrower and tailored to the arson investigation."). The Magistrate Judge rejected that distinction between "seizure" and "disclosure" as "not dispositive" because "the government would have seen both disclosed and seized information."[43] The Magistrate Judge's analysis on that issue is correct. But to the extent the government and law enforcement believed there was a meaningful distinction between the information to be disclosed and the information to be "seized" under the warrant, it appears that law enforcement did not abide by that limitation. As Allen noted in her prior briefing, law enforcement appears to have maintained the entirety of the disclosed information. In fact, the Facebook materials produced to the defense in discovery cover more than 87,000 pages and there is no indication that it reflects only the more narrow subcategory of items subject to "seizure" that the warrant described. That suggests law enforcement did not strictly abide by the edicts of the warrant, further rendering the good-faith exception inapplicable. *See Winn,*

---

[43] Dkt. No. 41 at 19.

*Federal Defender Services*
*of Wisconsin, Inc.*

79 F. Supp. At 923-24 (refusing to apply good faith here officers "shockingly managed to exceed the scope of the warrant despite its incredible overbreadth").

## IV. Allen's statements to officers on the day her home was searched must be suppressed.

Finally, Allen's third pretrial motion sought suppression of all statements she made to law enforcement when she was interrogated while ten armed officers in tactical gear searched her home. The reality of Ms. Allen's confrontation with law enforcement on November 2, 2021, is that a reasonable person would have felt themselves to be in custody and not free to leave given the police-dominated atmosphere, the coercive tactics employed by police, the accusatory questioning, and the absence of any reasonable alternatives for Ms. Allen to leave. It's a fiction to believe that a couple of statements during nearly an hour of interrogation to a suspect in Allen's shoes advising her she could leave, wasn't under arrest, or didn't have to talk, would dispel the overwhelming feeling that the police were in control of her every movement. The police, knowing this, set up what they referred to among themselves as a "ruse," intending to catch Allen unaware and alone to subject her to intense questioning without the benefit of *Miranda* warnings.

The Recommendation recognizes that there were coercive aspects to the encounter. It notes that Allen responded to the officers' show of force in following her upstairs and snatching her phone from her hand with confusion and fear. It also notes that ten officers dressed in tactical gear approached her house with large assault rifles drawn, which was "undoubtedly disturbing." But it gives the impact of these coercive

28

*Federal Defender Services of Wisconsin, Inc.*

actions short shrift and barely recognizes the impact the accusatory questioning would have had on a suspect like Allen, as it communicated the officers' belief that Allen had committed a serious felony. The facts set forth in Allen's reply brief provides a fuller understanding of the dynamics at play.[44] The one-two punch of Heimerl and Anderson entering her home, seizing her phone, and going to her bedroom, followed by the ten officers storming her home, made Allen feel at the officers' mercy before the knockout punch supplied by the accusations against her erased any doubt in her mind that she could not just choose to leave.

The Recommendation emphasizes that Heimerl explained to Allen that what the police were doing was "protocol,"[45] or "for safety,"[46] but those explanations made their actions no less invasive or domineering. In fact, at one point immediately after Heimerl told Allen the police were acting according to policy and for safety, she can be heard breathing heavily and crying before exclaiming: "Oh my God. This is so invasive!"[47] This is right after the armed officers can be heard shouting in the background as they entered Allen's home.[48] The Recommendation makes no effort to address the case law Allen cited on this point. *See United States v. De La Vega*, No. 18-cr-40, 2018 WL 8545871, at *6 (E.D. Wis. Oct. 18, 2018), *report and recommendation adopted*, No. 18-CR-40-JPS, 2019 WL 1453065 (E.D. Wis. Apr. 2, 2019) (while the armed entry no doubt was a routine practice to ensure

---

[44] Dkt. No. 38 at 1-11.
[45] Dkt. No. 41 at 34
[46] Dkt. No. 41 at 27,
[47] Dkt. No. 30-5 at 09:45 to 10:10.
[48] Dkt. No. 30-5 at 09:55 and 09:58.

*Federal Defender Services
of Wisconsin, Inc.*

safety and security, "even if routine, it is still relevant when determining whether a reasonable person would believe he was in custody"); *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010) (recognizing that whether measures were taken for safety or not, the presence of an "overwhelming armed force in the small house could not have failed to intimidate the occupants").

Similarly, the Recommendation emphasizes that when police execute a search warrant, they have the limited authority to detain occupants while the search takes place. Of course, Allen's complaint isn't with the lawfulness of the detention, it's with the fact that she was interrogated while in custody and without *Miranda* warnings. The police may have been fully justified in executing the search warrant as they did, but that doesn't lessen the impact those actions had on Allen's state of mind. *See De La Vega*, 2019 WL 1453065 (rejecting the government's argument that the lawfulness of the search of defendant's home pursuant to a warrant was at all relevant to whether the defendant was in custody of purposes of *Miranda*). Regardless of policy, a reasonable person in Allen's shoes, a Black woman in an overwhelmingly white community, would view the actions of two white male officers following her into her bedroom and taking her phone, in anticipation of a tactical squad entering the house as highly invasive of her privacy and extremely intimidating.[49] Those feelings of intimidation don't disintegrate when the police soften their tone or try to calm a suspect down.[50]

---

[49] *See* Dkt. No. 38 at 25-26.
[50] Dkt. No. 38 at 26-28.

*Federal Defender Services*
*of Wisconsin, Inc.*

Further the cases the Recommendation cites for the proposition that generally "[a] person detained during the execution of a search warrant is not normally in custody for *Miranda* purposes" actually stand in stark contrast to the circumstances Allen faced here. In *United States v. Saadeh*, 61 F.3d 510, 520 (7th Cir. 1995), for example, the defendant was detained in his home's garage with the other occupants of the building for a short period of time before his eventual arrest. During the time he was detained, the court emphasized, the defendant was "not the isolated target of any directed questioning," in fact, his questioning was "limited in scope and duration" to "a single question." *Id*. Those circumstances, the court found, did not rise to the level of restraint comparable to an arrest. But that is very different from the circumstances Allen found herself in on November 2, where she was alone, moved from her home to a police car, and subjected to lengthy, accusatory questioning about her involvement in an arson.

The second case the Recommendation cites to say that, in general, a brief detention while officers execute a search warrant is not "custodial" within the meaning of *Miranda*, *United States v. Burns*, 37 F.3d 276 (7th Cir. 1994), is also markedly distinguishable. In *Burns,* the defendant was detained in her own hotel room for "less than 10 minutes," while only two law enforcement officers, who did not display or brandish weapons, searched her room. Further, like in *Saadeh*, the defendant's questioning was limited in scope and duration – indeed, the opinion cites to only two questions law enforcement officers asked Burns. *Id.* at 278, 281. Again, that is very different from Allen's circumstances. Both *Burns* and *Saadeh*, therefore, reinforce that Allen's detention was not

31

*Federal Defender Services of Wisconsin, Inc.*

merely a routine detention during the execution of a search warrant. Allen faced significantly more coercive pressure than the defendants in either of those cases, making her detention more akin to an arrest than a brief investigatory stop, and triggering the protections of *Miranda.*

The Recommendation's other main points are that Allen was told she wasn't under arrest, willingly answered the agent's questions after being told she did not have to, and that the statements to the effect that she could go inside after they finished talking "were not a threat so much as an explanation and attempt at reassurance." Allen's reply brief addressed these points at length and examined why the alleged reassurances by Heimerl would not have made a reasonable person believe they were free to leave.[51] It's notable that despite the claim that Allen consented to the interview, she never once was asked if she wanted to talk or wanted to leave until after the questioning stopped. That's why *Miranda* warnings are so important—they inform the suspect of their rights and require a waiver before questioning.

One very significant factor in the analysis here is Heimerl's accusatory questioning indicating the police had a strong case against Allen that would have made a reasonable person believe they would not be allowed to go home that day. Yet, the analysis section of the Recommendation never addresses this factor, which strongly supports a finding of custody as discussed in Allen's underlying reply brief.[52] The setting of the interrogation,

---

[51] *See* Dkt. No. 38 at 14-21.
[52] Dkt. No. 38 at 21-23.

*Federal Defender Services*
*of Wisconsin, Inc.*

a law-enforcement vehicle where Allen was hemmed in, also was a police-dominated atmosphere.[53]

The Seventh Circuit has recognized that police "sometimes are restive under the restraints imposed by the [*Miranda*] rule and seek to circumvent it by avoiding the appearance of custody." *Slaight*, 620 F.3d at 817. That's what happened here. And, as in *Slaight*, the mere fact that the officer told the suspect that they were not under arrest and free to leave doesn't trump all else that occurred.

 The coercive environment surrounding Allen's interrogation – the show of force in entering her home, the seizure of her phone, her relocation to a police vehicle, her isolation, her lack of alternative places to go given her clothing and the weather, her extensive questioning, and the accusatory nature of that questioning – all rendered any supposed reassurances that she was free to leave meaningless. A reasonable person in Allen's position would have understood themselves to be in custody, regardless of such empty disclaimers. Because Allen was interrogated in a custodial setting without the protections of *Miranda*, her statements must be suppressed.

## CONCLUSION

For the reasons above and in Ms. Allen's prior submissions, the Court should overrule the Magistrate Judge's Recommendation and grant Ms. Allen's motion to suppress the fruits of the warrants to search her home, vehicle, restaurant, and Facebook

---

[53] Dkt. No. 38 at 23-25.

*Federal Defender Services
of Wisconsin, Inc.*

records; her motion to suppress her statements obtained without *Miranda*'s protections; and her request for a *Franks* hearing.

Respectfully submitted,

*/s/ Craig W. Albee*
Craig W. Albee, WI Bar #1015752
Dennise Moreno, NY Bar #5797154
Federal Defender Services
    of Wisconsin, Inc.
411 E. Wisconsin Avenue, Suite 2310
Milwaukee, WI 53202
Tel. (414) 221-9900
Email: craig_albee@fd.org

*Counsel for Defendant,* Arletta Allen

34