UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff,*

        *vs.*                             Case No. 24-cr-236

ARLETTA ALLEN,

        *Defendant.*

## REPLY IN SUPPORT OF OBJECTIONS

**I.**       **Hankins's Affidavit Failed to Supply Probable Cause**

Allen's first challenge to the search warrant is that the affidavit failed to explain why Special Agent Hankins, the fire investigator, concluded that the origin of the fire was the shelf on the landing at the top of the stairs. This was critical because Hankins's conclusions about the fire's cause were dependent on the origin. The affidavit touts Hankins's credentials and summarizes some of the firefighters' scene observations, but it doesn't explain why those observations led Hankins to conclude that the fire began on the shelf. That left the warrant-issuing judge reliant on Hankins's bare conclusions, which isn't enough under *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Rather, the affidavit must provide a sufficient basis for the warrant-issuing judge to assess the reasonableness of the expert opinion. It didn't in this case.

The government suggests that *Gates* dealt with an anonymous letter, not expert opinion, so its warning against relying on conclusory statements isn't applicable here. ECF No. 45 at 4. But *Gates* wasn't limited to its facts and its declaration that the

*Federal Defender Services
Of Wisconsin, Inc.*

magistrate's action "cannot be the mere ratification of the bare conclusion of others," applies to the evaluation of any search warrant. Allen provided a recent example of its application to an expert opinion in an arson investigation in *United States v. Waide*, 60 F. 4th 327, 337 (6th Cir. 2023), where the court found that a fire investigator's affidavit proclaiming a fire "incendiary," was insufficient because it failed to provide factual support for the claim.

The government complains that Allen's challenge relies on irrelevant sources. ECF No. 45 at 5. Allen cited a law journal article about arson investigations and wrongful convictions not as legal argument, but to highlight that fire investigation is a complex endeavor that requires an assessment of the investigator's methods, which wasn't possible here given the absence of any information as to how the investigators arrived at their opinion. The warrant-issuing judge cannot just assume that proper methods were followed or that there was sufficient support for the investigator's opinion as to the origin of the fire. While Allen isn't disputing Hankins's expertise, that expertise doesn't allow the warrant-issuing judge to rubber stamp his bare conclusions.

The government takes Allen to task for "speculat[ing]" that the fire observed by firefighters could be the result of drop down or conduction, but that's no more speculative than concluding the fire started on the shelf because there were flames in the area. ECF No. 45 at 5-6. Allen is merely identifying that there are other potential hypotheses regarding the origin of the fire. That is, even with so little information in the affidavit, it's not hard to hypothesize other possibilities. And, of course, another

2

possibility is that there wasn't enough available information to reliably determine an origin point. The Recommendation made some assumptions about the fire (that the presence of flames on the landing supported an origin in the shelf and that ceiling heat for some reason suggests the fire couldn't have begun there, for example), ECF No. 41 at 7, but there's no support for those assumptions in the affidavit or any indication that Hankins's opinion was grounded on those facts. It was Hankins's job to spell out why other locations were rejected and why he concluded the fire began on the shelf within the confines of the four corners of the affidavit. He didn't do that. And Allen has no separate duty to prove what actually happened when she challenges the sufficiency of the affidavit.

Allen remains puzzled by the government's continued emphasis on the fact that the investigation was still ongoing. ECF No. 45 at 6. An incomplete investigation doesn't enhance its case, it undermines the strength of any conclusions drawn by investigators, who couldn't rule out other causes until they completed their investigation. This was especially important here because the government's reasoning was that there were no apparent ignition sources in the shelf area so the fire must have been intentionally set. The government's response doesn't explain why that reasoning, based on the inappropriate negative corpus methodology, should be adopted in the absence of any information in the affidavit about how important additional testing would be and the likelihood that the testing would reveal an alternative cause for the fire.

*Federal Defender Services*
*Of Wisconsin, Inc.*

In addition to failing to establish that the fire was intentionally set, the affidavit failed to establish that Allen was responsible for the fire. For the reasons set forth in Allen's Objections, the affidavit failed to establish motive. On this point, the government merely responds that the affidavit provided enough information "to infer" that the fire "could have been financially motivated," ECF No. 45 at 6-7, but "could have been" isn't probable cause. The affidavit simply fails to show that the restaurant was in financial distress or that Allen, the lessee, would have benefited from causing the fire. Nor does the affidavit establish that the person on the video was Allen or that that person, whoever it was, ever entered the restaurant.

## II. Allen has made the necessary preliminary showing for a *Franks* hearing.

### A. This Court should review Allen's *Franks* claim de novo.

The government argues that this Court must only review the Magistrate Judge's decision to deny Allen's *Franks* motion for "clear error." That is not the appropriate standard. ECF No. 45 at 3. In support of that standard, the government cites to *United States v. Harris*, 464 F.3d 733, 737 (7th Cir. 2006), but that case is about what standard an *appellate court* will apply to a *district court's* decision to deny a request for a *Franks* hearing, it does not govern the appropriate standard of review where a district court is reviewing the Magistrate Judge's determination.[1]

---

[1] *Harris* also makes clear that even an appellate court, which gives deference to the district court's factual findings under the clear error inquiry, will review "any legal determinations that factor into the court's ruling" de novo. *See* 464 F.3d at 737.

*Federal Defender Services*
*Of Wisconsin, Inc.*

To determine the relevant standard, this Court must instead look to the Federal Magistrates Act, 28 U.S.C. § 636, and the rule implementing it, Federal Rule of Criminal Procedure 59. Together, the statute and the rule outline the procedures for matters that can be referred to a magistrate judge and the scope of a magistrate judge's authority in federal criminal cases.

Under Rule 59, district judges may refer certain matters to magistrate judges. The scope of the magistrate judge's authority over those matters and the relevant standard of review and oversight the district court must apply depends on whether the referred matter is "dispositive" or "non-dispositive." For "non-dispositive" matters, the magistrate judge can issue an order deciding the matter, and while the parties may object to that order, the district court reviews it for "clear error." *United States v. Garcia*, 936 F.3d 1128, 1137 (10th Cir. 2019).

For "dispositive" matters, on the other hand, the magistrate judge must issue a report and recommendation instead of an order, recommending findings and a course of action to the district court judge. The parties, again, may object to that recommendation. And if any party does object, "then the district court must consider de novo the objections." *Id.*

Importantly, "Rule 59 does not clarify what constitutes a dispositive or non-dispositive issue, leaving to the courts to decide what can properly be referred to a magistrate judge and what requires a report and recommendation." *Id.*; *see also* Fed. R. Crim. P. 59, Advisory Committee's Notes 2005 ("Although the rule distinguishes between

*Federal Defender Services*
*Of Wisconsin, Inc.*

'dispositive' and non-dispositive' matters, it does not attempt to define or otherwise catalog motions that may fall within either category. Instead, that task is left to the case law.").

Rule 59 does, however, provide *some* guidance regarding what should be considered "dispositive" in criminal matters. The rule specifically lists "a defendant's motion to dismiss or quash an indictment or information, *a motion to suppress evidence*, or any matter that may dispose of a charge or defense," as "dispositive." Fed. R. Crim. P. 59 (b)(1) (emphasis added). The underlying statute, 28 U.S.C. § 636, similarly includes a defendant's "motion to suppress" among the types of motions requiring de novo review.

That language, alone, should settle the matter here. A *Franks* motion that alleges the government violated a defendant's Fourth Amendment rights by making knowingly or recklessly false misrepresentations or omissions in a warrant affidavit *is* a "motion to suppress." That the Supreme Court created a specific procedural mechanism to achieve such suppression in the context of false or misleading statements in *Franks* does not change the fundamental nature of the motion. Suppression, after all, remains the ultimate remedy for such violations. *See Franks*, 438 U.S. at 155-156 ("[T]he Court has not questioned . . . the continued application of the rule to suppress evidence from the State's case where a Fourth Amendment violation has been substantial and deliberate. We see no principled basis for distinguishing between the sufficiency of an affidavit, which is also subject to post-search examination, and the question of its integrity."); *see also id.* at 156 (explaining that where a defendant establishes, by a preponderance of the evidence,

6

*Federal Defender Services*
*Of Wisconsin, Inc.*

that the affidavit intentionally or recklessly included material false statements, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit").

But even if this Court were to find that a *Franks* motion is not a "motion to suppress" within the meaning of Rule 59 or the Federal Magistrates Act, it is sufficiently similar in kind to such motions to nevertheless trigger the more exacting standard of review for "dispositive" matters. As noted above, the Advisory Committee specifically noted that the list of "dispositive" motions included in the Rule was not meant to be exhaustive. Although the Federal Magistrates Act also specifically enumerates types of motions that necessarily require robust de novo review by a district court upon an objection, courts have similarly found that the statutory "list is non-exhaustive." *See Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008) (collecting cases); *see also Flam v. Flam*, 788 F.3d 1043 (9th Cir. 2015) (recognizing that "the Supreme Court has identified some judicial functions as dispositive notwithstanding the fact that they do not appear in the [statute's] list.").

In reaching that conclusion, courts have cited the fact that "[g]iven the possible constitutional implications of delegating Article III judges' duties to magistrate judges," courts should generally "constru[e] the Federal Magistrates Acts narrowly." *Id.* Put another way, in order to avoid constitutional problems with over-delegating the district court's duties to magistrate judges, courts should err on the side requiring more robust review by the district courts—not less. The relevant inquiry courts have used to

7

*Federal Defender Services Of Wisconsin, Inc.*

Case 2:24-cr-00236-PP   Filed 09/24/25   Page 7 of 23   Document 48

determine whether a matter is "dispositive" or not has been how similar the contested matter is to the "dispositive" motions listed in Rule 59 and § 636(b). *See, e.g., Gomez v. United States*, 490 U.S. 858, 873-74 (1989) (concluding that jury selection in a felony trial is dispositive for purposes of §636(b)(1)(B), despite the fact that it's not specifically enumerated in the statute, because it is "more akin to those precisely defined, dispositive matters" than the "non-dispositive" matters governed by the more lax standard in § 636(b)(1)(A)"). Courts have looked at, for example, "the practical effect of the challenged action on the instant litigation" and how similar that effect is to the "dispositive" motions included in Rule 59 and § 636. *Flam*, 788 F.3d at 1046.

Here, even if a *Franks* motion is not characterized directly as a "motion to suppress" within the meaning of Rule 59 or § 636, it is sufficiently similar to be characterized to such motions to be considered "dispositive." The magistrate judge's decision to deny a *Franks* motion, after all, is "functionally equivalent" to an order denying a motion to suppress. Both decisions put a halt to the defendant's attempt to keep evidence out at trial that they believe was obtained in violation of their rights.

Accordingly, because Allen has filed specific objections, the Magistrate Judge's decision to deny her request for a *Franks* hearing should be subject to de novo review.[2] Allen maintains, however, that even under a clear error standard, this Court should grant her request for a *Franks* hearing.

---

[2] Allen acknowledges that this Court has previously applied a "clear error" standard of review to a Magistrate Judge's order denying a *Franks* hearing in the past. *See United States v. Massey*, No. 20-cr-162, 2022 WL 214793 (E.D. Wis. Jan. 25, 2022). However, the parties did not challenge or brief the standard of review in that case and the Court, therefore, had no occasion to consider the appropriate standard.

*Federal Defender Services
Of Wisconsin, Inc.*

## B. The lithium batteries

As noted above, SA Hankins's reasoning was that the fire must have been intentionally set because there were no other potential ignition sources at the point of origin. But there was another potential source in the form of four lithium-ion batteries that are a well-known cause of fire. The government's response attempts to excuse the failure to alert the warrant-issuing judge to the presence of the batteries in the following ways:

- The NFPA 921 only added its section warning of the dangers of lithium-ion batteries in the 2021 edition, ECF No. 45 at 8;
- The fire damaged batteries would have been difficult for Hankins to identify as lithium-ion batteries, ECF No. 45 at 9; and
- There's no evidence that Hankins knew these were lithium-ion batteries, ECF No. 45 at 9.

Notably, the government doesn't claim that Hankins *didn't know* these were lithium-ion batteries or that he wasn't aware of the fire risk those batteries posed (however, in an earlier pleading the government asserted that the fact that these were lithium batteries was a "fact not yet in existence" and a "fact yet unknown" to Hankins when he prepared the affidavit). *See* ECF No. 32 at 9, 10.

As to the first point, the 2021 edition of the NFPA 921 was issued on April 5, 2020, with an effective date of April 25, 2020, and superseded all previous editions of the manual.[3] This was almost a year and a half before the affidavit in this case. Hankins's Origin and Cause Report (which admittedly was prepared after the affidavit) states that

---

[3] NFPA 921, *Guide for Fire and Explosion Investigations*, at 921-1 (2021 ed.).

*Federal Defender Services*
*Of Wisconsin, Inc.*

Hankins "utilized the Scientific Method during the course of this fire investigation, as recommended by the 2021 edition of NFPA 921 Guide for Fire & Explosion Investigations . . . ."[4]

As to points two and three, Allen asserts that any qualified fire investigator would have recognized the batteries as lithium-ion batteries and known they were a potential ignition source that posed a fire risk. And even if somehow he wasn't certain what type of batteries they were, Hankins would have known they might be lithium-ion batteries that were a potential source of the fire that must be considered by a fire investigator.

The government also says it's "improper" to use a 2025 lens on an issue that it claims was only emerging as an area of fire study in 2021. ECF No. 45 at 8. In other words, there was no reason to assume that Hankins would yet have known about the changes to the NFPA 921 or have learned about the dangers of lithium-ion batteries in November 2021. Allen has attached, as Exhibit A, Special Agent Hankins's CV,[5] which reflects that in June 2021, more than three months before the fire in this case, *he took a one-hour class from the International Association of Arson Investigators about Lithium-Ion Battery Fires*. Allen further notes that in at least one investigation before 2021, Hankins received a report from the same ATF Electrical Engineer used in this case, Cameron Novak, that identified lithium batteries as a potential ignition source that must be considered.[6] That was in 2017. So there's little doubt, despite the government's protestations, that SA

---

[4] In the Discovery, marked Allen_000653.
[5] Filed in *United States v. Patel*, 24-cr-00150 (E.D. Wis.), Dkt. No. 16, Ex. A.
[6] See *United States v. Lane*, 21-cr-00083 (E.D. Wis.), Novak report at 3 ("Batteries can also fail when overheated, mechanically damaged, or from a manufacturing defect").

*Federal Defender Services Of Wisconsin, Inc.*

Hankins was well aware of the dangers of lithium-ion battery fires at the time he was conducting this investigation based on his training and the revisions to the NFPA 921 that predated this investigation.

Given that Hankins had received training on lithium-ion batteries and was familiar with the 2021 edition of the NFPA 921, which warns of the dangers of lithium batteries, Allen has made a substantial preliminary showing that the omission of the information that lithium-ion batteries were found at the scene was deliberate or reckless.

The government's claim that Hankins simply did not know the batteries were lithium-ion batteries demands a hearing. The Seventh Circuit has made clear that the government cannot "present new evidence to explain the discrepancies identified by the defense" and "bolster" the warrant affidavit to rebut the defense's preliminary showing required for a *Franks* hearing. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013) (also recognizing that a "pre-*Franks*" hearing might appropriately be ordered for the defense to have an opportunity to make a full showing in support of its motion). Instead, such evidence is only "appropriate for the *Franks* hearing itself, where the defense must have the opportunity for full cross-examination." *Id.* The government's claim that Hankins, an experienced fire investigator, had not identified the recovered batteries as lithium-ion batteries is precisely such an attempt to explain away a discrepancy that the defense should have the opportunity to cross-examine. It is so implausible that Hankins didn't know or consider that these were lithium-ion batteries that the government's claim regarding his lack of knowledge gives more reason – not less – to doubt his credibility

11

*Federal Defender Services*
*Of Wisconsin, Inc.*

and find that his omission in the affidavit was intentional or reckless. Allen also hereby provides notice that at trial, she will seek to use the government's suggestion that Hankins didn't know these were lithium-batteries to impeach his expertise and the quality of his fire investigation.

The existence of a known potential fire source that was omitted from the affidavit sharply undermines the reasoning that supported a claim that the fire was intentional. It was clear error for the magistrate judge to find otherwise.

## C. Absence of ignitable liquids and negative corpus.

Allen has just a few points in reply regarding the failure to disclose that the debris from the point of origin had tested negative for ignitable liquids and that Hankins relied on negative corpus. Whether ignitable liquids are found at a fire scene is an important clue to fire investigators in determining cause. It should have been included in the affidavit as it certainly would have been if the tests had been positive.

With respect to negative corpus, the affidavit touted Hankins's credentials as a fire investigator. But he deviated from the accepted guidelines by using a methodology viewed as inappropriate by the NFPA 921. The government calls Allen's analogy to *Clark* "preposterous," ECF No. 45 at 8, but Allen isn't comparing Hankins to an informant as the government suggests. Rather, just as an investigator who uses an informant must disclose the informant's "warts" that call into question his reliability, an investigator relying on a scientific analysis must disclose the "warts" of the methodology used that could call into question the reliability of the process. The process of elimination used here

*Federal Defender Services*
*Of Wisconsin, Inc.*

has been deemed inappropriate by the NFPA 921 and that should have been disclosed to the warrant-issuing judge.

The three omissions identified above, in combination, negated any minimal showing of probable cause. The Magistrate Judge clearly erred in finding otherwise.

### III. The good-faith exception cannot save the unconstitutionally overbroad Facebook warrant.

Allen objected to the Magistrate Judge's conclusion that the good faith exception salvaged the facially overbroad Facebook warrant. The warrant authorized officers to sift through years of Allen's Facebook data – location information, friend connections, and private messages – far beyond anything tied to the alleged offense. Allen raised several reasons that the good-faith exception could not save such a sweeping violation of her Fourth Amendment rights, including that the warrant incorporated the same misrepresentations Allen highlighted in her *Franks* challenge; the warrant was so facially deficient and overbroad that a reasonable officer could not have relied on it; and that the officers' failure to faithfully execute the terms of the warrant defeated any claim of good faith. ECF No. 44 at 21 – 28.

In its response to Allen's objections, the government faults Allen for not "point[ing] to any binding Supreme Court or Seventh Circuit case that definitively resolves the issue in her favor." ECF No. 45 at 13. According to the government, that is fatal to any argument that the good-faith exception does not apply. But a defendant does not need to cite a factually identical case to defeat good faith. While demonstrating officers ignored

*Federal Defender Services*
*Of Wisconsin, Inc.*

binding precedent that is directly factually on point is certainly *one* path to show their reliance on a warrant was unreasonable, there are others. Even the government's own cited authority acknowledges this. *See* ECF No. 45 at 13 (citing *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002) (explaining that the good-faith exception will not apply if *either:* "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were materially indistinguishable from those presented in the case at hand; *or* (2) the affidavit is so plainly deficient that any reasonably well trained officer 'would have known his affidavit failed to establish probable cause '"(emphasis added))). Here, Allen's argument is that the warrant authorized an indiscriminate sweep of years of her private digital life, the vast majority of which had no discernible connection to the offense being investigated. That was a clear violation of the Fourth Amendment's particularity requirement that made the warrant facially deficient.

     As the Supreme Court has explained, "[g]iven that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly d[oes] not comply with that requirement was valid." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). Because the principle of particularity is so foundational, warrants that so clearly fail to limit the search and seizure are facially deficient and cannot be reasonably relied on. In fact, the quintessential case that created the good-faith exception, *United States v. Leon*, specifically listed warrants lacking particularity as an example of those that may be "so facially deficient" that good faith may not apply. 468 U.S. 897, 923

*Federal Defender Services*
*Of Wisconsin, Inc.*

(1984) ("[D]epending on the circumstances of the particular case, a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.").

In that vein, there are many courts that have refused to apply the good-faith exception where warrants clearly violated the Fourth Amendment's particularity requirement. *See, e.g.*, *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988) (finding good faith did not apply to warrant that authorized the search and seizure of a "long list of business records typical of the documents kept by an export company); *United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (refusing to apply good-faith exception to overbroad warrant that authorized authorities to search and seize "every electronic" in the defendant's home where "[n]othing in the affidavit or warrant supported – or could have supported – probable cause to seize" all such devices); *United States v. Winn*, 79 F. Supp. 3d 904, 924 (S.D. Ill. 2015) (good faith did not apply because "it was not objectively reasonable for [officers] to think that a warrant was valid when it gave them unbridled discretion to search for and seize" broad data from defendant's phone that had little connection to the offense being investigated).

Further, as Allen noted in her objections, the Seventh Circuit *has*, in fact, weighed in on the importance of the particularity requirement to digital data in the past and specifically instructed officers "involved in searches of digital media to exercise caution to ensure that warrants describe with particularity the things to be seized and that searches are narrowly tailored to uncover only those things described." *United States v.*

*Federal Defender Services*
*Of Wisconsin, Inc.*

*Mann*, 592 F.3d 779, 786 (7th Cir. 2010). While the government tries to distinguish the facts of *Mann* in a footnote, it offers no explanation or reason why an objectively reasonable officer could have disregarded that clear admonition to carefully apply the particularity requirement to searches of digital data.

Finally, the government offered no response to Allen's second point: the good faith exception cannot apply here because officers did not follow the warrant's terms. The warrant affidavit tried to distinguish between the data that Facebook had to turn over for law enforcement to search (essentially all of Ms. Allen's data from the past two years), and the data that law enforcement would eventually "seize" (evidence of the purported arson). *See* ECF No. 32 at 21. While that distinction is largely a fiction that cannot solve the overbreadth problem since, by any definition, *all* of the data the government received from Facebook was "seized," it does not appear that law enforcement made any attempt to treat to two categories of data differently. As Ms. Allen noted in her objections, law enforcement appears to have maintained the entirety of the disclosed Facebook data, whether related to the alleged offense or not. ECF No. 44 at 27. The government did not deny that or offer any explanation of what steps law enforcement took to give *any* effect to the warrant's distinction between the data to be "searched" and the data to be "seized." Because the government has not shown that law enforcement officers faithfully executed the warrant, it cannot meet it burden of showing that their reliance on the warrant was reasonable. *See United States v. Fuccillo*, 808 F.2d 173, 177 (1st Cir. 1987) ("The good faith exception, therefore, will not be applied unless the officers executing search warrants, at

*Federal Defender Services
Of Wisconsin, Inc.*

the very minimum, act within the scope of the warrants and abide by their terms."); *see also United States v. Potts*, 586 F.3d 823, 832-33 (10th Cir. 2009) ("[P]roper execution of an invalid warrant is a pre-condition: if the pre-conditions exists, then the court should apply the objective good faith test to the warrant, asking whether a reasonably trained officer could have believe that the search was authorized in spite of the defect in the warrant. . . . *Leon* does not apply if the execution of the warrant was improper."). That provides a second, independent, reason that the good faith exception cannot apply.

In short, the Facebook warrant was unconstitutional. Because no reasonable officer should have relied on it and the government has not shown that officers even abided by its terms, the good-faith exception cannot prevent suppression. The Court should, therefore, adopt the Magistrate Judge's well supported finding of overbreadth but reject the conclusion that the good-faith exception applies and order that all evidence obtained from the Facebook warrant be suppressed.

## IV. Allen was in custody when officers interrogated her on the day her home was searched.

Allen also moved to suppress the statements she made to law enforcement officers while she was interrogated, sitting in a law enforcement vehicle with two agents, in her bed clothes, with no access to her purse or car, watching as ten armed officers entered and searched her home. In her previous briefing, Allen described how the circumstances she faced on that day created a coercive atmosphere that would have made any reasonable person in her shoes feel like they were not free to leave. To protect against

17

those coercive pressures, agents should have informed Allen of her rights. But they did not, opting instead to interrogate Allen without giving her a *Miranda* warning.

In its response to Allen's objections, the government focuses on the agent's demeanor, describing them as "polite, calm, professional, and sensitive," and stressing that the agents told Allen she was "not under arrest" and that she was "free to leave." ECF No. 45 at 15-18. But the custody inquiry is not about whether the officers acted with civility, or even whether their tactics were justified as a matter of policy or safety. Rather, the question is whether, in light of the totality of the circumstances, a reasonable person in Allen's position would have felt free to terminate the encounter and walk away.

A reasonable person in Allen's shoes – a Black woman, by herself, who was confronted with two male agents who restricted her movement in her own house, followed her into her bedroom, physically took her phone from her hand, told her a federal judge had found cause to search her home, and walked her to a law enforcement vehicle, where she sat and watched as ten armed officers in tactical gear and carrying assault rifles entered and searched her home – would not have felt free to leave. The agent's "politeness" and reassurances that she was not going to be arrested "*today*" and didn't have to talk to them were a weak antidote to all else that took place.[7]

---

[7] The government asserts that Allen falsely stated that she was never asked if she wanted to talk to police or leave until after she terminated the interview. ECF No. 45 at 15, n. 7. Allen acknowledges that her characterization was inaccurately framed and should have been explained more carefully. It was intended as a summary of the argument Allen made with more depth and nuance in the reply brief she filed in support of her original motion. *See* ECF No. 38 at 16 -18. Allen cited to that portion of her original briefing and incorporated it by reference into her objections in the immediately preceding sentence. *See* ECF No. 44 at 32 ("Allen's reply brief addressed these points at length and examined why the alleged reassurances by

*Federal Defender Services*
*Of Wisconsin, Inc.*

As the Seventh Circuit made clear in *Slaight*, "being polite to a suspect" and "telling him repeatedly that he's free to end the questioning and leave do not create safe harbor for police who would prefer to give *Miranda* warnings after the suspect has confessed rather than before." *United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010). The government asserts that *Slaight* is not even "remotely comparable" to Ms. Allen's case, labeling any claim that the agents' actions here were on par with law enforcement's behavior in *Slaight* "absurd." ECF No. 45. At 16 – 17.

The government ignores that Allen never claimed *Slaight* and *De La* Vega were squarely on all fours with the conduct here. Instead, Allen cited to those cases for a very

---

Heimerl would not have made a reasonable person believe they were free to leave." (citing ECF No. 38 at 14-21)). However, Allen recognizes that she should have been clearer with her argument.

    The point Allen intended to make was that officers never affirmatively sought her consent to be interrogated as a potential suspect. Instead, when officers first contacted Allen that morning, they did so under the "ruse" that they wanted to meet with her to "share a little bit of information" about the fire at her restaurant. That ruse made it seem as if the agents would be doing the talking, relaying information to Ms. Allen, rather than asking her questions that could solicit potentially incriminating information. The government is correct that when Agents Heimerl arrived at Allen's home, he told her "We're hoping we can talk in the truck," and asked, "Can we?." Ms. Allen similarly noted that request in her original reply brief. ECF No. 38 at 16. However, at that point, Ms. Allen still believed the "ruse" that agents were simply there to provide her information as an interested party, not to confront her and interrogate her as a suspect. That request, therefore, did not amount to seeking Ms. Allen's consent to answer potentially incriminating questions.

    The "ruse" was done, and the agents' intentions were more apparent minutes later, when they took Allen's phone and restricted her movement in her own home. As Allen argued in her original reply, at that point, Heimerl "began telling Allen what she needed to do, rather than seeking her permission." ECF No. 38 at 16. He told her, "We're gonna go outside and sit in my truck. Okay?." Tr. at 06:54. He told her that she didn't need to bring her purse. He said, "When we're done taking, you're coming back in the house and we're leaving. Okay?" Tr. at 07:02; *see also* Tr. at 09:11 ("[W]hen we're done talking, you're going to go back in your house."). And, as the government notes, he told Allen " . . . you don't have to talk with us. Okay? But I'm hoping we can take this opportunity to talk some more. Okay?" Tr. at 11:44. Those weren't questions to Allen asking *if* she wanted to talk in the truck or speak to agents at all, but rather directions about how they were going to proceed. Adding an "okay?" at the end wasn't an invitation for Allen to pushback or refuse, nor did it affirmatively seek her actual consent for the encounter. Indeed, Heimerl would often continue talking through his "okays," not truly leaving time or space for Arletta to respond. *See*, e.g., Tr. at 07:46; 08:09; 09:11; 11:44.

19

*Federal Defender Services*
*Of Wisconsin, Inc.*

specific proposition in her objection: that the Recommendation had not addressed case law finding that even routine police conduct taken as a safety precaution can add to the coerciveness of the environment when deciding whether a reasonable person would have felt free to leave. *See* ECF No. 44 at 29-30 ("The Recommendation emphasizes that Heimerl explained to Allen that what the police were doing was 'protocol' or 'for safety' but those explanations made their actions no less invasive or domineering. . . . The Recommendation makes no effort to address the case law Allen cited on this point." (citing *United States v. De La Vega*, No. 18-cr-40, 2018 WL 8545871, at *6 (E.D. Wis. Oct. 18, 2018), *report and recommendation adopted*, No. 18-CR-40-JPS, 2019 WL 1453065 (E.D. Wis. Apr. 2, 2019) and *Slaight*, 620 F.3d at 820).

In any case, there are far more similarities between the conduct in those cases and the circumstances here than the government suggests. In *Slaight*, for example, multiple police officers entered the defendant's home, with guns drawn. 620 F.3d at 818. The same is true here. In *Slaight*, the court made found it relevant that the police *could have* interviewed Slaight in his own home but instead took him to a second location. *Id.* at 818-19. The same is true here. Admittedly, in *Slaight* the second location was a small room in a police station whereas here the second location was a police vehicle in Ms. Allen's driveway. While not exactly the same, the environments share some commonalities: they are both small, "claustrophobic" settings that put the individuals being interrogated in uncomfortably close quarters with the police, *id.* at 819, 822, and they are both more police-dominated than the suspects' homes. *See De La Vega*, 2018 WL 8545871, at *6 (explaining that while

*Federal Defender Services*
*Of Wisconsin, Inc.*

"the interior of a vehicle parked on a residential street is a relatively public location," it is still a "police-dominated environment"). Just as in *Slaight*, the agents here "plied" Allen with questions with the express goal of getting Allen to incriminate herself. 620 F.3d at 820; ECF No. 30 at 6. And like Slaight, it quickly became apparent to Allen that the police had evidence that implicated her in a significant crime and "couldn't have believed they would actually let [her] go." *Id.* at 820.[8]

Notably, *Slaight* also had some of the very factors that the government argues conclusively show that Allen was not in custody. The police in *Slaight* were "polite" and "repeatedly told Slaight that he was free to terminate the interrogation and leave." *Id.* at 821. They asked Slaight if he would "consent to a voluntary interview," *id.*, at 820 – arguably a more direct and upfront inquiry than Allen received. They even asked Slaight if he was willing to do the interview at the police department, and offered to let him drive himself there. *Id.*

But none of those things rendered the interrogation non-custodial in *Slaight*, and they are equally not dispositive here. The repeated assurances that Slaight could leave did little to dissipate the coercive pressures of the environment, particularly because despite those reassurances, the practical reality would have made it difficult to Slaight to actually take the police up on their offer and leave. *See id.* at 819 (noting that although police told Slaight he was free to leave, they "didn't offer to drive him home" and there was no

---

[8] Notably, although the government asserts that agents "were not in a position to arrest" Allen like the police in *Slaight*, ECF 45 at 17, that sounds to counter to their argument elsewhere that there was probable cause that the restaurant fire was an arson and that Allen was the culprit.

*Federal Defender Services*
*Of Wisconsin, Inc.*

evidence that his home was "within walking distance and if not whether he had money for a cab"). The same rings true here: Heimerl's reassurances that Allen was free to leave meant little where Allen was in her bed clothes, inappropriately dressed for the weather, did not have her purse or phone, did not have access to her car,[9] and had nowhere to go.

The point is that even though cases like *Slaight* and *De La Vega* may not be identical to Allen's case, each demonstrates similar core principles: when law enforcement combines displays of force, like the ten officers who entered Ms. Allen's home, with accusatory questioning, in police-dominated settings, a reasonable person would perceive themselves to be in custody. Because Allen was subjected to custodial interrogation without *Miranda* warnings, her statements must be suppressed.

## CONCLUSION

For the reasons above and in her prior submissions, Allen renews her request that the Court overrule the Magistrate Judge's Recommendation and grant Allen's motion to suppress the fruits of the warrants to search her home, vehicle, restaurant, and Facebook records; her motion to suppress her statements obtained without *Miranda*'s protections; and her request for a *Franks* hearing.

---

[9] Although the government notes that Agent Heimerl told Allen she could enter her vehicle, that was well after Ms. Allen's interrogation had ended.

22

*Federal Defender Services*
*Of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin, this 24th day of September, 2025.

Respectfully submitted,

*/s/  Craig W. Albee*

Craig W. Albee, WI Bar #1015752
Federal Defender Services
   of Wisconsin, Inc.
411 E. Wisconsin Avenue, Suite 2310
Milwaukee, WI 53202
Tel.  (414) 221-9900
Email:  craig_albee@fd.org

*/s/  Dennise Moreno*

Dennise Moreno, NY Bar #5797154
Federal Defender Services
   of Wisconsin, Inc.
411 E. Wisconsin Avenue, Suite 2310
Milwaukee, WI 53202
Tel.  (414) 221-9900
Email:  dennise_moreno@fd.org

*Counsel for Defendant,* Arletta Allen

23