UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                     Case No. 24-cr-236-pp

    v.

ARLETTA ALLEN,

        Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 44), ADOPTING JUDGE DUFFIN'S REPORT AND RECOMMENDATION (DKT. NO. 41) AND DENYING DEFENDANT'S MOTIONS TO SUPPRESS (DKT. NOS. 23, 24, 25)**

On December 17, 2024, the grand jury returned a two-count indictment charging the defendant with arson of a building and a scheme to commit wire fraud. Dkt. No. 1. On May 27, 2025, the defendant filed three pretrial motions: (1) a motion to suppress evidence obtained from her residence, vehicle and restaurant and a request for a hearing under Franks v. Delaware, 438 U.S. 154 (1978), dkt. no. 23; (2) a motion to suppress Facebook records, dkt. no. 24; and (3) a motion to suppress statements she made to law enforcement on November 2, 2021, dkt. no. 25. On August 4, 2025, Magistrate Judge William E. Duffin issued an order denying the motion for a Franks hearing and recommending that this court deny the defendant's motions to suppress. Dkt. Nos. 40, 41. The defendant timely filed an objection, dkt. no. 44, the government responded, dkt. no. 45, and the defendant filed a reply, dkt. no. 48.

1

The court will overrule the defendant's objections, adopt Judge Duffin's recommendation and deny the defendant's motions to suppress.

## I. Legal Standard

In a criminal case, district judges may designate magistrate judges to submit to the district court judge proposed findings of fact and recommendations for disposition of a "dispositive" motion, such as a motion to dismiss an indictment. 28 U.S.C. §636(b)(1)(B). When a magistrate judge submits to the district judge proposed findings and recommendations under §636(b)(1)(B), the parties have fourteen days to object to the magistrate judge's report and recommendation. 28 U.S.C. §636(b)(1)(C). If a party objects, the district judge must make a *de novo* determination of the portions of the report and recommendation to which the party objects. 28 U.S.C. §636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge;" the district judge also has the options of asking for further evidence or sending the issue back to the magistrate judge with instructions for further proceedings. Id.

## II. Facts

These facts come from the probable cause affidavit of Special Agent Rick Hankins (attached as an exhibit to the defendant's motion to suppress), dkt. no. 23-4, and the parties' stipulated facts, dkt. no. 30.

### A. The Fire and Investigation

On the evening of October 10, 2021, firefighters responded to a 911 call reporting a possible fire at the defendant's Fond du Lac, Wisconsin restaurant,

A Family Affair Soulfood Kitchen. Dkt. No. 23-4 at ¶¶7, 9. When the firefighters arrived, they found the restaurant's doors were closed and locked. Id. at ¶7. The firefighters forced open the rear door and made their way through thick smoke into the kitchen. Id. With a thermal imaging camera, the firefighters observed heat at the kitchen's ceiling and at the top landing of the basement staircase they discovered a small fire approximately one foot high. Id. The firefighters were able to quickly extinguish the open flame with water. Id.

Law enforcement opened an investigation into the fire's cause and on October 12 and 14, 2021—with the defendant's written consent—conducted a fire scene examination at the restaurant. Id. at ¶¶8, 10. Investigators determined that the fire began on a shelf on the top landing of the basement staircase, where they discovered remnants of charred towels, cardboard, napkins, electrical circuits and appliances. Id. at ¶11. The defendant stated that the appliances would have been plugged into a power strip that was plugged into a ceiling-mounted receptacle. Id. But the investigators determined that the appliances likely were not plugged into the ceiling receptacle at the time the fire started. Id. at ¶¶11–12. The investigators also found two handheld lighters in a wall-mounted basket just outside the entrance to the basement staircase. Id. at ¶13.

The defendant told investigators that she had her restaurant's front and back door locks re-keyed about two days after the restaurant was burglarized on September 4, 2021 (a month before the fire). Id. at ¶15. The defendant stated that she placed a new key in the restaurant's lockbox and changed the

3

lockbox code. Id. She told investigators that the only people who knew the new code were herself, an employee named JoJo and a delivery person. Id. The defendant told investigators that on the day of the fire, she left the restaurant with an employee, J.M., between 2:45 and 3:00 P.M. and went straight home, where she stayed until a woman who lived behind the restaurant notified the defendant that firefighters were at the restaurant. Id. at ¶16. The defendant stated that she used Facebook to call the woman as she was preparing to return to the restaurant. Id. The defendant said that on the morning of the fire, she had seen arcs and sparks from the ceiling-mounted plug at the top of the basement staircase. Id. at ¶17. The defendant told investigators that she had invested about $100,000 in improvements to the building, with $75,000 of that coming from loans. Id. at ¶18.

Surveillance footage from two nearby businesses showed that at approximately 8:33 P.M. on the night of the fire, a dark SUV with chrome wheels drove past the restaurant before slowing down and appearing to park just out of the camera's line of sight. Id. at ¶26. About a minute later, a person wearing a dark hoodie and dark shoes with a distinct white design on the sides and carrying a backpack walked on the sidewalk toward the restaurant, through the parking lot and turned right toward the restaurant, before disappearing from the camera's view. Id. at ¶¶27–29. The motion light mounted near the rear door of the restaurant illuminated shortly thereafter. Id. at ¶30. About three minutes later, the person wearing the hoodie and backpack walked south through the parking lot and away from the restaurant. Id. at ¶31.

4

Around 8:45 P.M., vehicle lights illuminated near where the SUV had disappeared from the camera's view earlier. Id. at ¶33. Emergency dispatch received a 911 call regarding smoke at the restaurant at 8:59 P.M. Id. at ¶7. The surveillance cameras then captured a firefighter on the scene at approximately 9:03 P.M. Id. at ¶34.

Investigators reviewed the defendant's public Facebook profile and saw photos of her wearing black shoes with a distinct white design on the sides—shoes that matched the shoes worn by the individual in the surveillance video. Id. at ¶36. The defendant's size and shape also appeared similar to the size and shape of the person captured on the surveillance footage. Id. On October 14, 2021 (four days after the fire), investigators also saw the defendant driving a dark colored Dodge Durango with chrome wheels; she had posted photos of that car to her Facebook page. Id. at ¶37. Investigators recovered from the trash at the defendant's residence some mail addressed to her, indicating that she was experiencing financial difficulties. Id. at ¶40.

Special Agent Rick Hankins submitted an affidavit attesting to these facts and stating that although the investigation was ongoing, he believed that there was probable cause to conclude that the fire was intentionally set, not accidental. Id. at ¶42. He based this opinion on the fact that investigators did not find evidence of an electrical failure at the fire's origin point and that the surveillance footage showed a person briefly entering and exiting the restaurant twenty minutes before the fire was reported. Id. He opined that the limited

number of people with access to the new door code suggested that the defendant likely was the person who had entered the restaurant. Id.

On November 1, 2021, Magistrate Judge Stephen C. Dries issued search warrants for the restaurant, the defendant's house and the defendant's Dodge Durango. Id. at ¶¶42–43; see also Dkt. Nos. 23-1, 23-2, 23-3. Judge Dries also issued a search warrant for the defendant's Facebook account. See Dkt. No. 24-1.

B.    November 2, 2021 Interview

On the morning of November 2, 2021, Special Agent Kevin Heimerl called the defendant and asked to meet with her to "share a little bit of information." Dkt. No. 30 at ¶¶1, 4. SA Heimerl and SA Matthew Anderson were parked about one block away from the defendant's house at the time of the call. Id. at ¶¶2–3. Heimerl recorded a portion of this phone call and his later in-person conversation with the defendant that morning. Id. at ¶5. About two minutes after speaking with the defendant on the phone, the agents arrived at her home and parked in her driveway at the rear of the home. Id. at ¶¶6–7.

Heimerl and Anderson met the defendant at the front door, entered her home and spoke to her in the front hallway of the home. Id. at ¶¶8–9. Heimerl stated that the agents were "hoping to talk in the truck" and asked if the defendant would like to get a coat before stepping outside. Id. at ¶11. It was in the low 30s outside, and the defendant was wearing the clothes she'd slept in the night before. Id. at ¶¶10, 12. The defendant turned and began walking upstairs. Id. at ¶13. Heimerl followed the defendant, told her to "hang on a

6

second" and asked, "What are you going up for?" Id. at ¶16. The defendant did

not invite Heimerl to follow her upstairs. Id. at ¶15. Heimerl then asked to

"hold onto [the defendant's] phone, please." Id. at ¶17. Before she could

respond, Heimerl took the defendant's phone from her hand and asked

Anderson to follow him upstairs with the defendant. Id. at ¶¶18–19.

The defendant went into her bedroom to get a pair of socks. Id. at ¶20.

Heimerl handed the defendant's cell phone to Anderson and went inside the

defendant's bedroom while Anderson stood near the doorway. Id. at ¶21. The

defendant was not aware that a warrant had been issued authorizing the

search of her home and seizure of her cell phone. Id. at ¶22. Heimerl told the

defendant, "Just get what you need to get and we're gonna go outside and sit in

my truck. Okay?" Id. at ¶24. The agents then escorted the defendant

downstairs and toward the parked truck. Id. at ¶25. The agents did not pat the

defendant down or place her in handcuffs. Id. The defendant asserts that

Heimerl placed his hand on her arm and physically guided her out the door of

her home, while Heimerl states that he did not have any physical contact with

the defendant after taking her phone. Id. at ¶26. Once at the truck, the

defendant was escorted into the front passenger seat. Id. at ¶28. Heimerl sat in

the driver's seat and turned on the vehicle and its heating system, while

Anderson sat in the rear passenger seat behind the defendant. Id.

The defendant then saw approximately ten officers approaching her

home with weapons drawn. Id. at ¶30. The defendant believed that the officers

looked like a SWAT team and was visibly shaken, anxious and upset. Id. at

¶¶30–31. Heimerl questioned the defendant about the fire, including showing her images from the surveillance footage, while law enforcement executed the search warrant. Id. at ¶¶33–34. The defendant was in the truck for approximately two hours. Id. at ¶36. Neither agent informed the defendant of her Miranda rights. Id. at ¶37. The defendant previously had met or spoken with Heimerl six times before this but never had been shown the surveillance images from the night of the fire. Id. at ¶38. Both agents were in plainclothes and armed during the interview, but did not display their weapons to the defendant. Id. at ¶40. During the interview, the defendant was "visibly shaken, upset, and scared" with "tears in her eyes at times." Id. at ¶41. The parties agree that "portions" of Heimerl's questioning constituted an interrogation, but dispute whether the interrogation was conducted in a custodial setting. Id. at ¶42.

During the execution of the search warrant, law enforcement seized, among other things, phones, computers, documents and a pair of shoes. Dkt. No. 23 at 7.

### III. Motions to Suppress

On May 27, 2025, the defendant filed three motions to suppress. Dkt. Nos. 23, 24, 25. She filed a motion to suppress the evidence obtained from the search of her home, vehicle and business, arguing that SA Hankins's affidavit in support of the warrants omitted key facts. Dkt. No. 23 at 1. The defendant contended that had these facts been included, the affidavit would not have established probable cause that the fire was intentionally set. Id. The defendant

also requested a <u>Franks</u> hearing due to Hankins's alleged intentional or reckless omission from his affidavit of material facts about the fire investigation. <u>Id.</u>

Secondly, the defendant filed a motion to suppress all evidence obtained from her Facebook account, arguing that the search warrant was overbroad. Dkt. No. 24 at 1. She also argued that the affidavit in support failed to provide probable cause that the fire was intentionally set and that she was entitled to a <u>Franks</u> hearing on the grounds stated in her first motion. <u>Id.</u> at 1–2.

Finally, the defendant filed a motion to suppress all statements she made to investigators on the morning of November 2, 2021, arguing that she was not advised of her <u>Miranda</u> rights before questioning. Dkt. No. 25 at 1. She contended that she was in custody at the time of the questioning and requested an evidentiary hearing on this issue. <u>Id.</u>

On May 30, 2025, the government filed a statement regarding the motions. Dkt. No. 26. The government stated that the November 2, 2021 questioning was audio recorded, asserting that the recording was sufficient to allow the court to decide the motion to suppress. <u>Id.</u> at 2. The government stated that the parties intended to stipulate to some "additional contextual facts relevant to the motion" to narrow the scope of an evidentiary hearing. <u>Id.</u> The government asked the court to defer ruling on the request for an evidentiary hearing until the government had filed its response to the motions and the stipulated material facts. <u>Id.</u>

On June 17, 2025, the parties filed a statement of stipulated material facts and the audio recording of the November 2, 2021 interview. Dkt. No. 30. The parties agreed that an evidentiary hearing likely was not necessary to determine whether the defendant was in custody at the time of the questioning. Id. at 4 n.1. The government then filed a combined response to the three motions, dkt. no. 32, and the defendant filed reply briefs in support of each motion, dkt. nos. 37, 38, 39.

IV.    **Judge Duffin's Report and Recommendation (Dkt. No. 41)**

On August 4, 2025, Judge Duffin issued an order denying the defendant's request for a Franks hearing and recommending that the three motions to suppress be denied. Dkt. Nos. 40, 41.

    A.    <u>Motion to Suppress Evidence from Home, Car and Restaurant</u>

Judge Duffin first reviewed the affidavit submitted in support of the warrants for the search of the defendant's home, vehicle and restaurant. Id. He explained that a reviewing court should give "great deference" to the issuing judge and uphold the probable cause determination "so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing." Id. at 6 (quoting United States v. Wenzel, 854 F.3d 957, 960 (7th Cir. 2017)). Judge Duffin considered the defendant's argument that the affidavit lacked sufficient facts to allow the magistrate judge to independently conclude the likely origin of the fire. Id. at 6-7. He stated that the defendant had presented no evidence that the fire may have originated somewhere else. Id. at 7. Judge Duffin determined that the affidavit provided

10

enough facts supporting the investigators' conclusion about where the fire likely originated, at least for probable cause purposes. Id. Judge Duffin rejected the defendant's argument that the affidavit was "conclusory" and insufficient because it lacked an explanation of how the investigators ruled out other ignition sources. Id. at 8. Judge Duffin asserted that the affiant did not need "to exhaust the realm of possible sources when the scene in question did not reveal such connections" for the issuing judge to find probable cause. Id.

Judge Duffin then turned to the defendant's argument that the affidavit did not establish there was probable cause that *she* set the fire. Id. at 9. He stated that the investigation did not need to directly tie the defendant to the scene and he found that there were enough circumstantial facts linking her to the suspected arson. Id. at 9-10. Beyond the defendant's physical similarities to the individual on the surveillance footage, Judge Duffin pointed out that the mail recovered from the trash pull outside the defendant's house suggested that she was having financial difficulties that may have motivated her to set the fire. Id. at 9-10. Judge Duffin also cited the portions of the affidavit that stated that the individual from the surveillance footage had triggered the restaurant's security light and that the defendant was one of only three individuals with access to the door code. Id. at 10. Judge Duffin stated that the affidavit presented enough facts linking the defendant to the suspected arson to support a probable cause determination. Id.

B.    Request for *Franks* Hearing

Turning to the defendant's request for a <u>Franks</u> hearing, Judge Duffin recounted that under <u>Franks</u>, a court should suppress evidence if "(1) there is an omission or misrepresentation with respect to a search warrant affidavit; (2) the omission or misrepresentation was made intentionally or with reckless disregard for the truth; and (3) the omission or misrepresentation was material to the finding of probable cause." <u>Id.</u> at 10-11 (citing <u>United States v. Mullins</u>, 803 F.3d 858, 861-62 (7th Cir. 2015)). Judge Duffin explained that the defendant was entitled to a <u>Franks</u> hearing only if she presented more than conclusory proof that an omission or misrepresentation occurred for some reason more than a negligent mistake. <u>Id.</u> at 11 (quoting <u>United States v. Daniels</u>, 906 F.3d 673, 677 (7th Cir. 2018)).

Judge Duffin recounted the three facts that the defendant alleged that SA Hankins had omitted from his affidavit:

> (1) that investigators detected no ignitable liquids in the debris collected from the shelf where they suspected the fire had started; (2) that investigators recovered four lithium batteries (three of which were damaged); and (3) that the affiant relied on a methodology (known as negative corpus) that is considered inconsistent with the scientific method.

<u>Id.</u> As to the first fact, Judge Duffin stated that the absence of ignitable liquids or accelerants perhaps put the fire "outside the norm for arsons" but concluded that that abnormality alone was not dispositive to the probable cause determination, because the issuing judge must consider the totality of the circumstances to decide if there is probable cause. <u>Id.</u> at 12-13. Judge Duffin determined that the affidavit's failure to mention lithium batteries by name was

12

not significant because the composition of the batteries was not identified until months after Hankins submitted his affidavit. Id. at 13. Judge Duffin determined that naming the specific batteries recovered from the scene would not have tipped the scales against probable cause. Id. at 14.

As to the third fact, Judge Duffin recounted that according to the National Fire Protection Association's NFPA 921 Guide for Fire and Explosion Investigations (the industry guide for fire inspections), "negative corpus" is a process by which the investigator determines a fire's ignition source solely by eliminating all other suspected ignition sources in the fire's area of origin. Id. at 14-15. Judge Duffin considered the defendant's argument that investigators drew conclusions about the origin of the fire by ruling out other sources rather than by finding affirmative evidence supporting arson. Id. at 15. He concluded that the affidavit did contain facts supporting the arson theory, specifically the suspicious person who entered the restaurant shortly before the fire. Id. Judge Duffin found that the affidavit did not contain any material misrepresentation or omission, so the defendant was not entitled to a Franks hearing. Id. at 16.

C.    Motion to Suppress Facebook Records

Judge Duffin stated that the same probable cause affidavit supported the Facebook warrant and referenced the defendant's Facebook account several times. Id. at 16. Judge Duffin explained the affidavit stated that the defendant had used Facebook to call a witness to the fire, and that investigators had found the defendant's public Facebook page, seen photos of the defendant wearing shoes similar to those worn by the individual in the surveillance videos

13

and seen photos of a vehicle similar to the one in the surveillance videos. Id. at 17 (citing Dkt. No. 24-1 at ¶¶17, 36-38). Judge Duffin recounted that the warrant required Facebook to disclose nineteen categories of information, including "all stories posted since June 1, 2019; all photos and videos since June 1, 2019; all records of the account's usage of the 'like' feature; all information about Facebook pages the account is a 'fan' of; all past and present lists of friends; and all Facebook searches since June 1, 2019." Id. (citing Dkt. No. 24-1 at 4–7). Judge Duffin stated that from these categories, the warrant identified eleven categories of information for the government to "seize," including: "evidence of the crimes described; preparatory steps taken in furtherance of the crimes; evidence of motive, intent, or knowledge of the crimes; and evidence of the location, whereabouts, and patterns of travel of the account user." Id. at 17-18 (citing Dkt. No. 24-1 at 42–43).

Judge Duffin recounted the defendant's argument that the affidavit did not connect the alleged arson with the broad scope of information sought. Id. at 18. Specifically, the defendant argued that the temporal scope of the warrant was overbroad because she had not opened her restaurant until February 2021. Id. Although the government argued that the categories of information to be "seized" were narrower than the information to be "searched," Judge Duffin did not find that distinction meaningful because the government would have seen both the disclosed and seized information. Id. at 19 (quoting United States v. Chambers, Case No. 16-CR-13, 2016 WL 11448314, at *5 (E.D. Wis. Sept. 14, 2016), report and recommendation adopted, 2016 WL 6304709 (E.D. Wis.

14

Oct. 26, 2016)). Judge Duffin stated that though the Seventh Circuit and the Supreme Court have not weighed in on this issue, the Eleventh Circuit has found that social media warrants like this one are overbroad and invalid. Id. at 21 (quoting United States v. Roberts, Case No. 22-cr-00136, 2023 WL 5509261, at *2 (S.D. Ind. Aug. 25, 2023)). He determined that the warrant in this case was overbroad in both time and content. Id. at 22. He found that the affidavit did not establish probable cause for most of the requested categories to be searched and simply stated that general Facebook account activity could reveal evidence relevant to the arson. Id. Judge Duffin also found that the affidavit failed to explain why historical data was relevant to the investigation. Id.

But Judge Duffin determined that the warrant could be saved by the good faith exception to the exclusionary rule. Id. at 22-23. Judge Duffin explained that the good faith exception applies "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence." Id. at 23 (quoting Davis v. United States, 564 U.S. 229, 238 (2011)). He accepted the government's argument that the constitutionality of social media warrants is an unsettled area of law because the Eleventh Circuit's decision would not put officers in the Seventh Circuit on notice that such social media warrants may be overbroad. Id. at 24. Judge Duffin found that the defendant did not establish that law enforcement had acted deliberately, recklessly or with gross

negligence and that the good faith exception to the exclusionary rule applied to the Facebook warrant. Id.

    D.    <u>Motion to Suppress Statements</u>

Judge Duffin then considered the defendant's argument that the court should suppress the statements she made to law enforcement on November 2, 2021 because she made them during a custodial interrogation, without law enforcement first advising her of her <u>Miranda</u> rights. Id. at 24–25. Judge Duffin explained that <u>Miranda</u> warnings are required only once the suspect is "both in custody and subjected to interrogation." <u>Id.</u> at 30 (quoting <u>United States v. Ambrose</u>, 668 F.3d 943, 954 (7th Cir. 2012)). He recounted that there are several factors a court must consider in determining whether an individual was in custody from the perspective of a reasonable person in the defendant's position, including "the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning," among other factors, though no one factor is dispositive. <u>Id.</u> at 30–31 (quoting <u>United States v. Borostowski</u>, 775 F.3d 851, 859-60 (7th Cir. 2014)).

Judge Duffin considered the defendant's argument that she was in custody—that the officers controlled her movements and let her know that she would not be able to return home without speaking to them. <u>Id.</u> at 31–32. Judge Duffin also recounted that the defendant stated that during the

16

interview, she had mentioned needing a lawyer and had expressed fear and confusion about the search of her home. Id. at 32.

Judge Duffin determined that in light of all the facts, the defendant had failed to establish that her movement was restricted to the degree of an arrest. Id. at 33. Judge Duffin recounted that SA Heimerl had told the defendant that she was not under arrest and had explained that the search team was present to execute the warrant. Id. at 33–34. He opined that the fact that the detention occurred at the defendant's own residence weighed against the defendant because it did not involve "the inconvenience nor the indignity associated with a compelled visit to the police station." Id. at 34 (quoting United States v. Burns, 37 F.3d 276, 280 (7th Cir. 1994)). Judge Duffin also stated that law enforcement has implicit authority to detain the occupants of a residence to execute a search warrant founded on probable cause. Id. He determined that although the defendant's movement was limited due to the cold weather and the lack of access to her phone or belongings, SA Heimerl had given her the option to re-enter the home while the search warrant was being executed, albeit under monitoring by law enforcement. Id. Judge Duffin found that the defendant still willingly answered the officers' questions after she was told she did not have to. Id. Judge Duffin also found it relevant that the agents did not move the defendant away from the home, did not physically restrain her, told her she was free to leave and released her after the conversation. Id. at 35. Judge Duffin found that the interrogation was not custodial and did not require a Miranda warning. Id. at 35.

Judge Duffin recommended that this court deny the defendant's three motions to suppress. Id. He advised the parties that any written objections to the recommendation must be filed within fourteen days. Id.

## V.    Objections

After receiving a brief extension of her deadline, dkt. no. 43, the defendant filed an objection to the report and recommendation on September 3, 2025, dkt. no. 44.

### A.    Defendant's Objections (Dkt. No. 44)

The defendant argues that the affidavit supporting the warrant to search her home, car and restaurant failed to establish probable cause that she intentionally set the fire. Dkt. No. 44 at 2. She argues that to determine the cause of a fire, investigators must accurately identify the fire's point of origin. Id. The defendant contends that the affidavit included the investigators' opinion as to the fire's origin, but did not explain why they came to that conclusion. Id. at 2–3. She says that the affidavit failed to provide enough facts for the judge to determine whether the investigators had adequately pinpointed the source of the fire. Id. at 3. The plaintiff asserts that firefighters sprayed down the ceiling as well as the top of the basement stairs, but that there were no facts explaining why the investigators did not believe the fire started in the ceiling. Id. at 3–4. The defendant concedes that fire investigations are complex but argues that the court should not simply defer to the investigator's conclusions if those conclusions are not adequately supported or explained. Id. at 4. According to the defendant, for the judge to adequately determine if there was

18

probable cause to issue the warrant, the affiant needed to explain how he reached his opinion on the fire's origin. Id. at 6.

The defendant argues that the affidavit did not establish probable cause that the fire was intentional rather than accidental. Id. at 6. She asserts that the government's hypothesis is that the absence of any ignition source means that the fire was intentional. Id. at 7. She argues that the affidavit did not convincingly rule out other ignition sources and concedes that there were items collected from the scene that still needed to be tested. Id. The defendant argues that notifying the judge that the investigation was ongoing did not cure this deficiency because it was not clear how significant the remaining testing would be to determining the cause and circumstances of the fire. Id. She repeats her argument that the "negative corpus" theory is inconsistent with the scientific method and that investigators should not have concluded that the fire was intentionally set just because there was no evidence that it originated from another source. Id. at 8.

The defendant argues that the affidavit did not establish probable cause that she is the one who set the fire. Id. at 8. According to the defendant, Judge Duffin accepted the defendant's point that a dark SUV and sneakers were insufficient, standing alone, to tie the defendant to the person on the surveillance footage. Id. The defendant argues that if the court sets aside these common elements, there is no evidence tying her to the scene shortly before the fire began. Id. at 9. The defendant argues that the evidence of her alleged financial troubles is not enough to make up for the lack of evidence tying her to

19

the scene. Id. at 9–10. She says that a single "bounced" utility bill payment and an application to defer payment on her student loans does not support an inference that she was in such a desperate financial state that she would set fire to her restaurant. Id. at 10. She maintains there is no evidence that the restaurant was in financial trouble. Id. The defendant also asserts there is no basis to believe that she, as a lessee, would receive any insurance payout from the building owner's insurance policy. Id. at 10–11.

The defendant argues that she is entitled to a Franks hearing even if the affidavit is facially sufficient. Id. at 11. She says that the damaged lithium batteries present at the scene provided an alternative explanation for the fire and that omitting facts about the lithium batteries misled the warrant-issuing judge. Id. at 11–12. She asserts that the affidavit states that there was no evidence of an electrical source for the fire and no evidence of electrical failure, which is directly in conflict with the damaged lithium batteries recovered from the scene. Id. at 13. The defendant argues that the risk of overheating and ignition from lithium batteries would be well known to SA Hankins. Id. at 14. The defendant also contends that the batteries were visually distinct from regular household batteries, so "any fire investigator worth their weight would have been able to identify the batteries that were recovered as lithium-ion batteries." Id. at 14–15.

The defendant next argues that the affidavit omitted the fact that there were no ignitable liquids found on the debris from the basement shelf. Id. at 18. She contends that this, in combination with the weaknesses in the

investigators' methodology, weakens the inference that the fire was intentionally set. Id. The defendant asserts that Hankins should not have relied on "negative corpus" and the process of elimination to determine the cause of the fire. Id. at 19. She argues that Judge Duffin did not adequately address this issue in the recommendation, stating only that the bar for a probable cause determination is not high. Id. at 20. The defendant maintains that Judge Duffin's recommendation did not acknowledge the "cumulative impact" of the omission of the above facts. Id. The defendant argues that considering all the misstatements and omissions in combination, rather than going piece by piece, would have shown that the affidavit lacked probable cause. Id. at 20–21.

The defendant asserts that Judge Duffin properly concluded that the Facebook warrant was overbroad, but that he incorrectly concluded that the good faith exception should apply. Id. at 21. She argues that the good faith exception should not apply if law enforcement lacked "reasonable grounds for believing the warrant was properly issued." Id. at 22 (quoting United States v. Leon, 468 U.S. 897, 922–23 (1984)). She contends that officers lacked reasonable grounds here because the affidavit in support of the Facebook warrant contained the same factual omissions and misrepresentations discussed above. Id. at 23. The defendant argues that the good faith exception does not apply so long as courts have held that a "materially similar" affidavit failed to establish probable cause or the affidavit is plainly deficient. Id. at 24–25 (quoting United States v. Koerth, 312 F.3d 862, 869 (7th Cir. 2002)).

According to the defendant, a reasonably well-trained officer should have known that the Facebook warrant was an overbroad "general warrant" prohibited by the Fourth Amendment. Id. at 25. She cites United States v. Mann, 592 F.3d 779, 786 (7th Cir. 2010); she asserts that in that case, the Seventh Circuit opined that warrants for digital media searches must be narrowly tailored and particularized. Id. The defendant argues that the warrant here authorized a broad search of the defendant's Facebook account with no particularized explanation of what law enforcement hoped to find. Id. at 26.

The defendant argues that the court must suppress her November 2, 2021 statements because a reasonable person would have felt that she was in custody and not free to leave. Id. at 28. She states that Judge Duffin identified the coercive tactics the officers used during the interaction, including the way officers followed her into her home and the show of force related to the search of her home. Id. But the defendant says that Judge Duffin did not recognize the impact of these tactics on her because they communicated to her that she was being accused of a serious crime. Id. at 29. The defendant argues that she even exclaimed at one point during the interaction that "[t]his is so invasive," despite SA Heimerl's statements that the officers were simply following protocol. Id. She argues that officers may have properly executed the search warrant, but says that did not lessen the impact on her state of mind during the interview. Id. at 30. The defendant argues that as "a Black woman in an overwhelmingly white community," a reasonable person in her shoes would view "the actions of two white male officers following her into her bedroom and taking her phone, in

22

anticipation of a tactical squad entering the house as highly invasive of her privacy and extremely intimidating." Id.

The defendant argues that even though a court might not usually consider as having been in custody a person detained while law enforcement executes a search warrant, she was isolated, detained and subjected to lengthy questioning. Id. at 31. She argues that she was detained for two hours and subjected to significantly more coercive pressure than a defendant who is simply detained during a search. Id. at 31–32. She asserts that she was not given the option to end the interview or to refuse to answer questions. Id. at 32. The defendant contends that in his recommendation, Judge Duffin did not address the "accusatory" nature of Heimerl's questioning. Id. She argues that the tone and setting of the interview contributed to the coercive, police-dominated atmosphere. Id. at 32–33. The defendant argues that the totality of the circumstances shows that she was interrogated in a custodial setting. Id. at 33.

B.    Government's Response (Dkt. No. 45)

The government responds that the totality of the circumstances described in SA Hankins's affidavit provides probable cause to issue the warrants. Dkt. No. 45 at 4. It argues that the affidavit recounts Hankins's experience as a fire investigator, describes the fire investigation and presents the facts that support Hankins's inference that the fire was intentionally set, likely by the defendant. Id. at 4–5. The government contends that the affidavit is not conclusory solely because the defendant disagrees with the inferences

23

Hankins drew from the facts as stated. Id. at 5. It argues that the court should not speculate about possible alternative sources of the fire to invalidate the warrant. Id. at 5–6. It contends that there is no evidence of an alternative point of origin. Id. at 6. The government argues that probable cause does not require absolute certainty or even a showing that it is more likely than not that the defendant committed the crime. Id. The government asserts that Judge Duffin correctly concluded that the affidavit contained enough evidence of the defendant's motive and opportunity to support a finding of probable cause. Id. at 6–7.

The government argues that Judge Duffin did not commit clear error when he denied the defendant's request for a Franks hearing. Id. It says that Judge Duffin correctly concluded that specifically identifying the lithium batteries in the affidavit would not have impacted the probable cause determination. Id. at 8. The government argues that there is no evidence that Hankins intentionally or recklessly omitted any facts from his affidavit because in 2021, when the affidavit was submitted, the fire risk of lithium batteries was only just emerging as an issue. Id. The government attaches an image of the batteries recovered from the scene, arguing that the batteries were so damaged that it was not clear to the naked eye that they were lithium-ion batteries. Id. at 8–9. The government argues there is nothing in the record to show that Hankins would have known that the batteries were lithium batteries until months later, when the forensic examination revealed their composition. Id. at 9. It contends that the presence or absence of ignitable liquids at the scene is

not particularly relevant because fires may be started by other means. Id. at 10. The government says that there are facts to suggest that the fire was intentionally set and that Hankins did not rely solely on "negative corpus" to come to that conclusion. Id. at 10–11. It argues that while the NFPA standards may provide guidance to fire investigators, they are not a mandate or a measure by which the court must assess probable cause. Id. at 11. The government contends that Judge Duffin's decision to deny the Franks hearing was not clearly erroneous whether the "omitted" facts are considered individually or together. Id. at 12.

The government argues that Judge Duffin correctly applied the good faith exception to the Facebook warrant. Id. It argues that the court should afford Hankins's actions a presumption of good faith because he sought and obtained a warrant for the search. Id. at 12–13. It asserts that the defendant must show that Hankins should have known that the search was illegal despite the warrant and that the deterrence benefits of suppression outweigh the costs. Id. at 13 (citing Davis v. United States, 564 U.S. 229, 236–37 (2011)). It maintains that the proper breadth of a social media warrant is an unsettled area of the law and says that no Seventh Circuit caselaw exists that would put an officer on notice that the Facebook warrant here was overbroad. Id. The government argues that exclusion would be appropriate only if Hankins's conduct was deliberate, reckless or grossly negligent, which the defendant has not proven. Id. at 14.

25

The government says that although the defendant was distressed and her movements were somewhat restricted during the November 2, 2021 interview, she cannot establish that she was in custody at the time of the interview. Id. at 14–15. It contends that the recording shows that agents Heimerl and Anderson were "polite, calm, professional, and sensitive to [the defendant's] concerns and wellbeing at every stage of their encounter with her." Id. at 15. It argues that agents told the defendant multiple times that she was free to leave and that she did not have to talk to them. Id. The government argues that the defendant consented to the interview; the agents were in plainclothes and already had spoken to the defendant previously; the interview took place in an unmarked truck on the defendant's property, within public view; the interview was relatively short; and agents did not pat down, handcuff or draw weapons on the defendant. Id. The government argues that the defendant "controlled the scope and duration" of the interview, saying she pushed back on the agents' characterization of the evidence and asserted that she did not want to incriminate herself or answer further questions at the end of the interview. Id. at 16. The government says that the totality of these circumstances suggests the defendant was not in custody. Id. It contends that the defendant has not presented case law compelling a different result because the cases she cites in support of her argument deal with much more coercive, officer-dominated interactions than the interactions that occurred here. Id. at 16–18 (citing United States v. Slaight, 620 F.3d 816 (7th Cir. 2010); United

26

States v. De La Vega, Case No. 18-CR-40, 2018 WL 8545871 (E.D. Wis. Oct. 18, 2018)).

C.    Defendant's Reply (Dkt. No. 48)

The defendant replies that SA Hankins did not present enough facts in his affidavit to allow the warrant-issuing judge to assess the reasonableness of his conclusions that the fire started at the top of the stairs, was intentionally set and was likely set by the defendant. Dkt. No. 48 at 1. The defendant asserts that the affidavit is so factually deficient that it is easy to speculate about other possible causes and points of origin for the fire. Id. at 2–3. She opines that Hankins's statement that the investigation was ongoing weakens the government's argument because it suggests that the investigation might uncover facts that would cut against the probable cause finding. Id. at 3.

The defendant argues that the court should review Judge Duffin's order denying the Franks hearing de novo rather than for clear error. Id. at 4. She asserts that a district court reviews a magistrate judge's orders on non-dispositive matters for clear error, while it reviews objections to a magistrate judge's recommendations on dispositive matters de novo. Id. at 5 (quoting United States v. Garcia, 936 F.3d 1128, 1137 (10th Cir. 2019)). According to the defendant, Federal Rule of Criminal Procedure 59 does not define "dispositive motion" but specifically states that a motion to suppress evidence is a dispositive motion. Id. at 5–6. She argues that a motion for a Franks hearing is a motion to suppress that should be reviewed de novo, because suppression is the "ultimate remedy" for such a motion. Id. at 6 (citing Franks,

27

438 U.S. at 155–56). The defendant contends that even if a <u>Franks</u> motion is not considered a motion to suppress under Rule 59, it is significant enough to warrant *de novo* review. <u>Id.</u> at 7. She argues that the list of "dispositive" matters in Rule 59 is non-exhaustive and should be construed narrowly to avoid over-delegating significant constitutional issues to magistrate judge. <u>Id.</u> She asserts that this court should consider how similar the matter is to the enumerated dispositive motions in Rule 59. <u>Id.</u> at 7–8. The defendant contends that a <u>Franks</u> motion is similar enough to a motion to suppress to be considered a dispositive motion requiring *de novo* review. <u>Id.</u> at 8. The defendant concedes that this court has applied the clear error standard before when reviewing a magistrate judge's order denying a <u>Franks</u> motion, but contends that in that case, no party briefed the applicable standard of review for the motion. <u>Id.</u> at 8 n.2.

The defendant argues that whichever standard applies, the court should reject Judge Duffin's order denying the <u>Franks</u> hearing. <u>Id.</u> at 8. She asserts that the fire risks of lithium batteries were discussed in the 2021 edition of the NFPA guidance, which was issued on April 5, 2020, well before the date Hankins submitted his affidavit. <u>Id.</u> at 9. She says that "any qualified fire investigator" would have identified the batteries as lithium batteries (or at least considered the possibility that they were lithium batteries). <u>Id.</u> at 10. According to the defendant, there is no reason to believe that Hankins was unaware of the risks of lithium battery fires at the time he prepared the affidavit, so he should have included the possibility that these batteries were a potential source of the

Case 2:24-cr-00236-PP    Filed 10/28/25    Page 28 of 54    Document 49

fire. Id. at 10–11. She argues that the government's contention that Hankins did not know that these were lithium batteries should be tested at a Franks hearing, where the defendant may cross-examine him. Id. at 11–12. The defendant adds that Hankins should have included in the affidavit the lack of ignitable liquids on the scene, because the opposite fact (the *presence* of ignitable liquids on the scene) surely would have been included in a probable cause affidavit. Id. at 12. The defendant also opines that Hankins was obligated to expose in the affidavit the possible deficiencies in his "negative corpus" methodology, so that the warrant-issuing judge to make an informed assessment about probable cause. Id. at 12–13.

The defendant argues that she need not cite factually identical, binding precedent to establish that the good faith exception does not apply to the Facebook warrant. Id. at 13–14. She contends that she can establish this by showing that the affidavit was "so plainly deficient" that any reasonable officer would have known that there was no probable cause. Id. at 14. She asserts that the warrant is so obviously overbroad and so disconnected to the facts of the case that any officer should have known it was deficient. Id. The defendant argues that many courts refuse to apply the good faith exception if the warrant obviously violates the Fourth Amendment's particularity requirement. Id. at 15 (collecting cases). She also argues that the Seventh Circuit's decision in Mann is factually similar enough to provide an officer with guidance that the Facebook warrant was overbroad. Id. at 15–16 (citing Mann, 592 F.3d at 786).

The defendant argues that the government oversimplifies the circumstances of her November 2, 2021 interview. Id. at 17–18. She contends that although the officers may have behaved civilly toward her, the government dismisses her perspective of the circumstances. Id. at 18. The defendant argues that the officers engaged in a "ruse" to convince her to speak to them. Id. at 18 n.7. She says that officers falsely told her that they were going to share information with her in order to encourage her to answer potentially incriminating questions. Id. at 18–19 n.7. She contends that she was not fully aware of the purpose of the interview until it was too late. Id. The defendant argues that even routine or polite police conduct can create a coercive atmosphere for a defendant. Id. at 19–20. The defendant says that as in Slaight, where officers removed the defendant from his home and took him to a second, smaller location to interrogate him, the defendant was confined to a small, police-dominated space to force her answer officers' questions. Id. at 20–21 (citing Slaight, 620 F.3d at 118–19). The defendant argues that Slaight demonstrates the "core principles" that accusatory questioning in a police-dominated setting, combined with a show of force, would cause a reasonable person to believe she was in custody. Id. at 22.

## VI.  Analysis

### A.  Motion to Suppress Evidence

The defendant argues that SA Hankins's affidavit failed to establish probable cause because it did not explain why investigators concluded that the

30

fire originated at the top of the basement stairs, failed to establish that the fire was intentionally set and failed to establish that the defendant set the fire.

"A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." United States v. Curry, 538 F.3d 718, 729 (7th Cir. 2008) (quoting United States v. Mykytiuk, 402 F.3d 773, 776 (7th Cir. 2005)). "When considering an application for a warrant, the task of the issuing judge 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Taylor, 63 F.4th 637, 651 (7th Cir. 2023) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). A reviewing court "afford[s] 'great deference' to the probable cause finding made by the judge who evaluated the warrant application in the first instance and will uphold that determination so long as there is a 'substantial basis' for concluding 'that a search would uncover evidence of wrongdoing.'" United States v. Yarber, 915 F.3d 1103, 1105 (7th Cir. 2019) (quoting Gates, 462 U.S. at 236). Reversal is appropriate "only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the [judge] could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." United States v.

31

Spry, 190 F.3d 829, 835 (7th Cir. 1999) (quoting United States v. Pritchard, 745 F.2d 1112, 1120 (7th Cir. 1984)). "[D]oubtful cases should be resolved in favor of upholding the warrant." United States v. Quintanilla, 218 F.3d 674, 677 (7th Cir. 2000).

Judge Duffin correctly concluded that Hankins's affidavit contains sufficient facts to allow the issuing judge to conclude that someone may have started the restaurant fire intentionally. Hankins averred that firefighters discovered the only open flame at the top landing of the basement staircase and that they later found in that area remnants of charred towels, cardboard, napkins and electrical circuits and appliances, as well as lighters. Dkt. No. 23-4 at ¶¶7, 11, 13. Common sense dictates that the area where firefighters observed open flame—the *only* area in which they observed an open flame—as well as incendiary material is the likely origin point of the fire. The defendant identifies no evidence suggesting an alternative origin point other than her own speculation that the fire could have started in the ceiling and "fallen through" to the basement stairs.

The defendant's focus on the alleged uncertainty of the fire's origin point ignores the fact that courts determine probable cause based on the *totality* of the circumstances presented in the affidavit. The affidavit contained more information than a description of the likely location of the origin point— information that supported a conclusion that the fire was intentionally set. Beyond his discussion of the evidence found at the top of the basement stairs, Hankins described how investigators determined that the appliances in that

32

area likely were unplugged at the time of the fire, including third-party information from Spectrum about interruptions to the internet and television service on the day of the fire. Dkt. No. 23-4 at ¶¶11, 12. If no electrical devices were plugged in at the time of the fire, the issuing judge could infer that it was unlikely that the fire started due to a spontaneous electrical failure. Hankins described the surveillance footage showing a suspicious person moving around the outside of the restaurant shortly before a witness reported the fire. Id. at ¶¶21–34. The individual was close enough to the restaurant's back door to trigger the motion-activated light, which allowed the issuing judge to infer that the person may have entered the restaurant. Id. at ¶30. The totality of these facts is enough for a judge to make a common-sense inference that the fire may have been intentionally set.

The affidavit also contained enough facts to support an inference that the defendant may have been the person who set the fire. The defendant's appearance matches the size and shape of the suspect captured on the surveillance footage, and the defendant owned the same shoes and SUV as the suspect. Id. at ¶¶36–38. Only three people had access to the lock box at the rear of the restaurant, and one of them was the defendant. Id. at ¶15. The trash pull at the defendant's house yielded evidence that she could have been experiencing some financial troubles. Id. at ¶40. The totality of these facts allows a reasonable judge to infer that the defendant may have had the opportunity and motive to set the fire.

33

The court acknowledges that even considered together, these facts may not be enough to prove beyond a reasonable doubt that the defendant was the person who started the fire and that she did so intentionally. But that is not the standard for a probable cause finding. Judge Duffin correctly stated that "[d]eterminations of probable cause are naturally based on probabilities, and a finding of probable cause 'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" Dkt. No. 41 at 6 (quoting United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003)). The defendant's assertion that the facts in the affidavit *could be* interpreted differently does not mean that the affidavit does not contain enough facts for the issuing judge to reasonably conclude that evidence related to the potential arson could be found in the defendant's home, restaurant and vehicle.

The court will adopt Judge Duffin's recommendation and dismiss the defendant's motion to suppress the evidence obtained from her home, restaurant and vehicle.

> B.  *Franks* Hearing

The parties dispute the standard of review that the court should apply to Judge Duffin's order denying the defendant's request for a Franks hearing. Under 28 U.S.C. §636(b)(1)(B), a magistrate judge's report and recommendation on a *dispositive* motion—such as a motion to suppress evidence—is "'non-self-operating,' which means that it is "not valid until the district judge accepts the magistrate's report and recommendation and enters an order or judgment."

34

United States v. Brown, 79 F.3d 1499, 1503–04 (7th Cir. 1996) (quoting United States v. Ecker, 923 F.2d 8, 8-9 (1st Cir. 1991)). If a party objects to a report and recommendation on a dispositive issue, the district judge must make a *de novo* determination of the portions of the report and recommendation to which the party objects. 28 U.S.C. §636(b)(1)(C).

But under §636(b)(1)(*A*), a magistrate judge's ruling on a *non-dispositive* pretrial motion is "self-operating," which means that the magistrate judge's ruling is "valid when entered." Brown, 79 F.3d at 1503. In reviewing a magistrate judge's ruling on a non-dispositive motion, "the district judge may reconsider the magistrate's decision only 'where it has been shown that the magistrate's order is clearly erroneous or contrary to law.'" Id. (quoting 28 U.S.C. §636(b)(1)(A)). The question here is whether a motion for a Franks hearing is a dispositive or a non-dispositive motion.

As the defendant acknowledges, this district court consistently has reviewed a magistrate judge's order on motion for a Franks hearing under the clear error standard applicable to a ruling on a non-dispositive motion. United States v. Massey, Case No. 20-cr-162-pp, 2022 WL 214793, at *8 (E.D. Wis. Jan. 25, 2022); United States v. Cloyd, Case No. 18-cv-196-pp, 2020 WL 806645, at *22 (E.D. Wis. Feb. 18, 2020); United States v. Lewis, 386 F. Supp. 3d 963, 979 (E.D. Wis. 2019). Other judges in this district have found that a motion for a Franks hearing is non-dispositive and have applied the clear error standard when reviewing a magistrate judge's order denying such a hearing. See, *e.g.*, United States v. Johnson, Case No. 24-CR-40-JPS, 2025 WL

35

1883565, at *1 (E.D. Wis. July 8, 2025); United States v. Castine, Case No. 19-CR-120-JPS, 2019 WL 6715384, at *1 (E.D. Wis. Dec. 10, 2019); United States v. Jefferson, Case No. 09-CR-07, 2009 WL 4549189, at *1 (E.D. Wis. Nov. 27, 2009). The defendant has cited no case law supporting her argument that a motion for a Franks hearing is a dispositive motion, and the court was unable to locate any in this circuit. The court will—as it has in the past—apply the clear error standard to the defendant's objection to Judge Duffin's denial of the motion for a Franks hearing.

To obtain a Franks hearing, the defendant must make a substantial preliminary showing (1) that the warrant contained false information, (2) that the false information was included in the affidavit intentionally or with reckless disregard for the truth and (3) that the false information was necessary to find probable cause and issue the warrant. United States v. McMurtrey, 704 F.3d 502, 511 (7th Cir. 2013) (citing Franks, 438 U.S. at 155–56). "Franks hearings are 'rarely held' because '[t]hese elements are hard to prove.'" United States v. Dessart, 823 F.3d 395, 402 (7th Cir. 2016) (quoting United States v. Swanson, 210 F.3d 788, 790 (7th Cir. 2000)). A substantial preliminary showing as to the intentionality or recklessness of omissions requires either "direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive based on the nature of the omissions." United States v. Glover, 755 F.3d 811, 820 (7th Cir. 2014). This evidence "must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the

36

allegations." United States v. Woodfork, 999 F.3d 511, 518 (7th Cir. 2021)

(quoting United States v. Johnson, 580 F.3d 666, 670 (7th Cir. 2009)).

The defendant argues that Hankins omitted the following facts from his affidavit: (1) that investigators detected no ignitable liquids in the debris collected from the shelf where they suspected the fire had started; (2) that investigators recovered four lithium batteries from the scene; and (3) that the affiant improperly relied on the "negative corpus" method of determining the likely origin of the fire. The parties do not dispute that these facts are not included in the affidavit. The question is whether Judge Duffin erred in concluding that if they *had* been included, none of the three facts would have altered the probable cause determination—in other words, that none of the three facts was necessary to the probable cause finding. He did not.

The defendant argues that Hankins did not state in the affidavit that no ignitable liquids were detected. The defendant appears to assume that the only way to intentionally set a fire is by using ignitable liquids. But she has identified no evidence supporting that assumption. The affidavit *does* contain evidence that there were flammable materials—towels, cardboard, napkins and appliances—near the point of origin, and that there were lighters—ignition sources—in the basket by the basement stairs. The absence of one method of starting a fire (ignitable liquids) does not mean that the affidavit contained no evidence that the fire could have started in other ways. And it does not negate other evidence supporting the conclusion that the fire was intentionally set, such as the person who showed up in the SUV, triggered the motion-sensor

light outside the restaurant door, then left—all shortly before the fire was reported.

The same is true for the lithium batteries. Judge Duffin acknowledged that Hankins's affidavit stated that "several electrical artifacts" were recovered from the scene. Judge Duffin did not clearly err in finding that the affidavit's failure to specify that lithium batteries were among those artifacts would not have affected the probable cause determination. In its response to the defendant's objections to Judge Duffin's report and recommendation, the government provided a photo of the batteries recovered from the scene. Dkt. No. 45 at 9. The photo shows that the batteries were severely charred; they appear as four slim, misshapen cylinders whose markings are impossible to identify due to the fire damage. Although the defendant vigorously asserts that Hankins should or would have known these charred batteries were *lithium* batteries, she has identified no evidence supporting this assertion. Even if Hankins had known that these were *lithium* batteries, and that such batteries are highly flammable, the presence of combustible batteries at the scene does not negate the evidence that the only open flame was on the basement landing, that there were flammable items on that landing, that there were lighters by that landing and that a suspicious person was near the restaurant shortly before the fire was reported. Even if Hankins specifically had mentioned charred batteries in the affidavit, and speculated (at that point) that the charred items were lithium batteries, the issuing judge still reasonably could have found probable cause that the fire was intentionally set.

38

The defendant's "negative corpus" argument fares no better. In a footnote in her brief to Judge Duffin, the defendant said that Hankin's "origin and cause report . . . stated that he 'utilized the Scientific Method during the course of this fire investigation, as recommended by the 2021 edition of the NFPA 921 Guide for Fire & Explosive Investigations.' *See* ALLEN_000704." Dkt. No. 23 at 7 n.6. The defendant did not attach this "cause and origin" report to her motion or her brief. In her brief, she argued:

> . . . [A]s a veteran fire investigator, Hankins knew that it is inappropriate to determine a cause of a fire before completing the investigation and that it is also inappropriate to identify a fire as incendiary based on "negative corpus." Negative corpus is the process of "[i]dentifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists." NFPA 921, *Guide for Fire and Explosion Investigations* (2021), § 19.65 (hereinafter NFPA 921). That is precisely what happened here. When the omitted facts about the batteries, the absence of ignitable liquids, and the investigator's failure to follow the guidelines for conducting a fire investigation are considered, any probable cause in the affidavit is extinguished.

Dkt. No. 23 at 7.

Judge Duffin described NFPA 921's description of "negative corpus" as "an inappropriate use of the process of elimination, whereby an investigator determines a fire's ignition source 'by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists.'" Dkt. No. 40 at 14 (quoting NFPA 921, *Guide for Fire and Explosion Investigations* (2021), § 19.6.5). He also explained that NFPA 921 "advises that the 'negative corpus process is not

39

consistent with the scientific method, inappropriate, and should not be used because it generates untestable hypotheses . . . .' *Id.*" Id. at 15.

Judge Duffin concluded that Hankins's affidavit both described evidence that supported the theory of arson *and* revealed "that another potential cause was still being investigated." Id. He acknowledged that the defendant's argument about the *weight* to be accorded Hankins's investigative analysis "may be a useful trial strategy," but concluded that it did not defeat probable cause to search the defendants house, car and restaurant. Id.

Judge Duffin did not commit clear error. First, Hankins's affidavit does not mention "negative corpus." It does not mention NFPA 921. Neither the defendant nor the government provided Judge Duffin with a cause and origin report for the fire, but the defendant says that Hankins reported using "the scientific method" to determine origin, not the "negative corpus" process. The suggestion that Hankins used the "negative corpus" process comes from the *defendant*—only she asserts that Hankins used that process.

Second, the affidavit does not support the defendant's theory that Hankins used the "negative corpus" theory. Hankins included in the affidavit a paragraph titled "*Fire Cause Classification*." Dkt. No. 23-4 at ¶42. That paragraph says:

> Although the formal origin and cause investigation is ongoing and there will be additional examinations of electrical artifacts, Your Affiant believes the cause of this fire is more probable than not to be incendiary, an intentional act. Specifically, investigators did not observe evidence of an electrical failure in the area of fire origin, and there were no other potential accidental heat sources in that area other than electrical heat sources. Additionally, surveillance video

40

supports the likelihood that a person entered the rear door of the restaurant approximately 20 minutes before the fire was first reported. The timing of that entry in relation to smoke being first observed by witnesses is consistent with intentional open flame ignition of combustible material. Additionally, the limited access to the door code lends to the probability that the person suspected of entering the rear door was likely [the defendant].

Id.

Hankins did not engage in a process of elimination, in which he eliminated all ignition sources found, known or suspected to have been present near the origin of the fire and for which no supporting evidence existed. Although he averred that investigators did not see evidence of an electrical failure or other "accidental" heat sources, he revealed that the investigators had observed electrical heat sources. He listed the absence of evidence of an electrical failure as only *one* piece of evidence supporting the arson theory, along with the evidence of the person entering the restaurant shortly before smoke was reported and the evidence that only a few people had access to the door code. And he advised the reader that the investigation into the cause of the fire was ongoing and that there would be additional examinations of electrical artifacts. In this paragraph alone, Hankins cited specific evidence that supported the arson theory—in other words, he did not simply eliminate possible ignition sources but he also cited to evidence supporting an intentionally set fire.

Third, the full affidavit contained much more evidence supporting the arson theory than did that single "fire cause classification" paragraph. The full affidavit explained that when firefighters showed up at the restaurant, they

41

found all the doors of the restaurant locked and closed. Dkt. No. 23-4 at ¶7. It explained that the defendant leased the building and owned the restaurant and that the property is insured. Id. at ¶9. It explained that there were remnants of charred towels, cardboard, napkins, electrical circuits and appliances in the area where the firefighters found the only blaze. Id. at ¶11. It explained that the ATF electrical engineer found no "affirmative evidence that any of the electrical appliances on the shelf unit were energized at the time of the fire," in contrast to the defendant's statement that appliances would have been plugged into a power strip. Id. It explained that Spectrum records shows that the "internet modem and cable TV box at the restaurant went offline between 2:26PM – 2:41PM on October 10, 2021, which is the timeframe when [the defendant] closed and left the restaurant" (as reflected on surveillance footage). Id. at ¶12. It said that the defendant had stated that both the modem and the TV box had been on the shelf on the top landing of the basement staircase and had been plugged into the power strip. Id. It stated that investigators had found two handheld lighters in a wall-mounted basket outside of the entry to the top basement staircase. Id. at ¶13. It described the surveillance photos of the person with the distinctive shoes arriving at, and leaving, the restaurant. Id. at ¶¶21-34. It described the Facebook posts containing photos of the defendant wearing the same distinctive shoes as the person on the surveillance video, and showing a dark-colored Dodge Durango like one the DCI had observed the defendant driving. Id. at ¶¶35-37. It explained that car registration records showed that the defendant owned a 2013 Dodge Durango. Id. at ¶38. It

discussed the fact that the garbage pull at the defendant's residence had revealed a letter from a utility company advising the defendant that her utility payment had been rejected by her bank, and a cover letter from a student loan servicer advising the defendant that the servicer was providing her with a deferment application she'd requested, seeking to postpone her student loan payments. Id. at ¶40.

Even if Hankins had used the "negative corpus" process to theorize about the cause of the fire—and, again, the defendant is the only person who says he did—and even if he had said as much in the affidavit, the affidavit still contained plenty of evidence to allow the issuing judge to reasonably find probable cause that the fire was intentionally set.

Even if the evidence about the absence of ignitable liquid, or the discovery of batteries, or the alleged use of the "negative corpus" process, or all three, had been necessary to a finding of probable cause (which the court has concluded that they were not), the defendant has not demonstrated the second thing she'd need to show to obtain a Franks hearing: that Hankins had a subjective intent to deceive based on the nature of the omissions. The defendant has presented no evidence that Hankins deliberately or recklessly omitted these facts from the affidavit. In the case of the batteries, the government argued that it was not until months after the affidavit issued that the ATF Fire Research laboratory identified them as lithium-ion batteries, so Hankins could not have attested to that as fact in the affidavit. See Dkt. No. 45 at 9. Although the defendant insists that Hankins should have recognized the

batteries as lithium batteries, the photo of the charred batteries does not support that assertion. In the case of the "negative corpus" process, the court has recounted that only the defendant (who does not purport to be a fire investigator) asserts that Hankins used that process.

The defendant has not met the requirements for obtaining a <u>Franks</u> hearing and Judge Duffin did not err in concluding as much. The court will overrule the defendant's objections to Judge Duffin's order denying the motion for a <u>Franks</u> hearing.

  C. <u>Motion to Suppress Facebook Records</u>

The defendant objects to Judge Duffin's recommendation that the good faith exception applies to the Facebook warrant; she asserts that the warrant was so obviously deficient that any reasonable officer would have known it was not reliable.[1] In <u>United States v. Leon</u>, 468 U.S. 897 (1984), "the Supreme Court held that even if a search warrant was invalid because the supporting affidavit failed to support a finding of probable cause, evidence seized in executing the warrant should not be suppressed if the police officers relied in good faith on the judge's decision to issue the warrant." <u>United States v. Miller</u>, 673 F.3d 688, 693 (7th Cir. 2012) (citing <u>Leon</u>, 468 U.S. at 922–23). "An officer's decision to obtain a warrant is *prima facie* evidence that the officer was acting in good faith." <u>United States v. Reed</u>, 744 F.3d 519, 522 (7th Cir. 2014). But suppression still may be appropriate "if the magistrate or judge in issuing

---

[1] Neither party objects to Judge Duffin's determination that the Facebook warrant was overbroad, so the court will not disturb that finding.

a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," if the issuing judge "wholly abandoned" the detached and neutral judicial role, if the affidavit supporting the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or if the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923 (citations omitted). The court already has rejected the defendant's objections to the affidavit in support of the warrant application, so it need only address the defendant's argument that the officers' reliance on the warrant was unreasonable.

Judge Duffin properly applied the good faith exception. "[P]olice officers are 'charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles.'" United States v. Bell, 585 F.3d 1045, 1052 (7th Cir. 2009) (quoting United States v. Koerth, 312 F.3d 862, 869 (7th Cir. 2002)). "We evaluate an officer's good-faith reliance with an analysis similar to the one used in qualified-immunity cases and charge officers with knowledge of well-established legal principles." United States v. Orozco, 576 F.3d 745, 750 (7th Cir. 2009) (citing Koerth, 312 F.3d at 869) (finding the good faith-exception applied because "[w]e have not 'clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case

45

at hand'"). In making this evaluation, this court must consider whether the law is well-established in the Seventh Circuit. See United States v. Rainone, 816 F.3d 490, 496 (7th Cir. 2016) ("[T]he federal good-faith exception and Seventh Circuit precedent govern whether the exclusionary rule applies."). "Simply, if the warrants at issue are materially the same as a warrant previously found deficient in the Seventh Circuit, then the executing officers would be on notice that the warrants could not be valid; thus, the good-faith exception would not apply." Roberts, 2023 WL 5509261, at *3 (citing Bell, 585 F.3d at 1052).

The defendant cites Mann, 592 F.3d 779, arguing that this case should have put officers on notice that the Facebook warrant was overbroad. The decision in Mann addressed the question of whether an officer exceeded the scope of a warrant when searching a defendant's computer hard drive. In dicta, the Seventh Circuit stated that "we simply counsel officers and others involved in searches of digital media to exercise caution to ensure that warrants describe with particularity the things to be seized and that searches are narrowly tailored to uncover only those things described." Id. at 786. That is good counsel and this court does not dispute it. But Mann is not otherwise on point; the Mann court concluded that the search did *not* exceed the scope of the warrant, with a minor exception that did not invalidate the search. Id.

Here, the warrant required Facebook to disclose nineteen separate categories of information, including: all stories posted since June 1, 2019; all photos and videos since June 1, 2019; all records of the account's usage of the "like" feature; all information about Facebook pages the account is a "fan" of;

46

all past and present lists of friends; and all Facebook searches since June 1, 2019. Dkt. No. 24-1 at 4–7. The scope of information to be "seized" by the government included: evidence of the crimes described; preparatory steps taken in furtherance of the crimes; evidence of motive, intent, or knowledge of the crimes; and evidence of the location, whereabouts, and patterns of travel of the account user. Id. at 42–43. But it is not well-established that a warrant like this is overbroad. Mann did not invalidate a warrant as overbroad, and Mann's "counsel" to officers that digital media warrants should "describe with particularity the things to be seized" would not put an officer on notice that this particular warrant as issued was obviously overbroad. The court could not locate any precedent in the Seventh Circuit that indicates this is an area of the law that is well-established in this circuit. See Roberts, 2023 WL 5509261, at *4 (discussing the unsettled state of the law regarding social media warrants in the Seventh Circuit).

The court will adopt Judge Duffin's recommendation and deny the defendant's motion to suppress the Facebook records.

> D.    Motion to Suppress Statements

The defendant argues that the court must suppress the statements she made during the November 2, 2021 interview because she was not given a Miranda warning, despite being subjected to a custodial interrogation.

In Miranda v. Arizona, the Supreme Court effectuated the Fifth Amendment's privilege against self-incrimination in the context of custodial interrogations, holding that

47

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any meaningful way.

Miranda v. Arizona, 384 U.S. 436, 444 (1966). In other words, "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 428 (1984). But "[t]he privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation. Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." United States v. Ambrose, 668 F.3d 943, 954 (7th Cir. 2012). The Supreme Court put it this way:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' line and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

Thompson v. Keohane, 516 U.S. 99, 112 (1995).

The defendant argues that she was "in custody" during the November 2, 2021 interview. "[W]hether a suspect is 'in custody' is an objective inquiry," J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011), assessed from the perspective of a reasonable person in the defendant's position, Yarborough v.

48

Alvarado, 541 U.S. 652, 663 (2004). It requires the court to ask whether a person "would have felt he or she . . . was at liberty to terminate the interrogation and leave." Keohane, 516 U.S. at 112. "'[S]ubjective views harbored by either the interrogating officers or the person being questioned' are irrelevant. The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." J.D.B., 564 U.S. at 271 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)).

"In determining whether a reasonable person in the suspect's shoes would have felt free to leave, we consider 'all of the circumstances surrounding the interrogation.'" United States v. Patterson, 826 F.3d 450, 455 (7th Cir. 2016) (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)). Relevant factors include: "(1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation." Id. (citing Howes, 565 U.S. at 509). The Seventh Circuit has put a finer point on these factors, asking

> whether the encounter occurred in a public place; whether the suspect consented to speak with officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

United States v. Littledale, 652 F.3d 698, 701 (7th Cir. 2011).

Judge Duffin acknowledged that the defendant was distressed during the interview but ultimately determined that the totality of the circumstances

49

established that the defendant was not in custody at the time of questioning. He found it particularly relevant that the officers detained the defendant on her property during the execution of a valid search warrant. He also considered that officers did not use physical restraints or relocate the defendant from her property, and that they told her that she was not under arrest and that she was free to leave.

The defendant's objection focuses primarily on the officers' behavior prior to the questioning that occurred in the officers' truck. She states that "a reasonable person in [her] shoes, a Black woman in an overwhelmingly white community, would view the actions of two white male officers following her into her bedroom and taking her phone, in anticipation of a tactical squad entering the house as highly invasive of her privacy and extremely intimidating." Dkt. No. 44 at 30. But when the defendant expressed that she was confused shortly after the agents entered her home, SA Heimerl explained what was happening:

> Heimerl: So the . . . a judge authorized a search warrant for your home, to look for some evidence. You can leave your purse, you won't need anything else. Wha—when we're done talking, you're coming back in your house and we're leaving. Okay?
>
> Defendant: Okay—
>
> Heimerl: You're not going anywhere. Okay?
>
> Defendant: Okay.
>
> Heimerl: We're just going to go out in the driveway and sit in my truck. Okay?
>
> Defendant: Okay.
>
> Heimerl: Thanks. Perfect.

50

Dkt. No. 30-5 at 3.

Once they reached the agents' truck, Heimerl told the defendant she was not under arrest and repeated that she could go back into her house and that "we are all leaving" after they were finished talking. Id. at 5. Heimerl then told the defendant she didn't have to talk to the agents and told her she could "get out of the truck and leave anytime [she] want[ed]." Id. at 7. After Heimerl showed the defendant the surveillance footage from the night of the fire, they had the following exchange:

> Heimerl: All right. I believe it's always best to get out in front of things. And if you need to provide an explanation for why your car may have been on Center Avenue that night, now would be the time to do it. Okay? Better now—
>
> Defendant: I just don't wanna incriminate myself.
>
> Heimerl: I understand that.
>
> Defendant: That's not—
>
> Heimerl: You have, you have very difficult decisions to make now. You've already agreed that this is very compelling information that I've shown you, right?
>
> Defendant: Well, I don't, I don't think that I should be, like, agreeing to anything because I'm gonna need counsel, obviously.
>
> Heimerl: That's your choice. Absolutely. Absolutely.
>
> Defendant: So . . .
>
> Heimerl: So, I wanted to share this information with you, so you understood why we're here today.
>
> Defendant: Mhm.

Id. at 24. Heimerl asked the defendant several more times if she wanted to say anything about the night of the fire or the surveillance footage, and each time,

the defendant declined. Id. at 26–31. The defendant then asked to make a phone call to her pastor; Heimerl stated that she could make the call if the agents were present. Id. at 29–30. The defendant then stated that she did not want to sit in the truck and asked how much longer the officers would be searching her home. Id. at 32. SA Anderson checked with the officers and stated that it would take some more time before the search would be complete. Id. at 32–33. This was around the hour mark of the recording. For the remainder of their conversation, Heimerl did not question the defendant further about the night of the fire or the surveillance video. Heimerl and Anderson left the defendant at her home once the search was complete.

Based on the totality of the circumstances, the court agrees with Judge Duffin that the defendant was not in custody. The defendant's initial contact with the agents was at her house. Although the agents went with her, she was allowed to get warmer clothing. She left her house and went with the agents to their truck, which was on her property. She remained in the truck for about an hour for the purposes of questioning (the questioning did not continue into the second hour), she was not physically restrained and she was released at the end of the conversation. The agents did not point their weapons at the defendant or threaten her. She was not detained at a police station or government building. Heimerl told the defendant that she did not have to answer the agents' questions, and the defendant demonstrated that she understood by declining to answer when asked to explain why she may have been at her restaurant on the night of the fire. Although there were several

officers present to execute the search warrant, the defendant directly interacted only with Heimerl and Anderson, both of whom were known to her from previous interactions. The defendant has not alleged that the agents yelled at her or that they physically or verbally abused her. Although the defendant may have felt scared or upset during the interview, her subjective perception of the circumstances is not the issue. The question is whether a reasonable person in her position would have felt free to leave. Judge Duffin did not err in concluding that a reasonable person in that position would have felt free to leave.

The court will adopt Judge Duffin's recommendation and deny the defendant's motion to suppress the statements she made during the November 2, 2021 interview.

## VII. Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 44.

The court **ADOPTS** Judge Duffin's recommendation. Dkt. No. 41.

The court **DENIES** the defendant's motion to suppress evidence and for a Franks hearing. Dkt. No. 23.

The court **DENIES** the defendant's motion to suppress Facebook records. Dkt. No. 24.

The court **DENIES** the defendant's motion to suppress statements. Dkt. No. 25.

53

The court **ORDERS** that the parties must file a status report by the end of the day on **November 12, 2025** advising the court of their anticipated next steps.

Dated in Milwaukee, Wisconsin this 28th day of October, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**