UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 24-CR-236

ARLETTA ALLEN,

Defendant.

---

**UNITED STATES' CONSOLIDATED MOTIONS *IN LIMINE***

---

The United States of America, by and through its attorneys, Kelly B. Watzka and Porchia S. Lewand, Assistant United States Attorneys, hereby moves *in limine* for the following pretrial evidentiary rulings.[1]

## I. Factual and Procedural Background

To aid the Court, the United States provides the following summary of the anticipated trial evidence relevant to these motions:

In February 2021, the defendant opened and began operating "A Family Affair Soul Food Kitchen" ("the restaurant"). Previously, the defendant was self-employed as a motivational speaker, a career she claimed resulted in $25-30K per month in income from speaking engagements as of early 2020. However, according to the defendant, when the Covid-19 pandemic eliminated her speaking opportunities, she decided to open the restaurant. As part of that process, the defendant signed a triple net lease to operate the restaurant at 417 S. Main Street, Fond du Lac, Wisconsin, a building owned by R.F. In a triple net lease, the tenant pays reduced rent in exchange for assuming responsibility for maintenance, taxes, and insurance for a

[1] The United States reserves the right to supplement these motions if warranted.

commercial property. The defendant secured business loans to finance the restaurant and also invested personal savings.

Although the defendant initially employed approximately 15 people, she had difficulty maintaining employees. By October 10, 2021, the restaurant was woefully understaffed. As a result, the defendant was tethered to the restaurant. As she told investigators, "I live here. I'm here nonstop. All day, every day."

The restaurant was not financially successful. A forensic auditor's analysis of the restaurant's financial performance revealed that between February 2021 and September 2021, the restaurant's net ordinary income decreased from $9,019.83 to -$2,222.93 and that the restaurant experienced a cumulative net ordinary loss of -$3,202.38. By August 30, 2021, the defendant clearly felt the financial strain, as evidenced by a text message in which she stated, "I can't afford to close. There is no more money and I have a heavy loan."

In September 2021, the restaurant was vandalized. In addition, the defendant also learned that a significant leak in the roof was the result of wear and tear, not storm damage, resulting in a denial of her insurance claim. Under her lease, this meant that the defendant was responsible for the cost of repairing the roof. Shortly thereafter, the defendant's insurance company notified her that the commercial liability policy for the restaurant would be terminated as of December 1, 2021. Additionally, the defendant's most helpful employee, her fry cook J.M., gave notice that his last day of work would be October 10, 2021.

The defendant sent multiple messages to others indicating that she was overwhelmed and wanted a different life. For example, on October 8 and 9, 2021, the defendant sent messages stating that she was "not happy" at the restaurant, that she intended to sell the restaurant and "move on," that she was, "going back to my stage," and that she was "over all this." She added,

"My calling is on a stage inspiring the world. I feel like Fond du Lac [h]as its hands around my throat choking the literal life out of me." On the night of October 9, 2021, the defendant texted, "I'm breaking down now. I need God to get me out of here.  I closed at 6:30 it was so slow. I'm going home now.  I'm so sick of this life."

The following night, on October 10, 2021, a fire broke out at the restaurant. At approximately 8:59 p.m., emergency services/911 in Fond du Lac received a report of a burning smell and the sight of smoke in the 400 block of S. Main Street. Firefighters responded and determined that the smoke was emanating from the roof of the restaurant. Because the doors and windows of the restaurant were all closed and locked, the firefighters forced entry.  Once inside, heavy smoke completely obscured the firefighters' vision. Through the use of a thermal imaging camera, firefighters saw flames near the landing for the stairwell that led to the basement and successfully extinguished the fire.

Law enforcement agents from the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) became involved in the investigation.

As part of the investigation, the defendant was interviewed multiple times. She repeatedly told investigators that on October 10, 2021, she was last in the building at approximately 2:45 p.m. She stated that when she left for the day, she had her laptop, her payroll book, and her pink checkbook with her.  She further claimed that after leaving the restaurant, she remained at home until shortly after 9:00 p.m., when a friend messaged her about a fire at the restaurant. She repeated those claims even after investigators showed her surveillance images depicting a woman whose shape and size were consistent with the defendant's physical appearance, and who was wearing dark clothes, a hoodie, and shoes matching those worn by the defendant in pictures

she posted on Facebook, approaching and then departing the vicinity of the restaurant in the dark approximately 18 minutes before the 911 call. Eventually, the defendant admitted that she had returned to the restaurant that night, claiming she needed to retrieve her laptop, payroll book, and pink checkbook. Despite being in the restaurant immediately before smoke would have filled the restaurant before venting out of the rooftop, prompting the 911 call, the defendant insisted she had nothing to do with the fire. She also stated that she retrieved her pink checkbook from the shelves at the top of the landing to the basement stairs (which investigators determined was the area of origin for the fire) and that she didn't recall seeing any smoke or flames in the area at that time.

Following the fire, the defendant signed a sworn proof of loss insurance claim and submitted it to her insurance carrier in which she avowed that the fire was not a result of any activity on her part. As a result of the insurance claim, her carrier paid over $270,000 in proceeds to the defendant, the building owner, and lenders who financed the restaurant and held liens on restaurant equipment.

Following the fire, the defendant returned to her motivational speaking career and published a book. She has held herself out to be an expert on overcoming trauma and often focuses on her own trauma, including the trauma of losing her restaurant to fire. She has posted dozens of videos and participated in numerous interviews that are publicly available on YouTube. In an interview entitled, "Finding Her Voice: Trauma to Triumph with Arletta Allen," on April 5, 2024, the defendant discussed her pre-restaurant motivational speaking engagement income of approximately $25-30K/month, and how that income disappeared in February 2020 due to the pandemic, how she pivoted to opening a restaurant, the "tragic" fire at her restaurant, how she "employed 19 people," all of whom "lost their jobs" when she lost the restaurant, and how "the restaurant had to go so I could get back to the stage" because God had other plans for

her life.

The defendant is charged with multiple offenses stemming from the October 10, 2021, fire. Specifically, a grand jury returned a four-count indictment charging the defendant with (1) arson; (2) wire fraud; (3) arson in furtherance of another felony; and (4) making a materially false statement. The trial is scheduled to start on November 2, 2026.

## II. Legal Standard

This Court's "inherent authority" to manage the course of a trial includes the power to exclude evidence *in limine*. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp. 2d 870, 873 (E.D. Wis. 2010) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)); *see also Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). A motion *in limine* is one made "at the outset" or "preliminarily." *Black's Law Dictionary,* 803 (8th ed. 2004). Such motions permit the Court to "eliminate from further consideration evidence that clearly should not be presented to the jury." *Fail-Safe*, 744 F.Supp.2d at 873 (citing *Jonasson v. Lutheran Child and Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997)). Rulings on motions *in limine* may be adjusted as needed at trial. *Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 565 (7th Cir. 2006).

## III. Motion to Prohibit Argument or Inquiry in Support of Jury Nullification

It is improper for a defendant to suggest in any way that the jury should acquit her even if it finds that the United States has met its burden of proof. *See*, *e.g.*, *Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) (stating, in the context of Illinois felony-murder statute, that "[a] defendant has of course no right to ask the jury to disregard the judge's instructions . . . [a] defense that the law he is charged with violating is a bad law that the jury should refuse to enforce is no defense at all"); *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) ("Jury nullification is 'not to be positively sanctioned by instructions,' but is to be viewed as an 'aberration under our system'"); *see also United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).

Although the United States requests that the Court forbid all forms of questioning, commentary, or argument designed to induce jury nullification, for the reasons set forth below, the United States particularly requests that the Court forbid such arguments based on: a) the potential term of imprisonment in this case; (b) personal or family circumstances that the defendant has or will face; and (c) any motives or actions of law enforcement in investigating or prosecuting the matter.

**a. Potential Term of Imprisonment**

The defendant is facing a mandatory minimum term of 15 years' imprisonment if convicted of Counts One and Three. Unless a jury has a sentencing role, such as in capital cases, it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quotations and citations omitted); *see also Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) (noting that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"). Indeed, Seventh Circuit Pattern Jury Instruction 4.08 states, "[i]n deciding your verdict, you should not consider the possible punishment for the defendant." This basic principle applies equally to cases involving mandatory minimum penalties. *See Shannon*, 512 U.S. at 586 (recognizing that "as a general matter, jurors are not informed of mandatory minimum or maximum sentences").

For these reasons, the Court should bar the defendant from asking questions, making comments, or arguing about the potential penalties she faces if convicted.

**b. Personal or Family Circumstances**

Any argument regarding the toll that the investigation, a conviction, or prison sentence may take on the defendant, or her family, because of her age, medical status, employment status,

financial situation, or familial circumstances would only serve the improper purpose of invoking the sympathies of the jury and should be prohibited. *See United States v. Jinhuang Zheng*, 2017 WL 3434228 at *3 (N.D. Ill. Aug. 10, 2017). Any personal hardship the defendant has faced or may face is irrelevant to the jury's determination, collateral, and prejudicial. The defendant is a twice-divorced, single mother. The United States is aware that the defendant has made numerous public statements and has published a book representing that she is a victim of domestic abuse and survivor of trauma. The defendant also purportedly sought medical treatment following the fire due to sleeplessness, depression, and anxiety. These circumstances are irrelevant to her guilt or innocence in this case and because such circumstances, along with other personal circumstances, could only serve to arouse the sympathies of the jury, the United States moves to preclude any inquiry or argument regarding the personal hardships described above or any suggestion that the investigation, prosecution, or her conviction has caused or would cause unfair consequences.

**c. Motives of Law Enforcement**

Defense counsel should be similarly prevented from advancing argument or posing questions designed to inject issues of law enforcement motivation into this trial. A law enforcement officer's motive is not relevant to the jury's determination of guilt or innocence. *United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant"). Permitting unsupported arguments, questioning, or testimony of this nature in the presence of the jury risks irreparable prejudice and confusion of the matters at issue. Courts have long noted that such arguments "can distort the search for truth and drastically affect a juror's impartiality."



Case 2:24-cr-00236-PP Filed 09/24/26 Page 7 of 24 Document 76

*United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990). Further, evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus should be excluded on that basis. *See United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"); *United States v. Berrigan*, 482 F.2d 171, 174-76 (3rd Cir. 1973) (affirming exclusion of evidence relating to "discriminatory prosecution").

Similarly, the nature and duration of the investigation is not relevant to whether the government has proven its case beyond a reasonable doubt. The defense may suggest that law enforcement "rushed to judgment" in focusing their investigation on the defendant. However, the evidence will speak for itself, and the jury will either agree or disagree that it establishes the defendant's guilt. Evidence or comment about the duration of time between the alleged crime, law enforcement confronting the defendant with their suspicions of her involvement, and the eventual issuance of charges is not relevant. *See United States v. Estell*, 641 Fed. Appx. 552, 556 (7th Cir. 2016) ("trial judges have discretion to limit argument on tangential issues that could confuse the jury, and that includes a defendant's complaints about the adequacy of the government's investigation."); *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir. 1999) (affirming the trial court's refusal to have the "trial become a trial of the investigation.").

**IV. Motion to Bar Discovery Requests or Commentary on Discovery Matters**

In the presence of the jury, it is inappropriate to request discovery from a witness or opposing counsel, move the Court for discovery, or otherwise comment on discovery matters. Discovery-related discussions may create the false impression that the United States has suppressed information in this case as a means of seeking an unfair advantage. Thus, the jury might get the wrong impression that the United States has somehow improperly withheld

information that it has, in fact, already produced. These requests, if appropriate, can easily be made to the Court or opposing counsel outside the presence of the jury with no prejudice resulting to either side. *See generally Thompson v. Glenmede Trust Co*., 1996 WL 529693 (E.D. Pa. 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial.").

The United States thus respectfully moves to preclude the defendant from raising these types of issues in the presence of the jury.

## V. Motion to Bar the Defendant from Defining "Reasonable Doubt"

Attempts to define reasonable doubt for the jury are improper. *Bruce*, 109 F.3d at 329. Indeed, the Seventh Circuit has held that the term "reasonable doubt" should not be defined by either counsel or the trial court. *See United States v. Anderson*, 303 F.3d 847, 857 (7th Cir. 2002); *United States v. Reynolds*, 64 F.3d 292, 298 (7th Cir. 1995). That is because any attempt to define the term "presents a risk without any real benefit"—that is, any definition of the term often leans toward "misleading refinements" that "weaken and make imprecise the existing phrase." *Id.*; *see also Anderson*, 303 F.3d at 857 (government argument was proper because "it was invited by defense counsel's own improper attempt to define the reasonable doubt standard"); *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) (definitions of reasonable doubt are likely to "confuse juries more than the simple words themselves").

For these reasons, the Seventh Circuit has held that it is improper for attorneys to attempt to define reasonable doubt. *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1999); *see also United States v. Clancy*, No. 96–3317, 1999 WL 265164, at *8 (7th Cir. 1999); *Bruce*, 109

F.3d at 329; *United States v. Alex Janows & Co.*, 2 F.3d 716, 722–23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury.").

Given the above, the United States moves this Court to preclude the defendant from making any attempt to define reasonable doubt for the jury.

**VI. Motion to Preclude Introduction of Defendant's Out of Court Statements by the Defense**

The defendant was interviewed by law enforcement on multiple occasions following the fire. Some of the interviews were lengthy. The United States intends to call law enforcement witnesses to testify about the circumstances of the interviews, to summarize portions of the defendant's statements, and to introduce clips of audio recordings of portions of the interviews the United States views as relevant and/or inculpatory. The United States also intends to introduce statements made by the defendant to others either in person, via text, Facebook postings and/or messenger, and on YouTube. The topics covered by these statements include the defendant's activities prior to and following the fire, circumstances present at the restaurant on the day of the fire, the defendant's challenges in maintaining employees and operating the restaurant, the financial condition of the restaurant, and the defendant's alternative career plans. For the sake of completeness, the law enforcement witnesses will also testify that when the defendant was confronted with suspicions about her involvement in the fire, she repeatedly denied having any involvement in setting the fire.

The United States requests an order precluding the defendant from attempting to introduce her own out-of-court statements through cross-examination of the United States' witnesses (or through her own witnesses, should she elect to call any). Although the United States may admit the defendant's statements pursuant to Federal Rule of Evidence 801(d)(2)(A) as admissions by a party-opponent, the defendant is not free to do the same. When offered by the defense, a

defendant's out-of-court statements are inadmissible hearsay.

It is well settled that the government may admit a defendant's statements as non-hearsay statements of a party opponent. Fed. R. Evid. 801(d)(2); *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006) (holding that a defendant's "statements on the tapes constitute admissions by a party-opponent, and, as such, those statements are, by definition, not hearsay under Federal Rule of Evidence 801(d)(2)(A)"). It is also clear that the statements of other participants in a conversation with the defendant are admissible, not for the truth of the matter asserted, but to provide context. *United States v. Van Sach,* 458 F.3d 694, 701 (7th Cir. 2006); *see also United States v. Simmons*, 582 F.3d 730, 736 (7th Cir. 2009); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009); *United States v. Nettles*, 476 F.3d 508, 517-18 (7th Cir. 2006).

The United States will seek to admit portions of communications between the defendant and third parties who will not testify at trial, for the truth of the matters the defendant asserts in them, and not the truth of any assertions made by the third parties. The statements of the third parties are necessary for context because without those statements, the jury will be confused about the meaning and salience of the defendant's statements. Where a defendant's statements, which are admissible for the truth of the matter, occur in a conversation, then the statements of other participants in that conversation are admissible, not for the truth of the matters asserted, but to provide context for the defendant's statements. *United States v. Van Sach,* 458 F.3d 694, 701 (7th Cir. 2006); *see also United States v. Simmons*, 582 F.3d 730, 736 (7th Cir. 2009); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009).

The defendant may assert that the "rule of completeness" requires introduction of her entire interviews or communications. Federal Rule of Evidence 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the

introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Rule 106 only applies to written statements. Federal Rule of Evidence 611(a) grants the same authority to trial judges with respect to oral statements. *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993).

The "rule of completeness" is not unqualified. The proponent of the additional evidence (in this case, the defendant) bears the burden of demonstrating (1) its relevance to the issue in the case and (2) must show that it clarifies or explains the portion offered by the opponent. *United States v. Glovner*, 101 F.3d 1183, 1189-90 (7th Cir. 1996). The Seventh Circuit has adopted a four-part test for determining whether the additional evidence clarifies or explains the portion of the statement already offered into evidence. *Id*. Under this test, the remainder of the statement may only be admitted if it is necessary to 1) explain the admitted portion; 2) place the admitted portion in context; 3) avoid misleading the trier of fact; and 4) insure a fair and impartial understanding. *Id.*

When the prosecution seeks only to introduce a portion of a defendant's statement, the defendant is not entitled to introduce portions of her statement that are neither explanatory nor relevant to those portions of the statements introduced. *United States v. McCorkle*, 511 F.2d 482, 486-87 (7th Cir.1975). The "rule of completeness" does not authorize the introduction of defendant's self-serving, exculpatory out-of-court statements as part and parcel of statements introduced by government unless such statements are necessary to explain or clarify the portion of the statement received. *United States v. Haddad*, 10 F.3d 1252 (7th Cir. 1993); *see also United States v. Li*, 55 F.3d 325 (7th Cir. 1995) (upholding district court's exclusion of exculpatory portion of defendant's statement which was not necessary for completeness). The "rule of completeness" is not intended to open the floodgates and permit the wholesale

introduction of otherwise inadmissible evidence. *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982) (noting that the rule is designed to cause evidence to be viewed in its proper and fair context, not to make inadmissible evidence become admissible).

Simply put, the "rule of completeness" permits nothing more than setting the context and clarifying the evidence already introduced. It ensures fairness where a misunderstanding or distortion created by the other party can only be averted by introduction of the full out-of-court statement. In order to invoke the "rule of completeness," the defendant must make a focused and specific request outlining those portions of the introduced statement that are confusing, misleading or taken out of context. Here, there is no danger of confusion or misunderstanding because the testifying law enforcement officers will make clear that the defendant has denied involvement in the arson.

For these reasons, the United States moves this Court for an order precluding the defendant from seeking to introduce her own statements through cross or direct examination of other witnesses, or introduction of exhibits.

## VII. Motion to Admit Business Records

At trial, the government anticipates moving to admit records produced by numerous business entities, pursuant to the "business records" hearsay exception under Federal Rule of Evidence 803(6).

Rule 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is not excluded as inadmissible hearsay if "the record was made at or near the time by – or from information transmitted by – someone with knowledge;" the record was kept in the course of a regularly conducted activity of a business; and "making the record was a regular practice of that activity." Business records of this sort may be introduced "without foundation testimony from

the record custodian so long as the records are authenticated according to Fed. R. Evid. 902(11)." *United States v. Klinzing*, 315 F.3d 803, 805 (7th Cir. 2003).

Under Rule 902(11), "a party may authenticate a business record through a written declaration by a qualified custodian that the record meets the necessary foundational requirements, but the party intending to offer the record must provide written notice of that intention to all adverse parties, and . . . make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." *United States v. Bledsoe*, 70 Fed. App'x 370, 373 (7th Cir. 2003) (internal quotations omitted).

Thus, under Rule 803(6), the parties can "avoid the expense and inconvenience of producing time-consuming foundation witness testimony in situations where the authenticity of the business records could be confirmed by written declarations pursuant to Rules 902(11)-(12)." *Klinzing*, 315 F.3d at 809.

In this case, the United States has given the defendant adequate notice of its intent to offer the above-referenced records under Rule 803(6). *See Bledsoe*, 70 Fed. App'x at 373 (notice four days before trial was adequate). In accordance with Rule 902(11), the United States has produced business records and accompanying certifications in discovery. The records produced do not exhibit any indicia of untrustworthiness, nor has the defendant expressed doubt on the trustworthiness of these items since they were produced. The United States has preliminarily identified a number of entities whose records it anticipates introducing pursuant to Rules 803(6) and 902(11). Prior to the final pretrial conference, the United States will identify its final exhibit list, including all business records/certifications it intends to introduce.

Accordingly, the government requests that the Court be prepared at trial to admit the business records without the need for authenticating testimony from a live witness.

## VIII. Motion to Admit Evidence of Scheme and Defendant's Motive, Opportunity, Intent, Preparation, and Plan

The United States anticipates that the defendant may challenge some of the evidence it intends to present at trial as improper "other acts" evidence under Federal Rule of Evidence 404(b). For the reasons stated herein, however, the United States believes that the proposed evidence, which includes evidence of the defendant's execution of a wire fraud scheme designed to obtain insurance proceeds for fire loss by falsely claiming she had no involvement in the fire and evidence of the materially false statements made by the defendant to fire investigators, is arguably admissible as direct evidence of the charged offenses but is clearly admissible as evidence of the defendant's motive, opportunity, intent, preparation, plan, and knowledge. Nevertheless, in an abundance of caution, the United States has already provided notice to the defendant of its intent to introduce such evidence should the Court determine that Rule 404(b) applies.

Rule 404(b)'s limitations apply only to extrinsic evidence, not to direct evidence of the crimes charged. *United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015). *See also United States v. Elmer*, 980 F.3d 1171, 1175 (7th Cir. 2020); *United States v. Boone*, 628 F.3d 927, 933 (7th Cir. 2010). Rule 404(b)(1) provides, "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." It permits evidence of other acts if those acts are relevant to "another purpose" and such relevance is established by "some propensity-free chain of reasoning." *Ferrell*, 816 F.3d at 444; *United States v. Gomez*, 763 F.3d 845, 856, 860 (7th Cir. 2014)). The mere fact that a propensity inference could be drawn from otherwise admissible

other-act evidence is not by itself a basis for exclusion. *Id*. Rule 404(b)(2) includes a non-exhaustive list of permissible purposes for admitting other-act evidence. Those purposes include, but are not limited to, motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *See United States v. Taylor*, 522 F.3d 731, 735-36 (7th Cir. 2008) ("The list of permissible uses of bad-acts evidence in Rule 404(b) is introduced by 'such as,' and so is not exhaustive."). Other than offering other-act evidence solely to prove "that the defendant is prone to commit crimes or is otherwise a bad person," there are no uses prohibited by the rule. *Id.*.

In cases involving arson, evidence of financial difficulty has been routinely admitted to show motive. *See United States v. DeCicco,* 370 F.3d 206, 213-214 (1st Cir. 2004) (tax liability properly admitted to show motive to commit arson); *United States v. Williams,* 264 F.3d 561, 575 (5th Cir. 2001) (admitting evidence that defendant had recently lost his home); *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1, 5-6 (1st Cir. 2001) (admitting evidence that owners of commercial fishing vessel were seriously behind on loan because it was relevant to insured's motive to commit arson); *United States v. Utter,* 97 F.3d 509, 515 (11th Cir. 1996)(admitting evidence of defendant's financial problems and motive to commit arson); *United States v. Anderson,* 933 F.2d 1261, 1274 (5th Cir. 1991) (admitting evidence of civil judgments to show defendant's poor financial condition and motive to burn his failing furniture business); *United States v. Fakhoury,* 819 F.2d 1415, 1421 (7th Cir. 1987) (admitting evidence of defendant's financial status to show motive to attempt arson and to send fraudulent claims to his insurance company).

The Seventh Circuit has consistently found that evidence of financial distress is also relevant to establish a defendant's motive to commit fraud. *See Ferrell*, 816 F.3d at 446

(evidence of defendant’s poor financial condition properly admitted as evidence of motive to commit Medicare fraud); *United States v. Kuzlik,* 468 F.3d 972, 974 (7th Cir.2006) (finding that evidence of financial troubles and debt probative to show motive to engage in mail fraud scheme); and *United States v. Bardsley,* 884 F.2d 1024, 1027–28 (7th Cir.1989) (returned checks properly admitted under Rule 404(b) as evidence of defendant's motive to commit offense because it showed that he was having financial problems).

As noted above, a forensic review of the restaurant’s financial condition revealed that the defendant was experiencing financial difficulty, and the restaurant was operating at a net loss at the time of the fire. The defendant signed a lease which obligated her to maintain the building, which needed significant repairs to the roof, and to maintain commercial liability insurance, which her carrier indicated would be terminated as of December 1, 2021. She made numerous statements to others, including law enforcement, indicating that she was understaffed, tethered to the restaurant, unhappy operating the restaurant, unable to close because of her outstanding loan, and wanted to return to her motivational speaking career. The defendant also initially withheld a $160,000 insurance proceeds check for loss of the building from R.F., the owner of the building who was the designated beneficiary of those proceeds. The defendant insisted that she was entitled to some of the proceeds and demanded that R.F. share a portion of the check with her. R.F. had to engage legal representation to persuade the defendant to sign over the check to him. The defendant also seemingly used the “trauma” of the fire to bolster her motivational speaking career and made multiple post-fire statements regarding the restaurant, the fire, her perceived “true calling,” and return to the stage – including the April 5, 2024, YouTube interview described above.

Evidence of 1) the defendant’s increasing financial difficulties and operational

hardships, 2) her dissatisfaction with the restaurant and her life, 3) her belief that she could not simply close the restaurant due to her outstanding business loan, 4) her belief that she would be entitled to insurance proceeds, and 5) her belief that her true calling was on the stage, are all relevant and admissible to explain why she may have viewed arson as a solution to her problems.

The defendant's pre- and post-fire statements and conduct are also relevant to her intent, preparation, and plan. The defendant made numerous statements – to third parties and to law enforcement – about the circumstances at the restaurant and her activities on the day of the fire that were either demonstrably false and/or suggest her intent to mislead others about potential causes of the fire, her actions, and her purported reasons for returning to the restaurant just prior to the fire. For example, starting on the morning of October 10, 2021, and continuing through all stages of the fire investigation, the defendant repeated a detailed story to co-workers, friends, and investigators about hearing a popping noise and seeing a spark in an overhead outlet when she turned on the Alexa device, which was located in the area of origin of the fire, that morning. She stated that the Alexa device was plugged into a power strip which was plugged into an outlet in the ceiling. The defendant stated the popping/sparking scared her, so she unplugged the power strip from the outlet in the ceiling to "let it calm down" at approximately 7:45 a.m. that morning. Because other devices, including her cable box, modem, and router, were also plugged into that power strip, the internet went down when she unplugged the power strip. She claims this occurred before her employees arrived when she was alone in the restaurant. The defendant stated she did not plug the power strip back in until approximately 9:45 a.m., shortly before the restaurant opened. She stated the problem did not repeat itself and she left everything plugged in/on when she left the restaurant later that afternoon.

The defendant volunteered this information to co-workers and friends prior to the fire and

repeated the story to investigators and others after the fire, suggesting that an electrical issue may have caused the fire. The story is demonstrably false. A representative of Spectrum, which provided internet and cable service for the restaurant, told investigators that the restaurant's modem and cable box was connected to the server and functioning between October 6, 2021, at 1:15 a.m. (when Spectrum conducted maintenance on their systems) through October 10, 2021, at 2:24 p.m. There was no evidence to support the defendant's claim that the internet had been powered down for two hours on the morning of October 10. And the defendant's statement that she did not unplug or turn off the Alexa when she left that afternoon is also contradicted by Spectrum and the fire scene investigation, which determined that nothing in the area of origin of the fire was energized at the time of the fire.

These comments are probative of the defendant's intent and plan to falsely suggest that the fire was caused by an electrical issue. A statement or conduct that is probative of preparation or designed to create a false or alternative explanation for an *anticipated* fire is circumstantial evidence of preparation, plan, intent, and consciousness of the planned act which should be admitted as direct evidence of the charged offenses. *See United States v. Patel,* 370 F.3d 108, 113 (1st Cir. 2004) (evidence that in the days before a fire at his business the defendant told multiple people that the circuit breakers in his store were a fire hazard was circumstantial evidence that he was responsible for setting the fire); *United States v. Kamel,* 965 F.2d 484, 489 (7th Cir. 1992) (finding that defendants' pre-fire actions of twice increasing the insurance coverage for their business in the months prior to the fire, seeking alternative sites for their business, and removing contents from the business was circumstantial evidence that the defendants intended to set the fire and financially benefit from insurance proceeds); and *United States v. Lundy*, F.2d 809, 392, 396 (7th Cir. 1987) (noting that defendant's pre-fire conduct of

moving empty boxes to an area in his business that the defendant had been warned was a fire hazard was circumstantial evidence that he intentionally caused the fire).

The defendant's post-fire statements and conduct designed to distance herself from the scene of the fire and mislead investigators regarding potential causes of the fire are similarly admissible as direct evidence. In addition to her false story about powering down the internet in response to an allegedly sparking outlet, the defendant took other post-fire steps that are probative of her intent to mislead investigators and to financially benefit from the fire. For example, after finally admitting that she had returned to the restaurant shortly before the fire, the defendant falsely told investigators that she went back to retrieve her laptop, payroll book, and pink checkbook so she could complete payroll despite having previously told investigators that she had completed payroll earlier that afternoon at the restaurant, a fact corroborated by one of her employees, and that she took her laptop, payroll book, and pink checkbook home with her that afternoon. The defendant also told investigators that she brought her cell phone with her to the restaurant that night, but records associated with her cell phone demonstrate that it remained at her house. Given the defendant's prolific use of her cell phone and her statement that it is always with her, the fact that she left it behind and lied about its location to investigators suggests that she may have been concerned about location tracking capabilities when she decided to leave it at home.

For all of the above-stated reasons, the United States seeks admission of the defendant's pre- and post-fire statements and conduct that are direct evidence of the charged offenses, or alternatively admissible under the exceptions set forth in Rule 404(b).

## IX. Motion to Bar Evidence of Defendant's Law-Abidingness or Other "Good Acts"

The defendant may seek to introduce evidence of her past law-abiding conduct or other good acts. Evidence of "good" prior conduct is inadmissible under Federal Rule of Evidence 404(b) and should be disallowed. *See United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (prohibiting admission of "good acts" to prove that a defendant "had a good character and acted in conformity therewith"). *See also United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) ("Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment."); *United States v. Santos*, 65 F. Supp. 2d 802, 845-46 (N.D. Ill. 1999) ("A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions.").

Applied to this case, law-abidingness is not a pertinent character trait for the crimes with which the defendant is charged." *See Hill*, 40 F.3d at 169 ("Specific instances of law-abidingness . . . would [be] admissible only if law-abidingness was an essential element of the charge or defense" under Fed. R. Evid. 405(b)). *Id.* Similarly, evidence of other good behavior, such as the defendant's lawful operation of other businesses or the defendant's involvement in the church, is irrelevant because acts of honesty do not prove an absence of dishonest acts. *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("Evidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable.").

For these reasons, the court should preclude introduction of other good acts evidence.

## X. Motion to Admit Rule 1006 Summary Charts

The United States has obtained numerous business records associated with the defendant's restaurant and financial circumstances, hours of surveillance video taken on October

10, 2021, from residences and businesses in the vicinity of the defendant's restaurant, and voluminous electronic evidence associated with the defendant's cell phone and social media accounts. At trial, the United States intends to offer into evidence summary charts. Pursuant to Federal Rule of Evidence 1006, the contents of voluminous records which cannot be conveniently examined in court may be presented in the form of a chart or summary.

As to the business and financial records, the United States anticipates introducing summaries of documents and a timeline, which will be explained to the jury through the testimony of Kristin Fanta, an ATF forensic auditor. This testimony and evidence will assist the jury in understanding the financial performance of the restaurant and the financial and operational challenges faced by the defendant in the months leading to the fire.

Regarding the surveillance videos, the United States anticipates introducing compilations of relevant videos and video stills from different vantage points which will be introduced through a law enforcement witness. These compilations will help the jury focus on the time period immediately preceding the fire, will illustrate the defendant's arrival and departure from the vicinity of the restaurant during that time period, and will show the activation and deactivation of the restaurant's motion sensor light.

With respect to the electronic evidence obtained from the defendant's cell phone and social media accounts, the United States anticipates introducing summaries of pertinent communications which will be introduced through a law enforcement witness. The summaries will aid the jury in understanding the representations made by the defendant regarding the restaurant, the challenges she faced operating the restaurant, her state of mind regarding the restaurant and other career options, the circumstances immediately prior to the fire, and her comments about potential causes of the fire.

Rule 1006 requires a party seeking to introduce a summary of voluminous records to provide copies of those records to the opposing party at a reasonable time and place. In this case, all the underlying data and records have been available to the defense throughout the pendency of this case, the United States has preliminarily identified the statements it may include in the summary charts, and the charts will be included in the government's exhibits. *See, e.g., United States v. Isaacs*, 593 F.3d 517, 527 (7th Cir. 2010) (discussing admission of charts and summaries under Rule 1006); *United States v. Rangel*, 350 F.3d 648, 651 (7th Cir. 2003) (same).

Because the United States anticipates that all the elements of Rule 1006 will be satisfied, it requests that the Court admit the summary charts under Rule 1006 as substantive evidence and be made available to the jury to assist them during their deliberations.

**XI. Motion to Limit Scope of Defense Expert's Testimony**

While the United States did not file a formal *Daubert* motion challenging the qualifications of Dr. Michael Synodis or his opinions regarding lithium-ion batteries, it has raised concerns about the scope of his testimony in light of his expert disclosure, which did not satisfy the notice provisions of Rule 16. *See* ECF DKT 72. Dr. Synodis' expert disclosure includes the general claim that there were "multiple potential causes" of the fire but does not particularly identify those causes (other than lithium-ion batteries), does not include a complete statement of all of his opinions regarding causes of the fire, and does not explain the bases and reasons for his opinions about other potential causes. Nor is it clear from his disclosure whether he would be qualified to opine about other potential causes. For these reasons, Dr. Synodis should be prohibited from opining that there were "multiple potential causes" of the fire.

## XII. Conclusion

For the reasons stated above, the United States respectfully requests that the Court grant each of the United States' motions *in limine*.

Dated at Milwaukee, Wisconsin, this ____ day of September 2026.

Respectfully Submitted,

By: /s/ *Kelly B. Watzka &*
*Porchia S. Lewand*
Assistant United States Attorneys
Watzka Bar No. 1023186
Lewand Bar No. 1099830
Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin, 53202
Telephone: (414) 297-1700
E-mail: kelly.watzka@usdoj.gov
E-mail: porchia.lewand@usdoj.gov