UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 24-CR-236

ARLETTA ALLEN,

Defendant.

---

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE OR LIMIT TESTIMONY OF RICK HANKINS AND REQUEST FOR *DAUBERT* HEARING**

---

The United States of America, by and through its attorneys, Kelly B. Watzka and Porchia S. Lewand, Assistant United States Attorneys for the Eastern District of Wisconsin, hereby responds to the defendant, Arletta Allen's, motion to exclude or limit the testimony of Rick Hankins and request for a *Daubert* hearing. For the following reasons, the defendant's arguments are without merit and her motion and request for a hearing should be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

To aid the Court, the United States provides the following summary of the anticipated trial evidence relevant to the defendant's motion:

The charges in this case center around a fire that occurred on the evening of October 10, 2021, at "A Family Affair Soul Food Kitchen" ("the restaurant"), which was located in Fond du Lac, Wisconsin, and operated by the defendant. More specifically, at approximately 8:59 p.m., emergency services/911 in Fond du Lac received a report of a burning smell and the sight of thick smoke in the 400 block of S. Main Street. Firefighters responded and determined that the smoke was emanating from a vent on the roof of the restaurant. Because the doors and windows of the

restaurant were all closed and locked, the firefighters forced entry. Once inside, heavy smoke completely obscured the firefighters' vision. Through the use of a thermal imaging camera, firefighters saw flames near the landing for the stairwell that led to the basement and successfully extinguished the fire.

Law enforcement agents from the Wisconsin Department of Justice, Division of Criminal Investigations (DCI) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) became involved in the investigation of the fire. Investigators conducted interviews with individuals who witnessed the fire as well as individuals who were familiar with the building and/or the operation of the restaurant, including the defendant.

ATF Special Agent and Certified Fire Investigator Rick Hankins ("Hankins") and a team of other investigators conducted fire scene examinations on October 12, 2021, and October 14, 2021. During the examinations, investigators noted that the greatest concentration of fire damage inside the restaurant was near and above a shelf located on the north wall of the top landing of the basement staircase. This area was ultimately determined to be the area of origin for the fire. Investigators located two handheld lighters in a wall-mounted basket just outside the entry into the top of the basement staircase. Among numerous fire-damaged items recovered from the area of origin were remnants of charred towels, cardboard, napkins, and electrical circuits, appliances, and remnants of four battery cells. The battery cells were loose, with three having been located in fire debris underneath the shelving area and one partially hanging from the remnant of a shelf.

The business owner, defendant Allen, told investigators that the appliances on the shelf in the area of origin were plugged into a power strip that was itself plugged into a ceiling-mounted receptacle. She stated that the internet modem and cable TV box were located on the shelf in the top landing of the basement staircase and were plugged into that power strip. The defendant stated

she had not unplugged the power strip from the ceiling receptacle or turned off the power switch for that receptacle prior to leaving the restaurant that afternoon. Investigators examined the ceiling-mounted receptacle and found no evidence of blades plugged into the receptacle. They located a power strip with blades plugged into it, but the power strip itself was not plugged into any receptacle. They also found the wall mounted switch that controlled power to the ceiling mounted receptacle in the off position. Additionally, a representative from Spectrum, which provided internet and cable service for the restaurant, told investigators that those services went offline, i.e. were powered down, at the approximate time the defendant was observed leaving the restaurant on the afternoon of October 10th which was more than six hours before discovery of the fire.

Investigators inspected the restaurant's gas service and documented the pressure testing of kitchen gas appliances. During the examination, investigators did not locate any leaks or abnormalities in either the building's natural gas system or its appliances. Additional testing revealed no evidence of the presence of an accelerant in the area of origin.

Investigators collected several electrical artifacts from the fire scene, including the battery cells, for further forensic examination at the ATF Fire Research Laboratory by ATF Senior Electrical/Fire Research Engineer Cameron Novak. He examined the electrical components in the area of fire origin and did not locate evidence of electrical arcing which could be indicative of fire causation. Additionally, Novak found no affirmative evidence that any of the electrical appliances on the shelf unit were energized at the time of the fire, which reduces the likelihood that the fire was the result of an electrical failure. Through forensic examination, Novak identified the fire-damaged battery cells as 18650 lithium-ion battery cells. Novak's examination revealed that three of the cells had ruptured and ejected their contents and that the enclosure of one of the cells was

intact. Among other findings in his report, Novak made the following comments regarding the battery cells:

> Rupture and ejection of cell contents is an indication of failure caused by an increase in internal pressure and is an expected result of exposure to heat from a fire. Heating as the result of internal failure, however, can also manifest in increasing pressure, cell rupture, and ejection of contents. Failure of lithium-ion cells can be initiated by events such as physical damage, environmental heating, internal heating due to improper charging or discharging, or a manufacturing defect. These failure modes result in perforation of the cell insulator and result in a short circuit between the anode and cathode layers of the cell. While no physical deformity was noted during the examination, concluding that physical damage occurred pre-fire or post-fire due to collapse, displacement, recovery, etc. can be difficult. Environmental heating can occur because of the normal operating conditions where the batteries are stored or used. Internal heating, due to improper charging or discharging, often arises from use of a mismatched third-party charging device or utilizing cells in an inadvisable application exceeding the rating of the cell. As no charging or utilization device was recovered, a failure during charging or discharging is unlikely. Manufacturing defects can result in contaminants being introduced into the cell during the manufacturing process that can result in failure during normal use.
>
> The enclosure of one 18650 lithium-ion cell was intact. While it was noted that some of the cells had tabs suggesting use as part of a pack, the lack of context between individual cells (such as operating together in one pack of four or two packs of two or individual cells) prevents analyzing differential damage to ascertain if a cell was damaged due to internal failure or exposure to fire.

Although Novak concluded that the extensive damage observed on the battery cells was consistent with fire impingement, he could not determine forensically whether the damage was caused by external exposure to heat from the fire or internal failure.

Investigators conducted a neighborhood canvas and collected surveillance videos from nearby businesses and residences that captured activity in the vicinity of the restaurant prior to the fire. A surveillance camera at 406 South Center Street, which is a residence located approximately one block east of the restaurant, captured a dark SUV with distinctive tire rims drive north on Center Street and park near the intersection of 10th Street and Center Streed at approximately 8:33:03 p.m. At 8:34:27 p.m., that camera captured the image of person carrying a backpack and wearing dark clothing and a hood pulled over that individual's head. The person walked south on

Center Street. At approximately 8:37:03 p.m., a camera at a business located at 439 S. Main Street, which is on the corner of 11th Street and Main Street several buildings south of the restaurant, captured images of the same person walking north through the business's parking lot. At 8:37:54 p.m., the person reached the sidewalk in front of the restaurant and turned right towards the restaurant and out of view of the camera. At approximately 8:38:07 p.m. another camera at 406 S. Center Street captured images of illumination from the motion sensor light mounted near the rear entrance to the restaurant. The motion sensor light turned off approximately 11 seconds later at 8:38:18 p.m. At approximately 8:41:43 p.m. the camera at 439 S. Main Street captured images of the same person emerging from the area of the restaurant, walking south on the sidewalk, and then walking through the business's parking lot. At approximately 8:44:40 p.m., the camera at 406 S. Center Street captured images of the person walking north on the east side of Center Street. That same camera captured movement in the area near where the dark SUV with distinctive rims had parked. At approximately 8:45:22 p.m., the camera captured reflections of lights pulsing twice, consistent with a vehicle being unlocked, on the east side of Center Street. Approximately 5 seconds later, vehicle lights appeared to illuminate in the same area and then move north out of view of the camera. The 911 call alerting authorities to the sight of smoke and a burning smell in the area was made approximately 14 minutes later.

Investigators inspected the motion sensor light at the restaurant and determined that once it was activated it was set to remain illuminated for 3 minutes before deactivating unless a person manually turned off the light using a switch located inside of the restaurant. Investigators noted that the motion sensor light switch inside the restaurant was down, in the off position. The top of the switch was also covered in soot, which is consistent with the switch being in the off position at the time of the fire.

Although the defendant repeatedly insisted that she had not returned to the restaurant at any point after departing on the afternoon of October 10th, she eventually admitted to investigators that she had returned that night, purportedly to retrieve her laptop, payroll book, and pink checkbook. The defendant stated that she retrieved her pink checkbook from a shelf in the area of origin of the fire. The defendant stated that when she was in that area, she did not recall seeing any smoke or flames. The defendant also stated that she did not unplug anything or turn off the motion sensor light when she returned to the restaurant that night.

The defendant is charged with multiple offenses stemming from fire. Specifically, a grand jury returned a four-count indictment charging the defendant with (1) arson; (2) wire fraud; (3) arson in furtherance of another felony; and (4) making a materially false statement. The trial is scheduled to start on November 2, 2026.

Pursuant to this Court's pre-trial scheduling order, on July 10, 2026, the government filed several notices of expert testimony, including that of Hankins and Novak. *ECF 67*. Hankins' disclosure provided a summary of his proposed testimony, the origin and cause report authored by Hankins related to this case, as well as a statement of his qualifications. Summarized, Hankins will testify about his use of the Scientific Method, which is recommended by the NFPA 921[1], to conduct his origin and cause analysis and his ultimate conclusions that 1) the origin of the fire at the restaurant was on or near the shelves mounted on the north wall in the top landing of the basement staircase, 2) the cause of the fire was most likely the result of the intentional ignition of available

[1] NFPA 921 is not a mandate, but rather suggested guidelines for fire/explosive investigations. While it is widely accepted, the NFPA 921 itself cautions "anyone using this document should rely on his or her own judgment . . . in determining the exercise of reasonable care in any given circumstance. The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of NFPA standards." NFPA 921, 2024 edition, "Important Notices and Disclaimers Concerning NFPA Standards." Relevant provisions of the NFPA 921 will be cited herein.

or introduced combustible material by an open flame, and 3) the classification of the fire was incendiary, or intentionally set. Regarding the batteries found at the fire scene, Hankins considered lithium-ion battery failure as a possible cause of the fire but ultimately concluded that it was highly improbable in part because such failures are extremely rare events compared to the volume of lithium-ion batteries located in common everyday devices and because lithium-ion battery failures often occur when devices are being actively charged at the time of the failure, a circumstance not present here because the electrical receptacles in the area of fire origin were not energized at the time of the fire. Hankins also concluded that the totality of the evidence, including the timing of the fire development and its discovery, rendered the lithium-ion battery hypothesis unreasonable. In his opinion, an incendiary cause was more probable because the fire occurred shortly after a person left the building, a majority of fires are the result of human action or inaction, the efforts by that person to remain clandestine[2] suggested a nefarious purpose, and because of the presence of both an ignition source (lighters) and combustible materials (paper, cloth, cardboard, and plastic) in the area of origin.

On August 10, 2026, Allen filed a notice of expert testimony for Dr. Michael Synodis, a Principal Engineer with experience related to lithium-ion battery failure. Summarized, Dr. Synodis intends to testify that 1) there was insufficient testing[3] of the batteries recovered at the fire scene to exclude them as a potential cause of the fire; 2) Hankins improperly utilized "negative corpus"

---

[2] Those efforts include going to the restaurant in the dark after business hours, parking a distance away from the restaurant, wearing dark clothing (including a hood pulled over the person's head), and manually deactivating the motion sensor light.

[3] In light of Dr. Synodis' claims, the batteries were re-examined by Novak utilizing 3D Xray computer tomography this week. A supplemental report and related images will be produced to the defense as soon as they are available. The 3D Xray analysis did not alter Novak's original opinions regarding the batteries, namely that forensic examination of the batteries is inconclusive as to whether the damage was caused by external fire impingement or by internal battery failure.

to conclude that the fire was intentionally set; and 3) the fire should have been classified as undetermined. *ECF 68.*

On September 3, 2026, Allen moved to exclude or limit the testimony of Hankins and requested a *Daubert* hearing. Allen alleges that Hankins' methodologies in determining the cause of the fire were not reliable, that his opinions regarding the cause of the fire are not helpful to the jury and violate the federal rules of evidence, and that he is unqualified to testify regarding lithium-ion batteries.

She is mistaken. Hankins is amply qualified, applied reliable methodology rooted in the scientific method, drew reasonable inferences from the facts based on his training, experience, and judgment, and reached a conclusion based on the totality of the investigation regarding the most probable cause of the fire. His testimony will certainly aid the jury in understanding fire dynamics and a complicated fire scene and examination. His testimony is consistent with both the spirit and letter of Rule 702 and Allen's motion should be denied.

## II. APPLICABLE LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admission of expert testimony and provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

A district court is not required to conduct an evidentiary hearing every time the reliability of an expert's methods is put at issue under Rule 702. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999); *see also Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (there is no "specific form" a "*Daubert* inquiry" must take); *United States v. Johnson*, 916 F.3d 579, 587 (7th Cir. 2019) (no requirement that district court conduct a hearing to assess reliability).

**A. QUALIFICATIONS**

A court should consider "a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "An expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact - experience is an equally valuable teacher." *Artis v. Santos,* 95 F.4th 518, 526 (7th Cir. 2024).; citing *Kumho Tire Co.* at 156 ("But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); see also *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("The notion that *[Daubert]* requires particular credential for an expert witness is radically unsound. The Federal Rules of Evidence . . . do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character . . . anyone with relevant expertise enabling him to offer responsible testimony helpful to judge or jury may qualify as an expert witness.").

"An expert's specialization or lack thereof, typically goes to the weight of the testimony, not its admissibility." *Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023) (internal quotations omitted); *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) (noting that courts do not ordinarily impose requirement that an expert be a specialist in a given field to be qualified.").

### B. RELIABILITY

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993), trial courts are to serve as gatekeepers, permitting expert testimony only after receiving satisfactory evidence of its reliability. *Daubert* included a non-exclusive list of factors to aid judges in determining whether particular expert opinion is grounded in reliable scientific methodology. Among the factors articulated are: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community. *Id.* at 593–94. *Daubert* is intended to be a flexible test in which no single factor is dispositive. *Kuhmo Tire Co*., 526 U.S. at 151-152.

The issue of reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.,* 732 F.3d 796, 806 (7th Cir. 2013). To satisfy the requirements of Rule 702, there need only be a "rational connection between the data and the opinions." *Id.* at 809. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith,* 215 F.3d at 718. "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012), quoting *Daubert* 509 U.S. at 596.

Rule 702 was amended in 2023 to clarify that proffered expert testimony must satisfy the preponderance of the evidence standard set forth in Federal Rule of Evidence 104(a). The amendment was prompted by a concern that courts were deferring critical questions related to the sufficiency of an expert's basis and the application of the expert's methodology for the jury to determine. Yet, the committee made clear that "some challenges to expert testimony will raise matters of weight rather than admissibility even under the Rule 104(a) standard" and that the amendment does not require "the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." *Fed. R. Evid. 702, 2023 Amendments.* Additionally, the committee noted:

> It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit. '[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable... The evidentiary requirement of reliability is lower than the merits standard of correctness.'

*Id.* (internal citations omitted).

Although the December 2023 amendment underscores that the application of the expert's methodology is a question of admissibility and not of weight, courts have since found that when an expert's methodologies have been employed with the "soundness and care" expected of them, attacks beyond that, such as a critique of the correctness of the experts' conclusions, remain best suited for cross-examination. *Williams v. State Farm Mut. Auto. Ins. Co.*, 2026 WL 673434, at *2 (N.D. Ill. Mar. 10, 2026). Indeed, the Seventh Circuit recently held in a case involving competing expert opinions, "'[e]xpert testimony is still testimony, not irrefutable fact, and its ultimate persuasive power is for the jury to decide.'" *United States v. Andrews,* 172 F.4th 960, 969 (7th Cir.

2026). Any criticisms of how the government expert conducted his methodology were “fodder for cross examination, not grounds for exclusion.” *Id*. at 968, quoting *Artis* at 527.

### C. HELPFULNESS

Rule 702(a) also requires that the purported expert testimony will help the jury understand the facts at issue. "Rule 702's ‘helpfulness’ standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert* at 591–92. “In evaluating a Rule 104(a) proffer of expert testimony, the ultimate test is whether the testimony would assist the trier of fact in understanding the evidence.” *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996)(internal citation omitted). If an expert's testimony is helpful to the jury, it is admissible even if it “cover[s] matters that are within the average juror's comprehension.” *Id*.

The committee notes for Rule 702 caution against interpreting the helpfulness standard narrowly, noting that the rule “requires that the expert's knowledge ‘help’ the trier of fact to understand the evidence or to determine a fact in issue. Unfortunately, some courts have required the expert's testimony to ‘appreciably help’ the trier of fact. Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict." Fed. R. Evid. 702, 2023 Amendments.

## III. ARGUMENT

### A. HANKINS IS QUALFIED TO OPINE ON FIRE SCIENCE, INVESTIGATION, ORIGIN AND CAUSE, AND LITHIUM-ION BATTERIES

Hankins has been qualified as an expert in fire investigation and has testified in that capacity nearly a dozen times, including on four occasions in federal courts within this district. He has served as a certified fire investigator for approximately 19 years and has responded to and investigated more than 315 fires, during which he participated in origin-and-cause determinations.

In addition, he has conducted more than 275 live-fire exercises and has completed over 1,700 hours of fire-related training and education. His experience includes classifying fires as incendiary, accidental, natural, and undetermined. Since September 2024, Hankins has served as the ATF Certified Fire Investigator Program Manager, responsible for overseeing the training, development, and certification of ATF fire investigators nationwide. In that role, he is not merely a consumer of evolving fire-science knowledge — he is one of the individuals responsible for ensuring that certified federal fire investigators are trained to the highest, most current standards.

Hankins is also uniquely positioned to testify about the relationship between lithium-ion batteries and fire dynamics. Although the scientific understanding of lithium-ion batteries has advanced significantly since this investigation began in 2021, Hankins' knowledge and expertise has advanced in parallel. The evolution of NFPA 921 underscores the rapidly developing nature of lithium-ion battery fire science. Prior to 2021, the guide contained no section at all on lithium-ion batteries. The 2021 edition added only a cursory paragraph. By contrast, the 2024 edition now includes six dedicated sections addressing lithium-ion battery hazards, behavior, and fire dynamics. Hankins has remained fully current with these updates and has incorporated them into his investigative methodology and conclusions. Since 2021, he has undertaken an additional 319 hours of fire-science and investigation training to ensure his knowledge reflects the latest research and industry standards on all topics of fire dynamics and investigation. Despite the evolving nature of lithium-ion battery fire science, Hankins' origin-and-cause conclusions in this case remain fully supported and unchanged.

Additionally, Hankins is not the only qualified expert the government intends to present on the topic of lithium-ion batteries. As indicated above, ATF Engineer Novak will testify regarding the laboratory examination of the batteries conducted at the ATF research facility, as well as

regarding the fire dynamics specific to lithium-ion batteries, thermal runaway, fire causation, and fire impingement, as set forth in his expert disclosure. Novak's examination and analysis informed Hankins' conclusions regarding the cause of the fire and, pursuant to Rule 703, it was reasonable for him to rely on Novak. Because the recovery, condition, and forensic examination of the batteries are data points contemplated in Hankins' overall origin-and-cause analysis, preventing him from addressing them would create the unfair impression that the scientific method he employed was not thorough, undermine the reliability of his expert opinion, and risk confusing the jury. Hankins' testimony concerning the batteries is relevant to his overall origin-and-cause determination which should reflect the totality of his investigation, including the timing of the fire in relation to other critical data points identified in his disclosure. Hankins' testimony and Novak's testimony are complementary, not duplicative, and together provide the jury with a complete, coherent, and scientifically grounded understanding of how the fire occurred.

Hankins' prior testimony, extensive experience, leadership within ATF, evolving expertise, and reliance on the expertise and analysis of Novak, plainly establish that he is more than qualified to offer reliable, relevant expert testimony regarding fire science, fire investigation, origin-and-cause, and the significance of lithium-ion batteries in this fire.

### B. HANKINS RELIABLY APPLIED HIS EXPERTISE

In conducting his origin-and-cause analysis, Hankins employed the scientific method recommended by NFPA 921. Section 3.3.171 of NFPA 921 defines the scientific method as "the systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of hypotheses, and where possible, the selection of a final hypotheses." Hankins adhered to the NFPA 921 recommendations he determined were applicable to the fire

scene investigation and also relied on other materials, ATF guidelines, his training, experience, and judgment.

Experts whose opinions are based on accepted professional standards and industry methods satisfy Rule 702's reliability requirement. That the scientific method set forth in NFPA 921 is widely recognized as a reliable methodology by fire investigators is not in dispute in this case. In assessing the reliability of an expert's methodology, "[t]he trial court must use the criteria relevant to a particular kind of expertise in a specific case to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Smith* at 719. For this reason, courts have broadly endorsed NFPA 921. *See Am. Home Assurance Co. v. Makita Corp. of Am.*, 752 F. Supp. 3d 1028, 1048 (N.D. Ind. 2024) (NFPA 921 is a recognized guide for use by fire investigators in the fire investigation process); *Booth v. Black & Decker, Inc.,* 166 F.Supp. 2d 215, 220 (E.D. Pa. 2001)(the methodology provided by NFPA 921 is accepted as reliable given its "comprehensive and detailed treatment of fire investigations."); *Allstate Ins. Co. v. Hamilton Beach/Proctor-Silex, Inc.*, No. 2008 WL 3891259, at *6 (W.D. Pa. Aug. 19, 2008) (The step-by-step procedure of the method outlined in NFPA 921 provided the appropriate "standards controlling the technique's operation.").

Because Hankins employed the scientific method set forth in NFPA 921, his methodologies align with accepted and reliable investigative practices. The defendant's assertion that his investigation and conclusions were merely based on "personal opinions" ignores 30 pages of Hankins' origin-and-cause report which thoroughly discusses numerous data points, his analysis of that data, experiments conducted, and hypotheses considered—exactly as required by NFPA 921. Those data points include:

- the building's construction, including electrical and gas employment;
- witness statements, including the fire department personnel, the 911 caller, and defendant's own statements;
- a systematic processing of the scene including a damage assessment;
- excavation of fire debris and gas pressure testing;
- surveillance video;
- motion light examination and experimentation;
- internet and cable analysis;
- switch for purported problematic ceiling outlet;
- natural gas and appliance examination; and
- forensic electrical examinations completed at the ATF research laboratory.

Hankins' consideration of all of the above-referenced data points and the hypotheses he tested are consistent with industry standards and the scientific method, establishing the reliability of his methodology.

**i. Hankins was not required to eliminate every theoretical alternative before reaching an incendiary cause opinion**

The defendant claims that Hankins' opinions regarding the fire are unreliable because he did not exclude the possibility that one or more lithium-ion batteries failed internally and caused the fire. But that argument conflates mere possibility with a reasonable, evidence-based alternative hypothesis and imposes a standard that neither Rule 702 nor NFPA 921 requires.

Although the Committee Notes to Rule 702 suggest that a reliable expert should consider alternative causes, they do not require an expert to rule out every alternative cause. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013). The failure to exclude alternative causes is not a basis for exclusion. *Burton v. Am. Cyanamid*, 362 F.Supp.3d 588, 601 (E.D. Wis. 2019). "That [an expert] did not consider and exclude all possible factors . . . goes to the weight and not the admissibility of his testimony." *Id.*; see also *In re Testosterone Replacement Therapy Prods.*

*Liab. Litigation*, 2023 WL 7183216 at *6 (N.D. Ill. Nov. 1, 2023) ("An expert's opinion is not unreliable simply because some other piece of evidence, if it were to exist, might disprove the opinion . . . [the defense] is welcome to press at trial its theory that the evidence [the expert] considered does not remove doubt that a carotid artery dissection occurred, but that is an argument for the jury, not a basis to exclude his opinion.").

The Seventh Circuit's analysis in *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815 (7th Cir. 2012) is instructive. In *Lapsley*, the court affirmed the admission of expert causation testimony related to an industrial accident where the expert's opinions were based on known facts, consideration of alternative explanations, and a hypothesis that best fit the evidence. *Id.* In doing so, the court rejected the defendant's argument that the expert was unreliable, and his opinion was speculative because he could not identify every detail concerning how a relevant mechanism functioned or determine with absolute certainty the precise cause of the accident. *Id.* at 814. The court commented that the focus of Rule 702 is on whether the expert's causation hypothesis was reliably supported and applied to the known facts, such that it rises above speculation and becomes a presentable probability. *Id.*, citing *Smith* at 718-719 (hypothetical explanations of probable causes permitted where they have "analytically sound bases" beyond mere speculation).

Similarly, NFPA 921 does not require an investigator to affirmatively exclude a possible cause when the available data and the investigator's expertise otherwise establish the most probable cause of the fire. As one district court noted, "The manual does not state that alternative hypotheses *must* be excluded, or are *required* to be excluded. It simply suggests that categorical exclusion of alternative causes, when possible, is the best practice." *Farm Bureau Prop. & Cas. Ins. Co. v. CNH Indus. Am. LLC*, 2018 WL 2077727, at *8 (N.D. Iowa Feb. 5, 2018).

NFPA 921's scientific-method framework directs the investigator, after testing the hypotheses, to determine whether "there are any other hypotheses that are consistent with the data" and to document the facts supporting the final hypothesis "to the exclusion of all other *reasonable* hypotheses." NFPA 921 § 4.3.7 (emphasis added). The same methodology recognizes that the inability to refute a hypothesis does not establish that the hypothesis is true. NFPA 921 § 4.3.6.1. Further, NFPA 921 § 4.5.1.1. differentiates between probable and possible hypotheses: "Two expressions of certainty commonly used are probable and possible, as follows: (1) *Probable*. This expression corresponds to being more likely true than not. (2) *Possible*: The hypothesis may be demonstrated to be feasible but cannot be either ruled out or declared probable. If two or more hypotheses are equally likely, then the expression must be 'possible.'" Thus, NFPA 921's methodology is concerned with testing hypotheses against the evidence - not converting every possibility that survives absolute elimination into an equally viable cause.

That measured approach makes particular sense in the context of fire investigation, which frequently involves destroyed or partially consumed evidence, incomplete information, and circumstances in which an investigator is likely unable to reconstruct every physical event with absolute certainty.

Here, Hankins did not simply ignore the possibility of lithium-ion battery failure. Nor has he claimed that an internal battery failure was physically impossible. Rather, he considered it as a possible ignition source and evaluated it against the available evidence in this case, including the fact that the batteries were loose and were not actively charging at the time of the fire. He also considered the extremely rare nature of lithium-ion battery failures and noted that forensic examination of the batteries was inconclusive as to whether the extensive damage to the batteries were caused by exposure to the fire or an internal battery failure that preceded the fire. As noted

above, Hankins found the presence of a human inside the restaurant minutes before the fire was reported, that human's efforts to conceal their presence, the timeline of the fire development, the presence of lighters (ignition source) and charred paper, cloth, cardboard, and plastic (fuel source) in the area of origin significant to his analysis. Based on all of that data, Hankins concluded that it was highly improbable that battery failure caused the fire and that the fire was most likely caused by the human introduction of flame to combustible materials. In other words, Hankins concluded that these two hypotheses were not equally likely.

The defendant or her expert may disagree with Hankins' interpretation of the above-referenced facts or the weight he attributed to them. She may also disagree with his conclusion that battery failure was highly improbable. But those disagreements do not demonstrate that Hankins failed to consider an alternative cause or that his methodology was unreliable. Rather, Hankins appropriately applied the scientific method to a competing hypothesis, determined that it was merely possible, and concluded that another hypothesis was probable.

**ii. Hankins did not employ Negative Corpus**

Allen contends that Hankins improperly engaged in negative corpus by using a process of elimination. This argument misunderstands both NFPA 921 and the scientific method. NFPA 921 § 19.6.5 differentiates between the process of elimination and the concept of negative corpus:

> The process of elimination is an integral part of the scientific method. All potential ignition sources present, or believed to be present in the area of origin should be identified and alternative hypotheses should be considered and challenged against the facts. Elimination of a testable hypothesis by disproving the hypothesis with reliable evidence is a fundamental part of the scientific method. However, the process of elimination can be used inappropriately. Identifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as *negative corpus*. Determination of the ignition source must be based on data or logical inferences drawn from that data.... Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence), must be based on the analysis of facts

> and logical inferences that flow from those facts. Those facts and logical inferences are derived from evidence, observations, calculations, experiments, and the laws of science. Speculative information cannot be included in the analysis.

NFPA 921 explicitly recognizes the process of elimination as a core component of the scientific method when supported by investigative data. Negative corpus, by contrast, occurs only when an investigator eliminates all known potential ignition sources and then claims an ignition source for which no supporting evidence exists. As one district court recognized, negative corpus is 'the process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is *no supporting evidence* of its existence.' *United States v. Thomas*, 2022 WL 36098, at *9 (N.D. Ind. Jan. 3, 2022) (internal citations omitted).

That is not what happened here. By NFPA 921's own definition, Hankins did not employ negative corpus in this case. He did not conclude that the fire was incendiary simply because he was unable to identify an accidental cause. Nor did he reason that, because the fire remained unexplained after potential accidental causes were considered, the only remaining explanation was arson. Instead, Hankins identified and relied upon affirmative, case-specific data bearing directly on his analysis of the cause of this fire, including human presence immediately before the fire, concealment behavior, the timeline of the fire's development, and the presence of ignition sources and charred combustible materials in the area of origin.

The temporal relationship between these data points - namely observed human activity and the fire - is particularly important. Hankins did not simply observe that a person had been in the building at some unspecified time. He noted that the evidence placed the person's presence within a very short and defined period immediately preceding the fire. That proximity in time was

significant, particularly in light of NFPA 921 § 11.1 guidance that "The initiation, development, and consequences of many fires and explosions are either directly or indirectly related to actions or omissions of people associated with the incident scene. As such, the analyses of fire-related human behavior will often be an integral part of the investigation." Hankins also reasonably considered the person's concealment behavior. *See* NFPA 921 § 23.4.8.1 (The timing of a fire to coincide with conditions or circumstances that increase the chances of successful destruction of a property or assist in avoiding apprehension is recognized as a possible indicator of an incendiary fire).

The cases on which the defendant relies each involved circumstances where an expert's opinions were limited or excluded because they had not cited any affirmative evidence that independently supported their conclusions. For example, Allen cites *Russ v. Safeco Ins. Co. of America*, 2:11-cv-195, 2013 WL 1310501, at *25 (S.D. Miss. Mar. 26, 2013), where the expert's opinion that a fire involved human activity was excluded as pure speculation with no evidentiary basis.

This case is more akin to *Ball Corp. v. Air Tech of Michigan, Inc.,* 2022 WL 1801120, at *7 (N.D. Ind. June 2, 2022), in which the district court denied a motion to exclude the plaintiff's expert based upon a claim that he engaged in negative corpus. In that case, the court commented:

> Although Mr. Howell used the process of elimination in reaching his conclusion, he had supporting evidence and, therefore, did not engage in "negative corpus." . . . The evidence supporting his theory included witness accounts of the fire, evidence that dust was left in the oven after cleaning, dust adhered to cans after going through the oven, and the deposit discovered in the exhaust blower. The "negative corpus" argument does not merit exclusion. The remainder of the Defendant's arguments about causation relates to what it considers to be "speculative" reasoning, ignoring or misconstruing evidence, and failing to adequately consider alternative hypotheses. Again, the Court has difficulty understanding how these arguments are anything other than questioning the underlying facts or the correctness of Mr. Howell's opinion. That is not the Court's role under Rule 702 and *Daubert*.

*Id*. (internal citations omitted).

In this case, Hankins systematically evaluated multiple hypotheses, including electrical and gas failures, and documented why each potential accidental cause was either eliminated or highly improbable. Crucially, he identified affirmative evidence demonstrating that the fire was incendiary, including the charred remnants of cloth towels, paper napkins, cardboard, and plastics at the origin—materials that could serve as the initial fuels – and the presence of lighters in the vicinity of the origin – a potential ignition source. He further documented that an individual was present at the scene moments before the fire was reported, despite the establishment being locked and closed, and that the individual took multiple steps to conceal herself, providing additional corroborating evidence of human involvement.

Hankins' origin-and-cause report further notes that the defendant initially denied returning to the restaurant after closing several hours before the fire. Only after being confronted with surveillance images of an individual matching her physical appearance approaching the closed business in the dark did Allen admit she had gone back to the restaurant. Hankins' report also documented the defendant's claims regarding her reaction to an alleged sparking outlet on the morning of October 10th, and the reasons why significant aspects of her story were demonstrably false. Standing alone, these data points are not sufficient to establish cause, but they are nevertheless relevant corroboration of Hankins' incendiary hypothesis. *See* NFPA 921 § 23.3 (investigators may consider factors unrelated to combustion that are suggestive of a person's prior knowledge of a fire to develop hypotheses and further their investigation). Hankins reasonably considered the defendant's lies to fire investigators about her whereabouts at the time of the fire, as well as the fact that she provided false information related to potential ignition sources (i.e. the sparking outlet story) that could be excluded.

While the defendant's expert claims that Hankins engaged in negative corpus, his conclusion is based on nothing more than his belief that the above-referenced data points were insufficient to support Hankins' incendiary classification. That type of disagreement is not a basis for excluding Hankins' testimony. *Ball Corp* at *7; *See also Jolly v. Hoegh Autoliners Shipping AS*, 2024 WL 1976954, at *9 (M.D. Fla. Jan. 26, 2024) ("All the fire cause and origin expert witnesses in this case, including those cited by Grimaldi, acknowledge that a car is a possible fire ignition source. The experts merely disagree about how likely the car is to have been the ignition source. Where experts offer competing theories of a case, so long as both methodologies are reliable, 'the solution is not to exclude the experts but rather to let the jury decide whose testimony is more credible.') (internal citation omitted).

Hankins' conclusions were based on affirmative, supporting data consistent with NFPA 921 and fully aligned with accepted fire-investigation methodology. The Court should reject the defendant's suggestion that negative corpus, which played no role in this investigation, is a basis for exclusion under *Daubert*.

**iii. Strict compliance with NFPA 921 is not required to establish reliability**

Although the United States maintains that Hankins' investigation comfortably adhered to NFPA 921, even if the Court were to conclude that he deviated from portions of the guide, that alone would not justify excluding his testimony. As NFPA 921 § 1.3.2 acknowledges, because every fire "is in some way unique and different from any other, this document is not designed to encompass all the necessary components of a complete investigation or analysis of any one case. The scientific method, however, should be applied in every instance." It is up to the fire investigator to determine which recommended procedures apply in a particular circumstance. NFPA 921 § 1.3.3.

Additionally, NFPA 921 is a set of recommended guidelines - not an inflexible mandate - and minor departures do not render an investigator's methodology unreliable under Rule 702. As one court noted:

> Even though courts may consider the NFPA 921 guideline reliable, this does not mean that any deviation from that guideline renders a methodology unreliable. *See Pekarek v. Sunbeam Prods., Inc.*, 672 F. Supp. 2d 1161, 1175 (D. Kan. 2008) ("[F]ailure to strictly adhere to NFPA 921 does not render an investigation *per se* unreasonable."); *see also Schlesinger,* 898 F. Supp. 2d at 502–05 (denying petitioner's ineffective assistance of counsel claim because the Court would have admitted government's fire experts' testimony even though it may have not strictly complied with NFPA 921); *see also Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008) (writing that deviations from NFPA 921 are not necessarily wrong or inferior since the avowed "purpose of NFPA 921 'is to establish guidelines and recommendations' ") (quoting NFPA 921 ch. 1.2) (emphasis added).

*Thomas* at 9.

> Despite the NFPA 921 guidelines advising that negative corpus should not be used, courts have still found that "the absence of an accidental explanation for a fire [is] a sufficient basis for a finding of arson." *Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1171 (D. Minn. 2012) (collecting cases); *see Schlesinger*, 898 F. Supp. 2d at 505 (finding that even though NFPA 921 counseled against using negative corpus, "[t]he decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the [expert's] methodology – *e.g.*, the failure to rule out other possible causes – goes to the weight of the evidence not its admissibility").

*Id.* at 10.

Notably, the Court in *Thomas* found that the fire investigator, "used a process of elimination *with* additional supporting evidence. The specific pieces of supporting evidence that the court found persuasive included that the investigator, "(1) examined burn patterns, heat, fire, and smoke damage, and identified points of origin; (2) considered the possible causes of the fire; and (3) eliminated as possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no internal power source." *Id.*

Hankins did exactly those same things in this case. Any argument that Hankins failed to follow particular provisions of NFPA 921 does not invalidate the reliability of his testimony. He

followed the scientific method and reasonably relied on his training, experience, and judgment to support his findings.

### C. HANKINS' TESTIMONY WILL MEANINGFULLY AID THE JURY'S DETERMINATION

The defendant asserts that Hankins' opinions regarding his incendiary classification are unnecessary because he relies on facts easily understood by the jury. In doing so, the defendant essentially asks the Court to draw an artificial line between "scientific facts" and "common-sense facts" and to prohibit Hankins from testifying about the latter. Her motion rests on a fundamental misunderstanding of Rule 702, which contains no such limitation. The question is not whether every fact considered by a fire-investigation expert is itself "scientific." The question is whether the expert's specialized knowledge will assist the jury in determining a fact in issue. Fed. R. Evid. 702.

The defendant's argument improperly isolates several factual circumstances considered by Hankins - notably the presence of a person at the restaurant shortly before the fire, the person's manner of entering the building, and the chronology of events - and characterizes those circumstances as matters of common sense. But that characterization does not answer the Rule 702 question. Hankins was asked to consider those facts, together with the physical evidence, scene examination, fire dynamics, elimination of accidental causes, timing, witness statements and other investigative information, and apply his specialized knowledge and methodology to determine the classification of the fire. That is precisely the type of analysis contemplated by Rule 702. The fact that a lay juror can understand an individual piece of evidence does not mean that an expert is prohibited from testifying about that evidence as part of his specialized analysis.

Additionally, Rule 703 expressly permits an expert to base an opinion on facts or data of a type reasonably relied upon by experts in the field. The NFPA 921 makes clear that human data

points – like the surveillance video and witness statements -  are the precisely the kinds of facts that fire investigators should rely upon. As noted above, NFPA 921 § 11.1 instructs that "The initiation, development, and consequences of many fires and explosions are either directly or indirectly related to actions or omissions of people associated with the incident scene. As such, the analyses of fire-related human behavior will often be an integral part of the investigation."  Further, § 14.1.3 instructs that when evaluating data, the fire investigator should use "the fire investigator's common sense, the fire investigator's personal knowledge and experience, the information source's reputation, or the source's particular interest in the results of the fire investigation." The same section instructs fire investigators to evaluate source information for consistency with other data.

In isolation, a juror may understand that a person entering a building minutes before a fire is significant or that a person entering a building surreptitiously may be suspicious. However, standing alone, those observations do not answer the question of whether a fire should be classified as accidental, natural, undetermined, or incendiary.  That determination requires an expert to place those circumstances in the context of the fire investigation as a whole.

To support her argument, the defendant relies on *Somnis v. Country Mut. Ins. Co.*, 840 F.Supp.2d 1166 (D. Minn. 2012), in which a fire investigator concluded that a fire in a homeowner's house was the result of an intentionally set fire after the investigator simply eliminated all accidental fire causes. *Id.* at 1169. The district court excluded the expert's testimony based, in part, on its conclusion that the expert did nothing more than draw an inference that the jury was capable of drawing on its own. *Id.* at 1173,  The court reasoned that an expert who simply "draws inferences or reaches conclusions within the jury's competence" does not provide "helpful" testimony under Rule 702. *Id.* (internal citation omitted). But even *Somnis* held that testimony

from a qualified expert "should be admitted if it advances the trier of fact's understanding *to any degree*." *Id.* at 1170 (emphasis added).

More significantly, the defendant's reliance on *Somnis* is misplaced, as it is inconsistent with Seventh Circuit precedent. *See Hall* at 1342; *United States v. Lundy*, 809 F.2d 392 (7th Cir. 1987). In *Hall*, the Seventh Circuit found that a district court misapplied the helpfulness standard in excluding an expert's testimony just because it determined that jurors could comprehend some or all of the evidence underlying the expert's opinion. The Seventh Circuit held that exclusion is not required "just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *Hall* at 1342.

In *Lundy*, a defendant convicted of arson appealed the district court's decision to allow an expert to testify regarding his opinion that the fire was "purposely set - incendiary in origin," arguing that 1) the expert merely summarized facts fully comprehensible to the lay jury; 2) the expert's testimony was based on non-expert opinions formed by interviewing various witnesses, nearly all of whom testified at trial; and 3) the expert's opinion was based on consideration of the alleged arsonist's opportunity, motive and plan (which a jury could equally well comprehend), rather than by evaluating technical or scientific evidence. *Id.* at 395. In rejecting those arguments, the court noted:

> [H]earsay and third-party observations that are of a type normally relied upon by an expert in the field are properly utilized by such an expert in developing an expert opinion . . . [Here, the expert] presented uncontroverted evidence that interviews with many witnesses to a fire are a standard investigatory technique in cause and origin inquiries. In addition, [the expert's] opinion was also based heavily on his own investigation, which ruled out most accidental causes and suggested that an accelerant had been used. [The expert] never testified that Lundy or anyone in particular caused the fire.

*Id*. at 395-396 (internal citations omitted).

Similarly, Hankins will not be asked to identify the defendant as the person on the surveillance video. Nor will he opine that the defendant is guilty of arson. So, while the defendant claims that allowing Hankins to testify about his classification of the fire as incendiary is tantamount to telling the jury what to do, there is no danger of that occurring here. *Lundy* makes clear that a qualified expert is permitted to opine that a fire is incendiary without offending the rules of evidence. Nothing in Rule 702 or *Daubert* bars a fire investigator from characterizing a fire as incendiary and Allen provides no binding authority for her claim that such testimony violates Rule 704(b)'s prohibition against testimony regarding a defendant's mental state.

Additionally, *Somnis* appears to be an outlier in the context of fire investigation, as other courts have rejected its holding. *See Chapman v. State Farm Fire & Cas. Co.,* 2018 WL 4140705, at *2 (E.D. Mich. Aug. 30, 2018) ("The Court declines to follow *Somnis* because the existence of simultaneous ignition points being evidence of a deliberately created fire cannot necessarily be deduced by laypersons exercising simple logic."); *United States v. Peneaux,* 81 F. Supp. 3d 764, 768 (D.S.D. 2014) ("The Government's cause-and-origin expert will be allowed to opine that the fire was incendiary, which is one of four classifications - natural, accidental, undetermined, and incendiary - that cause-and-origin experts typically decide. However, the cause-and-origin expert should not opine on whether the fire was set "maliciously" or "willfully" as these are ultimate facts for the jury."); *Lise St. Cyr v. Flying J Inc.,* No. 3:06–cv–13, 2008 WL 2608127, at *7 (M.D.Fla.2008) ("The cause and origin of fires as well as other scientific and technical matters that will arise in this case are neither matters of common sense nor common knowledge."); *United States v. Santiago,* 202 Fed.Appx. 399, 401 (11th Cir.2006) (determinations of origin and cause of a fire are often beyond the understanding of the average lay person).

Fire science is complex and Hankins' testimony will assist the jury in understanding how and why this fire was properly classified as incendiary. This assistance is particularly critical because the government intends to introduce evidence that Allen attempted to advance alternative explanations - such as 'smelling gas' or seeing 'electrical sparks' prior to the fire - claims that were scientifically disproven and fall well outside common experience. The same is true of Hankins' analysis of burn patterns, the absence of electrical arcing, testing of natural-gas appliances, and the relevance of lithium-ion batteries and their prevalence as fire hazards. These subjects fall well outside the typical knowledge of lay jurors, particularly as they relate to determining whether a fire was intentionally set rather than accidental. Understanding how these factors operate within the broader framework of fire dynamics - and how Hankins used them to reach his classification - is precisely the type of expert guidance Rule 702 envisions.

This need for expert clarification is further underscored by the fact that Allen's own expert intends to testify that the fire should have been classified as undetermined. The jury will require reliable expert testimony to evaluate that claim, and Hankins provides precisely the type of scientific, methodical analysis Rule 702 contemplates.

For all of these reasons, the Court should reject the defendant's claims that Hankins' opinions are not helpful or invade the province of the jury.

## IV. CONCLUSION

The defendant's suggestion that Hankins is an unqualified expert offering a personal opinion based on an assumption that anything unexplained must be arson is neither supported by the facts nor the relevant case law. To the contrary, Hankins is a nationally recognized expert in fire investigation who utilized a reliable methodology, applied that methodology to the evidence in this case, considered the alternative hypothesis advanced by the defendant, explained why that

hypothesis is highly improbable, and explained why the evidence taken as a whole supports his classification of this fire as incendiary. The defendant's disagreement with Hankins' conclusions is properly addressed through cross examination and her own expert's testimony, not exclusion under *Daubert*.

For all of the above-stated reasons, the United States respectfully requests that the Court deny the defendant's motion and request for a *Daubert* hearing.

Dated at Milwaukee, Wisconsin, this 24th day of September 2026.

Respectfully Submitted,

KELLY B. WATZKA
PORCHIA S. LEWAND
Assistant United States Attorneys

By: /s/ *Kelly B. Watzka &*
*Porchia S. Lewand*
Watzka Bar No. 1023186
Lewand Bar No. 1099830
Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin, 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-mail: Kelly.watzka@usdoj.gov
E-mail: porchia.lewand@usdoj.gov